2012-1649, -1650

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SOVERAIN SOFTWARE LLC,

Plaintiff-Appellee,

v.

VICTORIA'S SECRET DIRECT BRAND MANAGEMENT, LLC,

Defendant-Appellant,

and

AVON PRODUCTS, INC.,

Defendant-Appellant.

**Appeals from the United States District Court for the Eastern District of Texas in case no. 09-CV-0274, Chief Judge Leonard Davis.**

## OPENING BRIEF OF DEFENDANT-APPELLANT AVON PRODUCTS, INC.

Gaston Kroub
LOCKE LORD, LLP
3 World Financial Center, 20th Floor
New York, NY 10281
Tel: (212) 415-8600
Fax: (212) 303-2754
gkroub@lockelord.com

Daryl L. Joseffer
  *Principal Attorney*
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 737-0500
Fax: (202) 626-3737
djoseffer@kslaw.com

Adam M. Conrad
KING & SPALDING LLP
100 N. Tryon Street, Suite 3900
Charlotte, NC 28202
Tel: (704) 503-2600

*Attorneys for Defendant-Appellant Avon Products, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellant Avon Products, Inc. certifies the following:

1.    The full name of the party represented by me is Avon Products, Inc.

2.    The name of the real party in interest represented by me is Avon Products, Inc.

3.    Avon Products, Inc. is a publicly owned company (NYSE: AVP) with no parent company.  There are no publicly held companies that own 10% or more of Avon Products Inc. stock.

4.    The names of all firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:

Greenberg Traurig: Barry J. Schindler; Dwayne L. Mason; Kimberly A. Warshawsky; Mary-Olga Lovett; Michael A. Nicodema

King & Spalding LLP: Daryl L. Joseffer; Adam M. Conrad

Locke Lord Bissell & Liddell: Gaston Kroub

Morgan Lewis & Bockius: David J. Levy; James A. Glenn, Jr.; Preetam A. Shingavi; Winstol D. Carter, Jr.

Potter Minton: Douglas R. McSwane, Jr.

Yarbrough Wilcox, PLLC: Debra E. Gunter; Herbert A. Yarbrough, III


January 22, 2013                                     /s/ Daryl L. Joseffer
Date                                                        Daryl L. Joseffer

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF RELATED CASES ................................................1

JURISDICTIONAL STATEMENT .....................................................1

STATEMENT OF THE ISSUES.........................................................2

STATEMENT OF THE CASE.............................................................4

STATEMENT OF FACTS ...................................................................6

    A. Defendant Avon Products, Inc. ................................................6

    B. Soverain And The Patented Technology ................................7

        1.The patents-in-suit relate to two aspects of electronic commerce............7

        2.The extensive licensing history of the patents-in-suit. ...........................11

        3.Soverain's e-commerce software platform.............................................11

    C. Procedural History .................................................................12

        1. At trial, Soverain argued that Defendants use the accused systems. ....................................................................................12

        2.Soverain's damages expert relied on a software license and adopted a royalty base consisting of all of Avon's online revenues. ....................................................................................13

        3. The district court denied Defendants' motion for JMOL or a new trial and granted Soverain's motion for post-judgment royalties. .........15

SUMMARY OF ARGUMENT ..........................................................17

STANDARDS OF REVIEW ..............................................................21

ARGUMENT .....................................................................................22

I.    THE ASSERTED PATENTS ARE INVALID.................................22

II.   AVON DOES NOT "USE" THE ENTIRE CLAIMED SYSTEM, WHICH INCLUDES ITS REPRESENTATIVES' OR CUSTOMERS' COMPUTERS. ...................................................................................23

III.  SOVERAIN'S DAMAGES MODEL IS BASED ON METHODOLOGIES THIS COURT HAS REPEATEDLY REJECTED........26

    A. Soverain's Proposed Royalty Rate Grossly Overstates The Value Of The Patented Technology..........................................................28

i

1.Soverain based its royalty rate on the full cost of a software license to much more than the patented invention....................................28

2.Soverain ignored the extensive licensing history of the patents-in-suit........................................................................................32

3.Sims rigged his analysis to try to evade the statutory limits on recovery of damages. ............................................................36

4.Sovereign's Georgia-Pacific analysis compounded the errors in its royalty rate. ........................................................................39

B.   Sovereign's Royalty Bases Violated Basic Apportionment Principles....................................................................................40

1.Sims's royalty base includes all of Defendants' online revenues, even though the patented technology does not drive demand for Defendants' products. ..................................................................40

2.Soverain failed to account for the 70-80 percent of orders on youravon.com that are not accused of infringement............................43

3. The district court erred in refusing even to instruct the jury on apportionment of the royalty base..............................................45

C.  This Court Should Remit Damages For Avon.com And Victoriassecret.com, Or Order A New Trial. ..............................................46

IV. THE DISTRICT COURT HAD NO AUTHORITY TO TRANSPOSE THE JURY'S DAMAGES AWARDS FOR AVON.COM AND YOURAVON.COM. .........................................................................47

V.  SOVERAIN IS NOT ENTITLED TO ENHANCED ONGOING ROYALTIES. ...............................................................................53

A.  The Traditional Four-Factor Text For Injunctive Relief Governs Ongoing Royalty Awards.............................................................54

B.  The District Court Lacked Authority To Increase The Ongoing Royalty Award 2.5 Times For Willfulness. ......................................58

CONCLUSION .......................................................................60

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ........................................................................59

*Amado v. Microsoft Corp.*,
517 F.3d 1353, 1361-62 (Fed. Cir. 2008)............................................... 56, 57, 58

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
147 F.3d 1374 (Fed. Cir. 1998) ......................................................................32

*Aquachem Co. v. Olin Corp.*,
699 F.2d 516 (11th Cir. 1983)..........................................................................49

*Baisden v. I'm Ready Prods., Inc.*,
693 F.3d 491 (5th Cir. 2012) ...........................................................................52

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ......................................................................23

*Castle v. United States*,
301 F.3d 1328 (Fed. Cir. 2002) ......................................................................38

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
631 F.3d 1279 (Fed. Cir. 2011) ........................................................ 2, 18, 24, 25

*City of Richmond v. Madison Mgt. Grp., Inc.*,
918 F.2d 438 (4th Cir. 1990) ..................................................................... 49, 50

*Clark v. Martinez*,
543 U.S. 371 (2005) ......................................................................................55

*Comaper Corp. v. Antec, Inc.*,
596 F.3d 1343 (Fed. Cir. 2010) ................................................................ 17, 23

*Cooper Indus., Inc. v. Tarmac Roofing Sys., Inc.*,
276 F.3d 704 (5th Cir. 2002) ...........................................................................45

*Davis v. Safeway Stores, Inc.*,
532 F.2d 489 (5th Cir. 1976) ...........................................................................47

*Dura-Wood Treating Co. v. Century Forest Indus., Inc.*,
694 F.2d 112 (5th Cir. 1982) ..................................................................... 48, 52

*eBay Inc. v. MercExchange, LLC.*,
547 U.S. 388 (2006) ............................................................................ 21, 55, 56

iii

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (2009) ............................................................... 57, 59

*G.A. Thompson & Co., Inc. v. Partridge*,
  636 F.2d 945 (5th Cir. 1981) ............................................... 20, 48, 49

*Garretson v. Clark*,
  111 U.S. 120 (1884) ................................................................ 40, 42

*Georgia-Pac. Corp v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) .........................................59

*Goodner v. Hyundai Motor Co., Ltd.*,
  650 F.3d 1034 (5th Cir. 2011) ...................................................21

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) .............................................. 27, 34

*Harcon Barge Co. v. D & G Boat Rentals, Inc.*,
  784 F.2d 665 (5th Cir. 1986) (en banc) ...............................51

*iLOR, LLC v. Google, Inc.*,
  631 F.3d 1372 (Fed. Cir. 2011) .................................................60

*Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*,
  408 F.3d 1374 (Fed. Cir. 2005) ...............................................38

*In re W. Tex. Mktg. Corp.*,
  12 F.3d 497 (5th Cir. 1994) .....................................................49

*IP Innovation L.L.C. v. Red Hat, Inc.*,
  705 F. Supp. 2d 687 (E.D. Tex. 2010) ................................. 33, 35

*LaserDynamics Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ............................................ passim

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ........................................ passim

*Mendenhall v. Barber-Greene Co.*,
  26 F.3d 1573 (Fed. Cir. 1994) ............................................. 17, 22

*Moore v. M/V Angela*,
  353 F.3d 376 (5th Cir. 2003) ............................................... 21, 46

*Muniauction Inc. v. Thompson Corp.*,
  532 F.3d 1318 (Fed. Cir. 2008) ................................................23

*NTP Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ................................................24

*O2 Micro Int'l Ltd. v. Taiwan Sumida Elecs., Inc.*,
    315 F. A'ppx 266 (Fed. Cir. 2009) (unpublished) ...............................................22

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) .............................................................. 54, 56, 58

*Pfizer, Inc. v. Synthon Holdings BV*,
    227 F. A'ppx 903 (Fed. Cir. 2007) (unpublished) ...............................................22

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992) ..............................................................................58

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) (per curiam) ........................................... 28, 30, 33

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ..................................................................... 27, 32

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir 1995) (en banc) ................................................... 40, 42, 45

*Rivera v. PNS Stores, Inc.*,
    647 F.3d 188 (5th Cir. 2011) ......................................................................... 48, 52

*Robert Tyer & Assocs., Inc. v. Env't Dynamics, Inc.*,
    119 F.3d 17, 1997 WL 419426 (Fed. Cir. 1997) (non-precedential)............ 52, 53

*Robles v. Exxon Corp.*,
    862 F.2d 1201 (5th Cir. 1989) ..............................................................................48

*Sosa v. M/V Lago Izabal*,
    736 F.2d 1028 (5th Cir. 1984) ..............................................................................47

*Soverain Software LLC v. Newegg Inc.*,
    No. 2011-1009 (Fed. Cir. Jan. 22, 2013).................................................... passim

*Studiengesellschaft Kohle, m.b.H v. Dart Indus., Inc.*,
    862 F.2d 1564 (Fed. Cir. 1998) ............................................................................33

*Telecordia Techs., Inc. v. Cisco Sys., Inc.*,
    612 F.3d 1365 (Fed. Cir. 2010) ............................................................................57

*Trell v. Marlee Elecs. Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990) ..................................................................... 18, 30

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..................................................................... 39, 43

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995) ................................................................................32

*United States v. Santos*,
  553 U.S. 507 (2008) ..........................................................................55

*Wang Labs., Inc. v. Toshiba Corp.*,
  993 F2d 858 (Fed. Cir. 1993) ............................................................39

*WhitServe, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012 ...................................................... passim

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) .................................................. 28, 31

*Zafro v. United States*,
  506 U.S. 534 (1993) ..........................................................................52

**Statutes**

35 U.S.C. § 101 ................................................................... 2, 5, 23

35 U.S.C. § 103 ......................................................................2, 23

35 U.S.C. § 271 ..........................................................................23

35 U.S.C. § 283 ................................................................ 20, 54, 55

35 U.S.C. § 284 .................................................................. 4, 21, 58

35 U.S.C. § 286 ..........................................................................38

35 U.S.C. § 287 ................................................................... 36, 38

**Rules**

Fed. Cir. R. 32.1 ........................................................................52

Fed. R. Civ. P. 60 ......................................................................48

**Other Authorities**

Roy J. Epstein & Paul Malherbe,
  *Reasonable Royalty Patent Infringement Damages After* Uniloc,
  39 AIPLA Q.J. 3 (2011) ....................................................................27

## STATEMENT OF RELATED CASES

There are no related cases, but this Court's decision today in *Soverain Software LLC v. Newegg Inc.*, No. 2011-1009 (Fed. Cir. Jan. 22, 2013), directly controls the disposition of this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338.  The district court entered final judgment on August 22, 2012.  JA1-2.  Appellant Avon Products, Inc. ("Avon") timely filed a notice of appeal on September 7, 2012.  JA278.  This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

1.      In *Soverain Software LLC v. Newegg Inc.*, No. 2011-1009 (Fed. Cir. Jan. 22, 2013), this Court held that the asserted patents are obvious.  Are the asserted claims invalid under 35 U.S.C. §§ 103 or § 101?

2.      All asserted claims recite systems, for shopping over the Internet, that include end users' computers as well as website operators' back-end servers.  This Court has held that, when a claimed system includes both an end user's personal computer and a website operator's equipment, "operat[ing] the back-end processing" in response to end users' requests, and providing software to those end users, does not constitute "use" of the system.  *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011).  Do Defendants "use" the claimed system when their back-end servers respond to users' requests?

3.a.    The predecessor of Appellee Soverain Software LLC ("Soverain") entered into more than 30 licenses for the patents-in-suit.  Its damages expert disregarded those licenses and constructed a royalty rate for the asserted patents based on the purported cost of a perpetual license to a software platform that encompasses the patented technology and many additional features.  The expert did not reduce his rate to isolate the portion of the software license's value that is attributable to the patented technology.  Rather, he further *increased* the rate by (i) packing the full cost of a perpetual license into the limited six-year period for

2

which Soverain is not statutorily barred from recovering damages and (ii) enhancing the rate another 50 percent based on the *Georgia-Pacific* factors. Should the district court have excluded this testimony or granted a new trial based on the expert's reliance on an inapposite software license, disregard for the on-point licenses, and manipulation of the software license to circumvent statutory limitations on recovery of damages?

b.    The expert multiplied his royalty rate by a royalty base consisting of all revenues from the sale of all products on the accused websites.  It is undisputed that the patented technology does not drive demand for those products.  It is also undisputed that youravon.com has two ordering methods, only one of which is accused of infringing at least the patented shopping-cart technology.  Should the district court have excluded the expert's testimony or granted a new trial because of the expert's failure to apportion the base to the value of the patented technology?

4.    The district court recognized that the jury's $8,215,000 award for avon.com is not supported by the evidence.  Instead of remitting that amount or granting a new trial, however, the court treated the jury's award for avon.com as if it were the award for youravon.com, and vice versa.  The court then upheld the awards on that basis.  Did the court exceed its authority by rewriting the jury's verdict?

5.      As prospective equitable relief, the district court ordered Defendants to pay royalties for any future infringement at enhanced royalty rates 2.5 times higher than the jury's implied rates. The court based that enhancement on its view that post-judgment infringement is per se willful under 35 U.S.C. § 284, regardless of the reasonableness of a pending appeal to this Court. Did the court err by: (i) awarding post-judgment royalties without applying the traditional test for granting equitable relief; (ii) enhancing its award for willfulness under Section 284, which applies to "damages," not equitable relief; and (iii) finding that Defendants are willful and adopting a 2.5 multiplier solely because Defendants are large companies that lost in the district court?

## STATEMENT OF THE CASE

Soverain filed its complaint on June 25, 2009, alleging that nineteen defendants infringed U.S. Patent Nos. 5,715,314 ("'314 patent"); 5,909,492 ("'492 patent"); and 7,272,639 ("'639 patent"). JA25000-01. The remaining defendants are Appellants Avon and Victoria's Secret.

On March 7, 2011, Defendants moved for summary judgment of non-infringement based on divided infringement. *See* JA27063. The district court held the motion in abeyance, eventually denying it on August 9, 2012. JA3. On March 21, 2011, Defendants moved to exclude the testimony of Soverain's damages

4

expert. *See* JA27379. On April 21, 2011, the court denied that motion without opinion. JA29.

The parties tried the case to a jury in November 2011. Prior to the jury's deliberations, the district court granted Soverain's oral motion for judgment as a matter of law ("JMOL") that the patents are not invalid under 35 U.S.C. § 101. *See* JA3366. On November 18, 2011, the jury returned a verdict that Appellants infringed claims 34 and 51 of the '314 patent and claims 15, 17, and 39 of the '492 patent, and that those claims are not invalid. JA26-27. (Soverain had withdrawn the '639 patent. *See* JA2207.) The jury awarded damages in the amount of $8,215,000 for avon.com; $485,000 for youravon.com; and $9,200,000 for victoriassecret.com. JA27.

On January 9, 2012, Appellants jointly renewed their motion for JMOL of invalidity and non-infringement, and moved in the alternative for a new trial on liability and remittitur or a new trial on damages. *See* JA30466; JA30497-99. Soverain moved for post-judgment royalties, pre- and post-judgment interest, post-verdict damages, and attorney's fees. *See* JA29593; JA29621; JA30018. On August 9, 2012, the district court amended the verdict by transposing the jury's damages awards for avon.com and youravon.com, denied Appellants' motions, denied Soverain's motion for attorney fees, and granted Soverain's other motions. *See* JA3-24. The court entered final judgment on August 22, 2012. JA1-2.

5

On January 22, 2013, this Court invalidated claims 34 and 51 of the '314 patent and claims 17, 41, and 61 of the '492 patent. *See Newegg*, No. 2011-1009, slip op. at 15, 20.

## STATEMENT OF FACTS

### A.    Defendant Avon Products, Inc.

Founded in 1886, Avon markets perfume, cosmetics, handbags, and related products. *See* JA2760. In partnership with its iconic "Avon lady" sales representatives, Avon developed an innovative business model, bringing the store directly to the consumer. JA2760-61. Avon is now a global company with over 600,000 active representatives. *See* JA2764, JA2766.

Avon's POET system—short for "personal order entry terminal"—used to allow Avon ladies to place orders electronically over a customer's home telephone line. JA2776. In 1993, Avon introduced PC Avon, a software package for representatives' home computers that enabled entry of orders, account queries, order histories, and other features. *See* JA2777-78, JA2780.

Avon later contracted with IBM to develop youravon.com. *See* JA2782-83. Launched in September 2000, this website is available only to Avon sales representatives and accounts for over 95 percent of Avon's online orders. *See* JA2782; JA2892. The youravon.com website has two separate methods for Avon ladies to enter their customers' product orders: the item entry form and the

6

electronic brochure. *See* JA2784-85; JA2792. As the district court noted, "Soverain accused the electronic brochure method." JA12. Soverain's infringement expert did not analyze the item entry form for infringement. *See* JA2534-39. Avon ladies use the item entry form to place "70 to 80 percent of" their customers' orders. JA2795; *see also* JA2896.

Avon also operates the publicly accessible avon.com website, which it uses to recruit Avon ladies and help customers locate a nearby Avon lady. *See* JA2883-85, JA2889. Customers may also place orders through avon.com, the vast majority of which are credited to Avon ladies—either sent to the representative for delivery to the customer or attributed to the representative but sent directly to the customer. *See* JA2889-91.

## B.    Soverain And The Patented Technology

Soverain is a patent licensing company. *See* JA2308-09. Founded in 2003, Soverain paid $590,000 to obtain the patents-in-suit and other assets from its bankrupt predecessor, Divine. *See* JA2294-95. Soverain and Appellants "are not competitors." JA2609; *see also* JA2319-20.

### 1.    The patents-in-suit relate to two aspects of electronic commerce.

The '314 and '492 patents—both entitled "Network Sales System"—share a common specification. JA63; JA113. The specification describes systems of networked computers capable of performing isolated tasks, such as shopping cart

7

and order history functionality, that are part of the broader electronic commerce environment. *See, e.g.*, JA90-91 Col. 1:50-3:56. In general, the described systems include front-end computers operated by a buyer or other user that are connected via a network to back-end computers operated by a merchant. *See, e.g.*, JA90 Col. 2:19-42.

The asserted claims of the '314 patent and claim 17 of the '492 patent relate to a "network-based sales system" involving "shopping cart" functionality. *Id.* Col. 2:19-20. The system "includes at least one buyer computer for operation by a user desiring to buy products," a "shopping cart computer," and "a shopping cart database connected to the shopping cart computer." *Id.* Col. 2:20-23. The customer may use the buyer computer "to add a plurality of . . . products to a shopping cart in the shopping cart database." *Id.* Col. 2:25-28. In response to the user's requests, the buyer computer sends messages "to the shopping cart computer" identifying the products: the shopping cart computer, upon receiving the messages, "modif[ies] the shopping cart in the shopping cart database to reflect" the user's requests. *Id.* Col. 2:28-37. The customer can then use the buyer computer to purchase the products in the shopping cart and initiate a payment transaction. *Id.* Col. 2:37-42.

Claim 34 of the '314 patent is representative of this system:

34.    A network-based sales system, comprising:

8

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to said shopping cart computer;

said buyer computer and said shopping cart computer being interconnected by a computer network;

said buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database, and, in response to said requests to add said products, to send a plurality of respective shopping cart messages to said shopping cart computer each of which comprises a product identifier identifying one of said plurality of products;

said shopping cart computer being programmed to receive said plurality of shopping cart messages, to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart, and to cause a payment message associated with said shopping cart to be created; and

said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart;

said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database.

JA96 Col. 13:62-14:28; *see also* JA146-47 Col. 14:44-15:15.

The other asserted claims of the '492 patent cover a system that allows customers to access their prior transactions. *See* JA91 Col. 3:19-37. This "hypertext statement system" includes "a client computer for operation by a client

9

user" networked to one or more "server computers." *Id.* Col. 3:19-23. The server records prior transactions and transmits them to the client computer. *Id.* Col. 3:27-29. Users may display products and their descriptions and click hypertext links in the transaction record. *Id.* Col. 3:29-34.

Claim 15 of the '492 patent is representative of these claims:

15.    A hypertext statement system, comprising:

a client computer for operation by a client user; and

one or more server computers for operation by a server user;

the client computer and the server computers being interconnected by a public packet switched computer network;

at least one of the server computers being programmed to record information pertaining to purchase transaction records in a database, and to transmit a statement document comprising the purchase transaction records to the client computer over the network;

the client computer being programmed to display the statement document to receive a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer, and to cause a transaction detail hypertext link corresponding to the portion of the statement document to be activated;

at least one of the server computers being programmed to respond to activation of the transaction detail hypertext link by transmitting the transaction details to the client computer over the network as a transaction detail document.

JA146 Col. 13:61-14:17. The '492 patent's "client computer" is "equivalent" to the "buyer computer" in the '314 patent. JA2385.

## 2. The extensive licensing history of the patents-in-suit.

Between 2000 and 2002, Divine licensed the patents-in-suit to over 30 companies. *See, e.g.*, JA3078, JA3086; JA16400-539; JA19639-98. Nearly all of these licenses are "lump-sum agreements." JA3079. In return for granting a license to the patents, Divine received a percentage of one year of the licensee's revenues, gross profits, or net profits from internet sales. *See* JA3078. The royalty rates varied between two and four percent of that single-year amount. *See* JA3079.

Soverain has also licensed the patents to several companies. *See* JA2309; JA3081. Most of those licenses were executed after 2007 and include additional patents. *See* JA3081; JA3088-89.

## 3. Soverain's e-commerce software platform.

For $590,000, Soverain acquired not only Divine's patents, but also a legacy software product, Transact. *See* JA2294-95. First offered in 1996 by a software company, Open Market, Transact is "a comprehensive eCommerce platform." JA2313. According to Soverain, Transact embodies the patents-in-suit, as many as thirty additional patents, and "a lot of additional functions"—including but not limited to security, inventory, currency, language, and tax functionality. JA2313-14; *see also* JA19956; JA21188. The software includes "well over a million lines of code . . . ." JA2312.

11

There have been no new Transact customers since 2001. *See* JA2308, JA2316. Customers could not purchase and install it off the shelf. *See* JA2298-99. Installation "differ[ed] from company to company" and could take years. JA2299; *see also* JA2305. Transact customers paid an initial license fee, implementation and customization fees, and annual maintenance and support fees thereafter. *See* JA2301-04. The gross profit for Transact software licenses was 17 percent in 2001, the only year for which that information is available. *See* JA3093. Soverain continues to service four Transact customers it inherited from Divine. *See* JA2316.

## C.    Procedural History

Before trial, Soverain limited its case by dropping the '639 patent, withdrawing its allegations of indirect infringement, and stating that it was not pursuing a theory of divided infringement. *See* JA2207; JA2675-77. At trial, Soverain sought to prove direct infringement of claims 34 and 51 of the '314 patent and claims 15, 17, and 39 of the '492 patent.

### 1.    At trial, Soverain argued that Defendants use the accused systems.

Soverain's sole theory of infringement at trial was that Avon uses the entire accused system, including the buyer or client computers, "from the server side." JA2676; *see also* JA2482; JA2677. The parties' experts agreed that "the buyer computer . . . doesn't belong to Avon or youravon.com." JA2393; *see also* JA2485. They further agreed that end users control their computers, navigate

freely to and from websites, initiate online orders, and add products to a website's shopping cart. *See* JA2406, JA2423, JA2485-87; *see also* JA2899-900. Defendants' expert, Dr. Keller, testified that Avon does not use the claimed buyer or client computer for those reasons, and therefore does not infringe. *See* JA3177-79, JA3182-83, JA3185, JA3194, JA3200-03.

Soverain's expert, Dr. Grimes, testified that these facts are "not important to my analysis." JA2393. He argued that Avon uses the claimed system by having servers send "HTML and JavaScript code down to [the] buyer computer" in response to a user's actions. *Id.*; *see also* JA2402, JA2405.

The parties' experts also disputed the patents' validity under Section 103 and other provisions. *See, e.g.*, JA2956-72; JA3283.

> ## 2. Soverain's damages expert relied on a software license and adopted a royalty base consisting of all of Avon's online revenues.

The parties' damages experts both used the "hypothetical negotiation" approach to determining damages. They agreed that the parties' hypothetical negotiation for a license to use the patented technology would have occurred in February 1998, but that Soverain could not recover damages for any infringement occurring before June 25, 2009, because it did not provide notice to Defendants before then. *See* JA2566, JA2569; JA26801.

13

Defendants' expert, Brian Napper, testified that the thirty-two licenses executed by Soverain's predecessor, Divine, provided significant evidence of the patented technology's value. *See, e.g.*, JA3077-81. Napper testified that it is "pretty rare" to have such a large body of licenses from which to value litigated patents. JA3086. Based on the royalty rates set forth in those licenses, he calculated that the parties would have agreed to a lump-sum reasonable royalty through trial of $478,619 for Avon, of which avon.com accounted for $20,628. *See* JA3064, JA3098-99.

Soverain's expert, Sims, testified that the Divine licenses are irrelevant and gave no weight to them. *See* JA2606-07. Instead, he calculated a running royalty and used the total cost of a perpetual license to the Transact software platform as his starting point in calculating his royalty rate. *See* JA2616-17. Sims did not reduce that amount to account for the undisputed facts that Transact's total cost is not attributable solely to the patented technology, and that Soverain is entitled to damages for six years, not in perpetuity. JA2628-29, JA2632; *see also* JA3067-68.

Instead, Sims *increased* his figure by another 50 percent, ostensibly based on the *Georgia-Pacific* factors. *See* JA2618-19. His *Georgia-Pacific* analysis turned on the cost of Transact and his belief that the patentee would have "want[ed] to get at least as much in a patent license as it was going to get from licensing its Transact software." JA2609; *see also* JA2582-83, JA2617-18.

14

Sims multiplied the resulting royalty rate by a royalty base consisting of all of Avon's revenues for orders placed through the accused websites. *See* JA2618-19. He did not determine what portion of those revenues was attributable to demand for the products being sold, as opposed to the patented technology; nor did he exclude sales made through the non-accused item entry form of youravon.com. JA2642-43, JA2652.

Sims concluded by recommending that the jury award damages of $9.7 million against Avon and $9.2 million against Victoria's Secret. *See* JA2620. He did not separately evaluate avon.com and youravon.com. *See* JA2624-25.

Defendants proposed jury instructions regarding use of a system and apportionment of damages, which the district court denied. *See* JA3384-85, JA3390-91. Before the jury began deliberating, the court also granted Soverain's motion for JMOL that the patents are not invalid under Section 101. *See* JA3366.

### 3. The district court denied Defendants' motion for JMOL or a new trial and granted Soverain's motion for post-judgment royalties.

The jury found that the asserted claims were infringed and not invalid. JA26-27. It awarded damages of $8,215,000 for avon.com, $485,000 for youravon.com, and $9,200,000 for Victoria's Secret. JA27.

The parties then filed post-trial motions. The district court denied Defendants' motions with respect to non-infringement and invalidity. The court

15

stated that Defendants control the entire claimed system, including end users'
computers, "by delivering web pages containing embedded programming." JA9.
The court also held that "there is sufficient evidence in the record to support the
jury's verdict that the patents are infringed and not invalid." JA17.

With respect to damages, the court concluded that Sims could disregard the
Divine licenses and base his royalty rate on the full cost of a software license to
Transact because Transact "embodied the patents-in-suit, and the system was
available at the time Defendants' infringement began." JA13.  The court agreed
that the youravon.com item entry form was not accused, but it denied JMOL for
sales made by that method on the ground that the amount of such sales was a fact
question for the jury in awarding damages. *See* JA12.

The court determined that the jury's award for one of Avon's websites,
avon.com, was not supported by the evidence. *See* JA15.  But it denied Avon's
motion for remittitur.  The court concluded that the verdict contained a clerical
error in which the jury must have intended its damages award for avon.com to be
for youravon.com, and vice versa. *See* JA14-15.  The court then revised the
verdict to transpose those awards, and upheld them as revised. *See id.*

Finally, the court ordered the Defendants to pay post-judgment royalties of
1.0% for victoriassecret.com; 1.05% for avon.com; and 0.875% for youravon.com.
JA24.  Soverain had asked the court to double the jury's implied royalty rates

based on changed circumstances between the date of the hypothetical negotiation and the court's judgment, and then to double them again for willfulness. *See* JA29627. The court denied the first requested basis for enhancement because the jury had already considered the factors that Soverain pointed to as changed circumstances. *See* JA22. But the court enhanced the jury's implied rates by 2.5 times for willfulness, based on its conclusion that post-judgment infringement is *per se* willful. *See* JA23-24.

## SUMMARY OF ARGUMENT

This is the unusual appeal that is squarely controlled by precedent on invalidity, infringement, and damages.

I. In a precedential decision involving the same patents-in-suit, the Court today invalidated, as obvious, claims 34 and 51 of the '314 patent and claims 17, 41, and 61 of the '492 patent. *See Newegg*, No. 2011-1009, slip op. at 15, 20. As a matter of law, therefore, claims 34 and 51 of the '314 patent and claim 17 of the '492 patent are invalid in this case "under principles of collateral estoppel." *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1577 (Fed. Cir. 1994) (citation omitted). Claim 15 of the '492 patent is likewise invalid because invalidated claim 41 depends from it and includes all of its limitations. *See Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1350 (Fed. Cir. 2010). Finally, claim 39 of the '492 patent is

invalid because it depends from claim 15 and its only additional limitation is that "the network is an Internet." JA159.

II.    Soverain relied on a single theory of infringement at trial:  that Defendants directly infringe by "using" the claimed systems, which include a defendant's website *and* an individual user's computer.  Under *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011), however, it is the end users that "use" such systems by initiating transactions from their computers.  Website operators like Avon *respond* to users' requests by "operating the back-end processing"—exactly what *Centillion* held, "as a matter of law," not to constitute "use" of the entire system.  *Id.* at 1286.

III.    Soverain's damages model is also irreconcilable with recent precedents of this Court.

A.  Soverain based its proposed royalty rate on the full cost of a perpetual software license to Transact, an e-commerce platform that includes many non-infringing features.   Soverain's reliance on the full cost of a license that "encompassed the right to other inventions compels reversal" because it is not apportioned to the value of the patented technology alone.  *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990).

That lack of apportionment is especially indefensible because there are more than 30 real-world licenses to the patents-in-suit.  Because such licenses "most

18

clearly reflect the economic value of the patented technology in the marketplace," Soverain's insistence on disregarding them rendered its methodology wholly unreliable. *LaserDynamics Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

Soverain did not even faithfully apply the Transact software licenses. Instead of spreading the cost of a Transact license over the agreed-upon 17-year license period, as an actual Transact license would have been, Soverain packed the full cost into the six-year period for which Soverain is not statutorily barred from recovering damages, attributing no payments to the first 11 years of the license. Even Soverain's expert admitted that no one would agree to such a rigged license in the "real world."

B.  Sims multiplied his inflated royalty rate by a royalty base consisting of all of Defendants' online revenues.  That runs afoul of fundamental apportionment principles, such as the entire market value rule, because the patented technology does not drive demand for all of the products sold over the accused websites—the products themselves do that.   Moreover, 70-80 percent of revenues from youravon.com are attributable to a different ordering method that, the district court recognized, was *not* accused of infringement.

III.    There is another problem with the awards against Avon.  Everyone agrees that the jury's award for avon.com is excessive and unsupported by the

19

evidence.  For youravon.com, however, the jury awarded approximately $485,000, which is close to the amount Avon had suggested.  Even on the face of the verdict, therefore, Avon is entitled to remittitur or a new trial on the concededly excessive avon.com award.

Instead, the district court transposed the jury's awards for the two Avon websites, treating each award as if it related to the other website, and upheld the awards as it had revised them.  To protect jury verdicts from judicial revision, however, the category of correctable "clerical errors" is limited to situations where the jury clearly wrote down a different verdict from the one it had reached.  If a court must "reexamin[e] the facts upon which the verdict was based," any error is not clearly clerical, and the court lacks authority to remake the verdict.  *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 963-64 (5th Cir. 1981).  Nonetheless, the court rewrote the verdict based on its own view of the evidence, even after acknowledging that its effort to deconstruct the verdict is off by at least $1 million.  The court had no authority to do so.

V.  The district court further erred by ordering Defendants to pay ongoing, post-judgment royalties at 2.5 times the royalty rates applied by the jury.  Because post-judgment royalties are an "equitable remedy," not damages, they are governed by 35 U.S.C. § 283.  The Supreme Court has construed that statute to require a plaintiff to satisfy the traditional four-factor test for prospective equitable relief.

20

*See eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391-92 (2006). Thus, this Court should, at a minimum, remand for application of that test.

In addition, the district court had no authority to enhance its royalty award for willfulness. Courts may enhance only "damages," not equitable relief, for willfulness. 35 U.S.C. § 284. The court also erred in treating post-judgment infringement as being *per se* willful—a point emphatically underscored by this Court's decision in *Newegg*, which has now invalidated these very claims. *See Newegg*, slip op. at 15, 20. At a minimum, this appeal is not objectively baseless or reflective of subjective bad faith, precluding any finding of willfulness during the pendency of this appeal.

## STANDARDS OF REVIEW

Under Fifth Circuit law, this Court must review "*de novo* a district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011). The Court "should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Id.* at 1040. The "grant or denial of a motion for a remittitur or a new trial is reviewed for an abuse of discretion." *LaserDynamics*, 694 F.3d at 66; *see also Moore v. M/V Angela*, 353 F.3d 376, 384 (5th Cir. 2003).

21

## ARGUMENT

## I.    THE ASSERTED PATENTS ARE INVALID.

In a precedential decision involving the same patents-in-suit, the Court today held claims 34 and 51 of the '314 patent and 17, 41, and 61 of the '492 patent invalid as obvious.  *See Newegg*, No. 2011-1009, slip op. at 15, 20.  Under this decision, every asserted claim in this case is invalid as a matter of law.

This Court expressly held in *Newegg* that each of the shopping-cart claims asserted in this case—claims 34 and 51 of the '314 patent and claim 17 of the '492 patent—is invalid.  "[O]nce the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under principles of collateral estoppel." *Mendenhall*, 26 F.3d at 1577.  Thus, Defendants are entitled to the benefit of *Newegg*'s holding that the claims are invalid.  *See O2 Micro Int'l Ltd. v. Taiwan Sumida Elecs., Inc.*, 315 F. A'ppx 266 (Fed. Cir. 2009) (unpublished); *Pfizer, Inc. v. Synthon Holdings BV*, 227 F. A'ppx 903 (Fed. Cir. 2007) (unpublished).

The hypertext claims—claims 15 and 39 of the '492 patent—are likewise invalid.  The *Newegg* Court invalidated claim 41, which depends from claim 15.  *See* JA146, JA159.   Because "'[a] broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is

22

invalid for obviousness,'" claim 41's invalidity dooms claim 15 as well. *Comaper*, 596 F.3d at 1350 (quoting *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1344 (Fed. Cir. 2009)). Indeed, the *Newegg* Court block quoted claim 15 in its opinion while discussing claim 41. *See Newegg*, slip op. at 15-16.

Similarly, claim 39 of the '492 patent depends from invalid claim 15, and adds only one limitation: "wherein the network is an Internet." JA159. The addition of an Internet limitation cannot render an otherwise obvious claim valid. *Muniauction Inc. v. Thompson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008). The *Newegg* Court invalidated another dependent claim for precisely that reason. *See Newegg*, slip op. at 19-20.

As further explained in Victoria's Secret's brief, which is incorporated by reference, the asserted patents are invalid under Section 103 and also under Section 101.

## II. AVON DOES NOT "USE" THE ENTIRE CLAIMED SYSTEM, WHICH INCLUDES ITS REPRESENTATIVES' OR CUSTOMERS' COMPUTERS.

Soverain relied on a single theory of liability at trial: that Defendants directly infringe under 35 U.S.C. § 271(a) by *using* the claimed systems, which include a defendant's website *and* an individual user's computer. That theory runs headlong into *Centillion*. Under *Centillion*'s interpretation of Section 271(a), Defendants do not "use" the entire claimed systems when they operate the back-

end website components; instead, their representatives or customers "use" an entire system by putting it into service from their own computers.

The asserted claims recite, among other things, a "buyer computer *for operation by a user* desiring to buy products" or "a client computer *for operation by a client user*." JA96 Col. 13:63-64; JA146 Col. 13:62 (emphases added). The claimed "user" or client is an Avon sales representative for youravon.com, or an Avon customer for avon.com. *See* JA2481. Everyone agrees that these users provide their own buyer or client computer; the computers are not owned or controlled by Avon. *See* JA2393; JA2485. In addition, Avon's representatives and customers initiate all transactions: from navigating to the website, to selecting or clicking on portions of the website, to ordering products (or not). *See* JA2406-07, JA2409.

Under those undisputed facts, Avon is entitled to judgment "as a matter of law" for the same reasons the *Centillion* defendant was. "[T]o 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it." *Centillion*, 631 F.3d at 1284 (citing *NTP Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)). Thus, when a claimed system includes both a website operator's equipment and an end user's personal computer, the website operator does *not* use the entire claimed system simply by "operat[ing] the back-end processing and

24

provid[ing] the software to adapt the user's personal computer." *Id.* at 1286. Instead, the required "control" entails "the ability to place the system as a whole into service." *Id.* at 1284.

Thus, an Avon customer or representative is, as the claims themselves recite, the "user." *That* person has "the ability to place the system as a whole into service" by visiting or logging on to Avon's websites, whereas Avon "operat[es] the back-end processing" in response to the user's requests. *Id.* at 1284; *see* pp. 12-13, *supra*. As in *Centillion*, "[i]f the user did not make the request, then the back-end processing would not be put into service." 631 F.3d at 1285. Indeed, end users alone decide whether to use the accused features by accessing their order histories or adding a "plurality of respective products" to a shopping cart. JA96.

The district court held that Avon infringes because the "embedded programming" in Avon's websites "puts the system as a whole into service so that [Avon] may benefit from the system." JA9. The court was apparently referring to testimony that Avon's servers transmit HTML and JavaScript code in response to end users' inquiries. *See* JA2393. This Court has squarely rejected that reasoning as a matter of law: "[s]upplying the software for the customer to use is not the same as using the system." *Centillion*, 631 F.3d at 1286.

The district court distinguished *Centillion* on the ground that the defendant in that case supplied software that the end users had to download and install,

whereas here "the user is not required to install anything." JA9. If anything, that would suggest that Avon does *less* than the *Centillion* defendant to exercise control; unlike that defendant, Avon does *not* require its users to download and install software to use the website, in the district court's view.

In any event, the district court's distinction goes at most to *how* a website operator provides software to a website user. That has no bearing on the dispositive point that Avon's customers and representatives—not Avon—put the entire claimed system into use by visiting or logging on to Avon's websites from their own computers. Thus, as further explained in Victoria's Secret's opening brief, which Avon incorporates by reference, Defendants are entitled to JMOL of non-infringement or, at a bare minimum, a new trial on this ground.

## III. SOVERAIN'S DAMAGES MODEL IS BASED ON METHODOLOGIES THIS COURT HAS REPEATEDLY REJECTED.

This Court has now held on numerous occasions that patent damages must be apportioned to the value of the patented invention—as opposed to other aspects of an accused product. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332, 1337 (Fed. Cir. 2009). Soverain's damages model makes no effort to comply with that requirement. Instead, Soverain inflated its damages requests in the very ways this Court has recently rejected: it relied on an inapposite software license that covered much *more* than the patented technology, while disregarding

on-point patent licenses to the asserted patents; and it included *all* of Defendants' revenues from online sales in its royalty bases, even though everyone agrees that the patented technology does *not* drive demand for products sold over the websites.

Soverain's inflated damages model is especially indefensible because its predecessor entered into more than 30 licenses for the patents-in-suit. Much of the damages debate today concerns how to determine damages when there is *not* a comparable license. *See* Roy J. Epstein & Paul Malherbe, *Reasonable Royalty Patent Infringement Damages After* Uniloc, 39 AIPLA Q.J. 3, 7, 25-29 (2011) (proposing "alternative royalty analyses" in absence of comparable licenses). The more than 30 on-point licenses provide a straightforward and reliable way of determining the value of a license to the patents-in-suit because that is exactly what they are. And they show that Soverain's proposal is fanciful.

Expert damages testimony is admissible only if it is supported by a proper legal framework as well as "sound economic proof" and "factual predicates." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); *accord LaserDynamics*, 694 F.3d at 67; *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002). Courts must also "scrutinize the evidence carefully" after trial to ensure that a damages award is based on a legally proper methodology and substantial evidence. *Lucent*, 580 F.3d at 1336; *accord WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29-31 (Fed. Cir. 2012).

27

The district court erred by admitting Soverain's unreliable expert testimony and again by denying remittitur or a new trial.

### A.  Soverain's Proposed Royalty Rate Grossly Overstates The Value Of The Patented Technology.

Because a reasonable royalty must reflect the value of the patented technology and "the claimed invention's footprint in the market place," *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (per curiam), parties may not rely on inapposite licenses to establish a reasonable royalty. *See LaserDynamics*, 694 F.3d at 79-81; *WhitServe*, 694 F.3d at 29-31; *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-21 (Fed. Cir. 2010); *ResQNet.com*, 594 F.3d at 869-73; *Lucent*, 580 F.3d at 1325-32.  If parties could rely on licenses that are not "commensurate" with the patented technology, "a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question."  *ResQNet*, 594 F.3d at 872; *see also id.* at 871 n.1 (finding licenses were not "coextensive with the claimed invention").

### 1.  Soverain based its royalty rate on the full cost of a software license to much more than the patented invention.

Soverain's expert, Sims, did not even attempt to value the patents-in-suit. Instead, he based his royalty rate on the full cost of a software license to Transact. Far from being "commensurate" with the patented technology, however, Transact

is an e-commerce software platform. *See* JA2313. Even Soverain's witnesses agree that Transact includes "a lot of features"—such as security, inventory, currency, language, and tax functionalities—that are *not* accused of infringement. JA2313-14; JA19956; JA21188. Indeed, Transact contains over a million lines of code, and as many as thirty additional patents read on it. *See* JA2312; JA2630. A license to the software platform also includes the right to use that completed product—not just a right to spend one's own money developing other products that use the patented technology.

The Transact license structure reflects the fundamental differences between Transact and the patented technology. A Transact software license includes a lump-sum payment, followed by millions of dollars in annual product support and maintenance fees that have nothing to do with the patented technology. *See* JA2301-04. By separating out those payments, the fee structure itself confirms that much of the cost of a Transact license is not attributable in any way to the patented technology.

Undaunted, Sims loaded the full cost of a Transact license, including every penny of these unrelated annual fees, into his damages model. That model is so untethered to the patents-in-suit that he never even adjusted his calculation after Soverain withdrew the '639 patent. *See* JA2630-31. No matter how many patents, claims, technologies, or products were at issue in this patent case or included in a

29

Transact software license, Sims conflated them all. That is the very definition of a failure to "account[] for the technological and economic differences between" a license and the patents-in-suit. *ResQNet*, 594 F.3d at 873.

The district court's post-trial opinion states that Transact is an appropriate starting point because "the Transact system embodied the patents-in-suit" and "was available at the time Defendants' infringement began." JA13. That misses the point that the Transact system encompassed much *more* than the patented invention. Sims's reliance on the broader software license therefore allowed him "to push the royalty up" beyond the value of the patented technology. *ResQNet*, 594 F.3d at 870. The court's failure to consider this crucial point that a Transact license "encompassed the right to other inventions compels reversal." *Trell*, 912 F.2d at 1447.

Soverain's other efforts to defend Sims's testimony only underscore the lack of apportionment. For example, Soverain argued at trial that its predecessor, Open Market, "had no reason to accept less to give the Defendants a patent license than they could get by selling Transact." JA3466 (emphasis added); JA2609, JA2617-18. Soverain similarly presented the hypothetical negotiation as a Hobson's choice for Defendants, who could either "implement [Transact] with the associated maintenance costs and setup costs and the license fees" or pay even *more* to "take the license to the patent." JA3509.

30

That approach does not work even on its own terms because Sims did not really calculate what Open Market would "get"—that is, its profit—from selling Transact. He took the company's *revenue* from a Transact license without subtracting its costs. *See* JA3069 (Napper); *cf. Wordtech*, 609 F.3d at 1321 ("This assumes, however, that [plaintiff] incurred zero costs."). Given that the only record evidence shows a gross profit for Transact of 17 percent, Sims's use of gross revenues was yet another way to inflate the baseline. *See* JA3092-93 (Napper).

More fundamentally, Soverain's position is contrary to controlling law because it assumes that the plaintiff in a hypothetical negotiation could refuse to license only the patented invention, and instead could insist on also licensing other technologies (here, all of the other Transact technologies) at a much higher price reflecting the value of *all* of those technologies. If Soverain could evade this Court's apportionment jurisprudence simply by asserting that its predecessor would not have agreed to a license based on the value of the patented invention, that jurisprudence would mean very little.

Thus, this Court has held that the hypothetical negotiation is not such a one-sided affair. As a matter of law, that negotiation postulates a successful negotiation in which each participant is willing and economically rational, and seeks to base the license on the value of the patented technology. *See, e.g., Lucent,*

580 F.3d at 1324-25, 1332, 1333. By asserting that it would not license the patented technology alone based on the value of that technology alone, and instead would assert hold-up power, Soverain is essentially saying that its predecessor would not have entered into the hypothetical negotiation.

Even if that were true (and its predecessor's 32 licenses to these patents show it is not), Soverain's approach runs contrary to the basic legal construct of a hypothetical negotiation, as discussed above. For that reason, a plaintiff cannot base a reasonable royalty on a proposed, but unaccepted, license. Otherwise, "patentees could artificially inflate the royalty rate by making outrageous offers." *WhitServe*, 694 F.3d at 30. Because Sims's testimony is based on an erroneous legal position, it should have been excluded. *See, e.g.*, *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1381 (Fed. Cir. 1998). Soverain has failed to carry its "burden to prove that" a license to Transact was "sufficiently comparable to sustain" the jury's award. *Lucent*, 580 F.3d at 1332.

### 2. Soverain ignored the extensive licensing history of the patents-in-suit.

Sims's reliance on a Transact software license is especially egregious in light of the extensive licensing history of the patents-in-suit, which "should carry considerable weight in calculating a reasonable royalty rate." *Riles*, 298 F.3d at 1313 (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995)); *see also IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691

(E.D. Tex. 2010) (Rader, C.J., by designation).  Soverain's predecessor, Divine, licensed the patents-in-suit *thirty-two* times.  *See* JA3086.  Those actual patent licenses to the patents-in-suit "most clearly reflect the economic value of the patented technology in the marketplace."  *LaserDynamics*, 694 F.3d at 79.  They are therefore "highly probative of the patented invention's economic value in the marketplace."  *Id.* at 80; *see also Lucent*, 580 F.3d at 1330.  But Sims disregarded those licenses, giving them no weight whatsoever.

That makes this case strikingly similar to *LaserDynamics*, which issued after the district court entered final judgment.  There as here, the plaintiff's expert based his proposed royalty on the value of much more than the patented invention, even though that approach was contrary to "the many license agreements to the [patent-in-suit] in the record."  *Id.* at 70.  Accordingly, the plaintiff's "theory of damages was legally unsupportable."  *Id.*; *see also ResQNet*, 594 F.3d at 872-83.

So too here, Sims chose a starting point that "was untethered from the patented technology at issue and the many licenses thereto and, as such, was arbitrary and speculative."  *LaserDynamics*, 694 F.3d at 81; *see also Studiengesellschaft Kohle, m.b.H v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1998).  The real-world licenses provide a highly reliable means of determining the cost of a license to the patents-in-suit because that is what they are.  Even Soverain has acknowledged that, "if you want a real-world situation, a real-world

connection as to what the appropriate royalty base is, you can hardly do better than the Divine licenses which were actual negotiations." JA2023. That is dispositive because, despite being hypothetical in nature, "the hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Lucent*, 580 F.3d at 1325. It therefore requires "sound economic proof of the nature of the market." *Grain Processing*, 185 F.3d at 1350; *see also* p. 27, *supra.* Discarding actual, on-point licenses flies in the face of those legal standards.

If anything, Soverain's rejection of the actual licenses is even more egregious than in *LaserDynamics*. In that case, the expert reduced his proposed royalty by two-thirds to at least attempt to apportion the award to the patented invention, as opposed to the broader product. *LaserDynamics*, 694 F.3d at 61, 69. Here, Sims actually *increased* his proposed royalty by 50 percent based on a qualitative *Georgia-Pacific* analysis, making it even less apportioned to the patented technology. *See* p. 39, *infra*.

Sims gave two reasons for disregarding the Divine licenses, both of which are contrary to law: some of the Divine licenses were settlements, and many of Divine's licensees were small companies. *See* JA2606-07. The first of those rationales does not even relate to the bulk of the licenses and, indeed, only underscores their importance because licenses separate from litigation are "far

*more* reliable indicators of what willing parties would agree to in a hypothetical negotiation." *LaserDynamics*, 694 F.3d at 78 (emphasis added).

The second rationale is at best makeweight. Divine's licensees varied in size. *See, e.g.*, JA3083-86; p. 11, *supra*. And even if a licensee's size might warrant some adjustment to the cost of a license, it provides no basis "to ignore [the] long history of licensing" altogether. *See LaserDynamics*, 694 F.3d at 81. Indeed, this Court held recently that an expert could not ignore twenty-nine licenses executed in the years prior to a hypothetical negotiation simply because the size of the relevant market had grown in the interim. *See id.* at 80-81; *see also Red Hat*, 705 F. Supp. 2d at 691.

Significantly, "[a]ctual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure." *LaserDynamics*, 694 F.3d at 79-80. The Divine licenses "were virtually all lump-sum agreements" that applied a royalty rate of two to four percent to a royalty base consisting of *one* year of a licensee's revenue or profits. JA3079. By contrast, Sims proposed a running-royalty model using a royalty base consisting of *all* of Defendants' online revenues, year after year. *See* JA2618-19. Thus, Sims's "running royalty theory cannot be reconciled with the actual licensing evidence." *LaserDynamics*, 694 F.3d at 80.

### 3. Sims rigged his analysis to try to evade the statutory limits on recovery of damages.

Sims's damages model is unreliable as a matter of law for the additional reason that it includes royalties attributable to years for which Soverain is statutorily barred from collecting damages.  There is no dispute that:   (i) Defendants' alleged infringement began in 1998, and the hypothetical negotiation therefore occurred in that year (*see, e.g.*, JA2569; *LaserDynamics*, 694 F.3d at 75); (ii) Soverain did not seek to recover pre-suit damages after failing to comply with the notice-or-marking provisions of 35 U.S.C. § 287 (*see, e.g.*, JA2566-67); and (iii) Soverain may therefore recover reasonable royalty damages only for the period between the filing of this suit on June 25, 2009, and the expiration of the last of the patents in 2015 (JA26801).  In other words, the hypothetical negotiation would have been for a 17-year license (from 1998 to 2015, *see* JA2609), but Defendants are statutorily immune from having to pay royalties attributable to the first 11 of those years.

Sims tried to circumvent that limitation by restructuring the Transact license in a way no actual licensor or licensee ever would.  He added up the purported total cost of a Transact software license—including software maintenance fees from 1998 until the end of time—and derived an implied royalty rate by spreading that total cost across expected sales during the six-year period for which Soverain is not statutorily barred from recovering damages.  *See, e.g.*, JA2596-601.  Because Sims

36

spread the total lifetime cost across only those sales, his total damages figure would have been the same no matter how many years of damages Soverain was entitled to recover.   *See* JA2639-42; JA27538-40.   If Soverain had sued in 1998 and was entitled to recover all 17 years of damages, or had waited until 2014 to file suit and was therefore entitled to damages for only a single year, Sims's damages figure would have been essentially the same.   Sims admitted as much.   *See, e.g.*, JA2639; JA27538-40.

That rigged and result-driven damages model is legally untenable.   First, it rests on a counter-factual hypothetical negotiation.   Sims testified that the parties would have agreed in 1998 to a 17-year license, in which all of the payments would be made during the 6-year period beginning in 2009.   *See, e.g.*, JA2587; JA27436.   But Sims presented no proof that anyone would structure a license to defer payment for over a decade, and then pack all of the payments for a 17-year license into the six-year period at issue.   To the contrary, the evidence shows otherwise.   None of the actual licenses to the patents-in-suit included a payment structure remotely similar to the one Sims invented; instead, nearly all of them involved up-front, lump-sum payments for the entire license period.   *See* p. 7, *supra*.

Thus, Sims himself conceded that there is no reason anyone would have agreed to such a license: "Of course, they wouldn't agree to a license agreement

where they don't receive any payment for eleven years in the real world, but we're not talking about the real world." JA27540-41. Sims was not talking about the real world, but this Court's jurisprudence does. The hypothetical negotiation attempts to replicate a real, *ex ante* negotiation, and must therefore be based on factually and economically sound predicates. *See* p. 27, *supra*.

Moreover, Sims's approach would impermissibly render the statutory limitations on damages in 35 U.S.C. §§ 286 and 287 meaningless. As discussed above, he would circumvent the statutory limitations on damages by the simple expedient of imagining a hypothetical negotiation in which the parties would have agreed to a royalty structure in which no payments are attributed to the 11-year period of alleged infringement for which Soverain is statutorily barred from recovering damages.

Parties cannot so easily "accomplish indirectly what they may not do directly." *Castle v. United States*, 301 F.3d 1328, 1340 (Fed. Cir. 2002). This Court has therefore rejected similar efforts to circumvent damages limitations by seeking precluded amounts "in different clothing." *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005); *accord Lucent*, 580 F.3d at 1338. The fact that Soverain chose to wait so long to file suit, and cut off its right to recover any damages for the first 11 years of alleged infringement, has a consequence. *See, e.g.*, *LaserDynamics*, 694 F.3d at 75

38

("We have . . . been careful to distinguish the hypothetical negotiation date from the other dates that trigger infringement liability."); *Wang Labs., Inc. v. Toshiba Corp.*, 993 F2d 858, 870 (Fed. Cir. 1993).

### 4.    Sovereign's *Georgia-Pacific* analysis compounded the errors in its royalty rate.

Sims also increased his inflated rate by another 50 percent, ostensibly in light of the *Georgia-Pacific* factors. *See* JA2618-19. The district court held that the jury was free to weigh Sims's testimony regarding the *Georgia-Pacific* factors. *See* JA13. But *Georgia-Pacific* does not excuse the fundamental errors discussed above: "Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

Moreover, Sims's *Georgia-Pacific* analysis gave significant weight to the existence of Transact as a so-called non-infringing alternative, while ignoring the on-point licenses discussed above. *See* JA2617. In other words, after deriving a royalty rate based on the full value of Transact, Sims then enhanced that rate further based in large part on Transact. This double-counting underscores the seriousness of Sims's error and the extent to which it drove his testimony.

39

**B.      Sovereign's Royalty Bases Violated Basic Apportionment Principles.**

Like his royalty rate, Sims's royalty bases run afoul of fundamental apportionment principles.  Sims used all of Defendants' online revenues as his royalty bases.  *See* JA2618-19.  It is well settled, however, that a patentee bears the burden of apportioning "damages between the patented feature and the unpatented features" of an accused product.  *Garretson v. Clark*, 111 U.S. 120, 121 (1884).  As this Court has explained, "calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product."  *LaserDynamics*, 694 F.3d at 67.  Thus, a patentee may rely on the entire market value of a product only if it can "prove that the patent-related feature is the basis for customer demand," *Lucent*, 580 F.3d at 1336 (citation and quotation marks omitted), and "the patented and unpatented components were analogous to a single functioning unit," *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 (Fed. Cir 1995) (en banc).

**1.      Sims's royalty base includes all of Defendants' online revenues, even though the patented technology does not drive demand for Defendants' products.**

Soverain's proposed royalty base consists of revenues from sales of products that have nothing to do with the patented technology.  Avon representatives and customers order products such as perfume and cosmetics through youravon.com and avon.com.  *See* JA2760.  Victoria's Secret customers likewise order apparel

and other products. *See* JA2913. Sims conceded that the patented technology does *not* drive demand for those non-infringing products. *See* JA2643-44. And for good reason: Defendants' customers are looking to buy products, not just a way of buying those products.

The district court held that the entire market value rule is inapplicable because Soverain's royalty base is not limited to the total value of the accused websites, but instead comprises all of the revenues derived from selling products over those websites. *See* JA13. According to the court, "[h]ad Soverain used the cost of implementing the entire website as its royalty base, the entire market value would have been implicated." *Id.* In other words, if Soverain had limited its royalty base to the cost of the accused websites—and thereby used a *more* tailored and apportioned royalty base—the entire market value rule would have precluded Soverain's overreaching. But because Soverain set its sights even higher and used a less apportioned approach—including all of the billions of dollars in revenue derived from selling unrelated products on those websites—the court found the entire market value rule irrelevant.

Far from *distinguishing* that rule, that rationale supplies an additional reason why Sims *violated* the rule. The entire market value rule precludes using the entire value of a non-infringing product in the royalty base unless that product and the infringing one "function together . . . to produce a desired end product or result.

41

All the components together must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit." *Rite-Hite*, 56 F.3d at 1550.

The products sold over the websites are not functional units with the patented features of the accused websites because they are separate and distinct. Defendants sell the products online "for marketing reasons," "as a matter of convenience or business advantage," "not because [the products and the patented invention] essentially functioned together." *Id.* at 1550-51. Indeed, Avon ladies have long ordered Avon's products through means other than its current websites. *See* pp. 6-7, *supra*. And Victoria's Secret continues to sell products in its stores. *See* JA2913.

In any event, the fundamental principle is that patentees must apportion "damages between the patented feature and the unpatented features" of the accused product. *Garretson*, 111 U.S. at 121. Even if the entire market value rule were narrowly defined to have a more limited scope, Sims's testimony flagrantly violates that general apportionment principle.

Indeed, this Court has emphasized that a significant problem with using a product's entire value is that it allows an expert to claim that the requested award is a low percentage of total sales, which improperly "skew[s] the damages horizon for the jury, regardless of the contribution of the patented component." *Uniloc*,

632 F.3d at 1320-21. Sims did exactly that by testifying that "I'm only asking for a royalty of 4/10 of a percent. The other 99.6 percent, it goes to other things." JA2645. This case fully implicates the apportionment and reliability concerns underlying the entire market value rule.

The district court excused Sims's failure even to attempt to apportion his base to the patented technology on the ground that online sales "provide[d] the base for both damages experts' analysis [sic]." JA13. That is wrong. Defendants' expert, Napper, proposed a one-time, lump-sum payment based on a *single year* of Defendants' online revenues. He did so because that is the lump-sum model used in the 32 real-world licenses discussed above. *See* JA3077-81. In contrast, Sims departed from that model by proposing a running royalty and basing it on *all* online revenues, year after year. Thus, Sims's running royalty is based on a far larger royalty base than Napper's lump sum. And given that "[s]ignificant differences exist between a running-royalty license and a lump-sum license," *Lucent*, 580 F.3d at 1326, comparisons between the two experts' models are apples-to-oranges in any event. *See Whitserve*, 694 F.3d at 30.

## 2. Soverain failed to account for the 70-80 percent of orders on youravon.com that are not accused of infringement.

As the district court stated, "Soverain accused the electronic brochure method" of ordering products through youravon.com. JA12. But the item entry form for youravon.com accounts for 70-80 percent of orders through that website,

which in turn accounts for about 95 percent of Avon's online revenues. *See* JA2782, JA2795; JA2892. Sims did not limit his royalty base to the 20-30 percent of accused electronic brochure orders, further violating basic apportionment principles.

The district court excused Sims's error on the ground that the exact percentage of orders made through the item entry form was a fact question for the jury to determine in awarding damages. *See* JA12. Any factual dispute over *how many* orders were placed through the item entry form had no impact, however, on Sims's testimony. He did not exclude *any* of Avon's online revenues from his royalty base for this or any other reason, demonstrating once again his indifference to apportionment. *See* JA2599. Moreover, the testimony of Avon's witnesses was unrebutted on this point. *See* pp. 6-7, *supra*. The passage cited by the district court therefore reveals no dispute. *See* JA2803-05.

In its post-trial briefing, Soverain argued that, although the item entry form orders do not infringe the shopping-cart claims, they do infringe the hypertext statement claims, and thus are properly part of the royalty base. *See* JA31432. The district court rejected that contention. *See* JA12. Moreover, this *post hoc* rationalization underscores the infirmity of Soverain's damages theory. Soverain apparently now attributes the vast majority of its requested damages only to the hypertext statement claims, but there is no evidence of the value of the hypertext

44

statement technology and no evidence of how often that technology was supposedly used in the context of the item entry form. *See* JA2537-38. Soverain's damages analysis lumped multiple technologies together, as explained above. *See* pp. 40-43, *supra*. Thus, the record does not support the implausible notion that the availability of the post-sale hypertext order history feature, which customers might or might not use, drives demand for every order made through the item entry form.

### 3. The district court erred in refusing even to instruct the jury on apportionment of the royalty base.

At a minimum, the district court erred in denying Defendants' proposed jury instruction on apportionment. Applying Fifth Circuit law, denial of a jury instruction is an abuse of discretion if the proposed instruction "'(1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.'" *Cooper Indus., Inc. v. Tarmac Roofing Sys., Inc.*, 276 F.3d 704, 714 (5th Cir. 2002) (citation omitted).

Avon's proposed instruction satisfies all three conditions. It correctly states this Court's holdings that use of a product's entire value is appropriate only if the patented technology "creates the demand" for that product and has "a functional relationship" with it. JA29557; *see Rite-Hite*, 56 F.3d at 1549-50. The district court's charge did not provide *any* similar guidance to the jury. *See* JA3436-42.

And this was a key issue at trial, as shown by Defendants' cross-examination of Sims on exactly these points. *See* JA2643-45. Because the court's refusal to give the instruction left the jury without legal guidance for understanding the importance of this critical testimony, Defendants are entitled, at a minimum, to a new trial before a properly instructed jury.

### C.    This Court Should Remit Damages For Avon.com And Victoriassecret.com, Or Order A New Trial.

Because the district court should have excluded Sims's speculative and unreliable testimony, the only competent evidence before the jury was that of Defendants' expert, Napper. Following the well-established parameters of the Divine licensing program, Napper concluded that the hypothetical negotiation would have resulted in "a one-time payment." JA3062. Napper derived the amount of that payment by applying, consistent with the Divine program, the average royalty rates derived from the Divine licenses to a one-year revenue or profit metric for each Defendant. *See* JA3079-80. For the period from the filing of the complaint through trial, Napper recommended $20,628 for avon.com, $457,991 for youravon.com, and $714,311 for victoriassecret.com. *See* JA3064, 3098-99.

Excluding Sims's inadmissible testimony, Napper's recommended amounts are the maximum supported by the record. The jury's awards for avon.com and victoriassecret.com greatly exceed these figures and are therefore greater than the amounts the jury "could properly have awarded." *Moore*, 353 F.3d at 384. In

accordance with the "maximum recovery rule," therefore, the Court should remit damages for avon.com and victoriassecret.com to Napper's recommended figures or, in the alternative, order a new trial. *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1035 (5th Cir. 1984); *see also Lucent*, 580 F.3d at 1331-32. Avon is also entitled to the same relief for youravon.com, but as explained below, Avon has not challenged the jury's (as opposed to the district court's) damages award for that website.

## IV.  THE DISTRICT COURT HAD NO AUTHORITY TO TRANSPOSE THE JURY'S DAMAGES AWARDS FOR AVON.COM AND YOURAVON.COM.

The jury's awards for the Avon websites underscore the untenability of the jury's damages awards. It is undisputed that the jury's "$8,215,000 award corresponding to avon.com is not supported by the evidence . . . ." JA15. In contrast, the jury's award of $485,000 for youravon.com is close to the amount requested by *Avon*. For that reason, Avon has not challenged the latter of those awards. Accordingly, the district court should have entered judgment for youravon.com based on the jury's award and remitted the concededly excessive avon.com award or at least granted a new trial for avon.com. Because the special verdict form "clearly separated the amounts" for each website, there is no reason to upset the youravon.com award. *Davis v. Safeway Stores, Inc.*, 532 F.2d 489, 491 n.3 (5th Cir. 1976) (ordering partial new damages trial).

But instead of upholding the one Avon award and remitting the other, the district court altered both awards and upheld them as altered. Specifically, the court transposed the awards, treating the jury's $485,000 award for youravon.com as if it were the jury's award for avon.com, and vice versa. *See* JA15.

The district court had no authority to do so. The court invoked its discretion to "correct clerical mistakes" pursuant to Fed. R. Civ. P. 60(a). *Id.* But the jury's error is not "clerical" as a matter of law. To ensure that judicial "corrections" of jury verdicts do not inadvertently thwart a jury's intent, the Fifth Circuit has held that only material "incorrectly recorded in or inadvertently omitted" from a verdict qualifies as a clerical error. *Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 199 (5th Cir. 2011); *see also Robles v. Exxon Corp.*, 862 F.2d 1201, 1208 n.9 (5th Cir. 1989). In other words, the question is not whether the jury was confused or made a mistake in reaching its verdict (in which case a party can seek JMOL or a new trial); the question is whether the jury wrote down its verdict incorrectly. Correctable clerical errors are "mechanical in nature"; they do not include errors "of judgment or *even of misidentification*, but merely of recitation." *Dura-Wood Treating Co. v. Century Forest Indus., Inc.*, 694 F.2d 112, 114 (5th Cir. 1982) (emphasis added).

Thus, Rule 60(a) does not authorize district courts to "reexamin[e] the facts upon which the verdict was based" to determine whether the jury erred. *G.A. Thompson*, 636 F.2d at 963-64. That would violate the Seventh Amendment. *See*

*Aquachem Co. v. Olin Corp.*, 699 F.2d 516, 520 n.2 (11th Cir. 1983).    If "cerebration or research into the law or planetary excursions into facts" is needed, the error is by definition substantive, not clerical.  *In re W. Tex. Mktg. Corp.*, 12 F.3d 497, 505 (5th Cir. 1994).

Moreover, it must be "clear" that the jury committed a clerical, as opposed to substantive, error.  *G.A. Thompson*, 636 F.2d at 963.  Even if a court would have authority to transpose two special verdict entries to "conform to the jury's obvious, but unexpressed intention," it has no authority to do so when it is not so "clear" that the jury's error is clerical.  *Aquachem*, 699 F.2d at 520; *see also City of Richmond v. Madison Mgt. Grp., Inc.*, 918 F.2d 438, 461 (4th Cir. 1990).

It is by no means obvious that the jury transposed its intended verdicts for the Avon websites.  Indeed, the district court based its conclusion on its own review of the record, which is proof positive, under the cases cited above, that the court exceeded its authority.  According to the court, "95% of Avon's online sales were conducted through the youravon.com site," but "the jury awarded the bulk of the damages for infringement relating to the avon.com site."  JA14.  The court transposed the two figures to, in its view, "*almost* mirror[] the 95%-5% division of online orders between the two sites."  JA15 (emphasis added).

The court acknowledged, however, that its 95 percent theory does not add up because "the award for avon.com represents *$1 million less* than 95% of the

49

amount Soverain sought from Avon." JA14 (emphasis added). Moreover, as noted above, the jury had good reason *not* to follow a 95-5 percent split between the two websites: the orders through youravon.com's item entry form were not accused, causing that website to account for a much lower percentage of the total infringing sales than the district court attributed to it. *See* JA12. Thus, the court's transposition was by no means "mechanical"; its theory of the verdict rested on speculation about the jury's view of the evidence and was off by at least $1 million. In other words, the district court had to speculate that the jury intended a specific division *that even the transposed awards do not achieve*. That alone confirms that the court erred by altering the jury's verdict. *See, e.g.*, *Richmond*, 918 F.2d at 461.

Moreover, the only theory that fits the facts suggests that the error was not clerical. While the jury's award for avon.com does not square with the evidence, its award for youravon.com *does*. The youravon.com award of $485,000 is only slightly higher than the $457,991 recommendation of Defendants' expert. *Compare* JA27, *with* JA3064, JA3098-99. (Indeed, if any numbers were transposed, it may have been those: the jury may have rounded up Defendants' number to $458,000 but then transposed two digits in writing down $485,000. If nothing else, that possibility illustrates the malleability of a clerical-error analysis in this case.)

50

In contrast, the jury's undeniably excessive award for avon.com is close to 95% of the amount Soverain requested and the jury awarded for *Victoria's Secret*. *See* JA27. If the district court is correct that the jury intended to award somewhere around 95 percent of Soverain's total requested amount as damages for avon.com, the jury may have erroneously conflated avon.com with victoriassecret.com in calculating the avon.com award. That theory fits the facts because Soverain's expert did not provide separate numbers for the two Avon websites; he "didn't see the need to separate" them. JA2624-25. If the jury went looking for a number to multiply by 95 percent, therefore, it may have used victoriassecret.com as a proxy for avon.com—a conclusion that is no less speculative than any other, and fits the facts better than any other.

In the end, therefore, the court's 95-5 percent analysis suggests at most that the jury may have *misunderstood* the evidence—not that the jury intended one thing and wrote down another. *See* JA14-15. That is an "[e]rror[] of a more substantial nature" not amenable to correction under Rule 60(a). *Harcon Barge Co. v. D & G Boat Rentals, Inc.*, 784 F.2d 665, 669 (5th Cir. 1986) (en banc). In any event, as explained above, the mere facts that the jury's reasoning is unclear, and that any effort to divine it requires an exegesis of the record, confirm that the jury's error was not a correctable clerical one.

The district court opined that a demonstrative used during Avon's closing argument confused the jury by transposing Napper's proposed damages figures for the two Avon websites. *See* JA14. That speculation is beside the point for at least three reasons. First, as explained above, it is not obvious that the jury intended different awards than the ones it wrote down, especially considering that the 95-5 percent theory underlying the court's transposition does not work and relies on reexamination of the record. Second, as explained above, even errors of "misidentification" are not correctable clerical errors because they are substantive errors in the intended verdict, not just in how the jury transcribed its verdict. *Dura-Wood*, 694 F.2d at 114. Third, counsel remedied any confusion by verbally correcting the numbers, *see* JA15; JA3499, and juries "are presumed to follow their instructions." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 507 (5th Cir. 2012) (quoting *Zafro v. United States*, 506 U.S. 534, 540 (1993)).

The district court also cited one older, non-precedential decision of this Court that preceded some of the more recent Fifth Circuit authority, *see Robert Tyer & Assocs., Inc. v. Env't Dynamics, Inc.*, 119 F.3d 17, 1997 WL 419426 (Fed. Cir. 1997) (non-precedential); *Rivera*, 647 F.3d at 199, and that is not citable as precedent in this Court, *see* Fed. Cir. R. 32.1(c). After limiting its holding to "the circumstances of th[at] case," *Tyer* affirmed the transposition of two awards in

52

circumstances where—unlike here—there was apparently no reason to doubt that the jury must have transposed the awards. *Robert Tyer*, 1997 WL 419426, *5.

In this case, as explained above, the competing views of the jury's intent, based on the court's and the parties' differing views of the record, confirm that the error is not a correctable clerical one. Moreover, when the clerk read the verdict aloud in open court, the jury expressed no concern with what had been read. And neither party saw any need to poll the jury. *See* JA3515-16. It is now far too late to speculate that the jury meant to return a different verdict from the one it did.

## V.    SOVERAIN IS NOT ENTITLED TO ENHANCED ONGOING ROYALTIES.

Flawed as the damages awards are, they are overshadowed by the district court's much larger awards of post-judgment royalties. After awarding damages for 2009-2012 at the jury's imputed royalty rates, the district court ordered Defendants to pay royalties at 2.5 times those rates for any future infringement, from the date of its 2012 judgment until the last of the patents expires in 2015. *See* JA2. Thus, the bulk of the awards takes the form of court-ordered post-judgment royalties. That result underscores the problems with the district court's relatively recent practice of routinely awarding enhanced post-judgment royalties. Under that practice, no matter what a jury awards, a judge may routinely and dramatically expand that award. The award in this case is legally untenable for a number of reasons.

53

## A.    The Traditional Four-Factor Text For Injunctive Relief Governs Ongoing Royalty Awards.

The district court erred in awarding post-judgment royalties in this case. Post-judgment royalties are an "equitable remedy," not "damages." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n.13, 1315-16 (Fed. Cir. 2007). Patent damages address "only past harm" resulting from past actions. *Whitserve*, 694 F.3d at 35. In contrast, an award of post-judgment royalties enjoins a defendant to pay an as-yet unknown amount of money in the future based in part on the amount of infringement that occurs in the future. *See* JA20-24. That is an injunction, which is the very reason why this Court found that courts may award post-judgment royalties in appropriate cases. *Paice*, 504 F.3d at 1315-16. If such awards were not injunctions, they would be damages, and the Seventh Amendment jury-trial right would preclude judges from usurping the jury's prerogative to make such awards in ordinary proceedings at law. *See id.*

As this Court has acknowledged, therefore, post-judgment awards are governed by 35 U.S.C. § 283, which governs injunctions in patent cases and was construed by the Supreme Court in *eBay*. *E.g.*, *Paice*, 504 F.3d at 1314-15. The district court agreed: "An ongoing royalty is a form of equitable relief authorized under 35 U.S.C. § 283." JA21. That statute provides in relevant part that courts "*may grant injunctions in accordance with the principles of equity* to prevent the violation of any right secured by patent, on such terms as the court deems

54

reasonable." 35 U.S.C. § 283 (emphasis added). That statutory language means, as the Supreme Court held in *eBay*, that a plaintiff may recover such relief only by satisfying the traditional four-factor test for prospective relief. *See* 547 U.S. at 391-92.

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391.

Although this Court has not yet applied *eBay*'s interpretation of that provision to post-judgment royalties, there is no basis for limiting *eBay* to some but not all injunctions issues under Section 283. That statute draws no such distinction; it specifies, without exception, that injunctions may be issued only "in accordance with the principles of equity." 35 U.S.C. § 283. And statutes do not, of course, change their meaning depending on their application. *Clark v. Martinez*, 543 U.S. 371, 378 (2005). The Court has "never engaged in such interpretive contortion." *United States v. Santos*, 553 U.S. 507, 521 (2008) (plurality). Rather, it has rejected "the dangerous principle that [courts may] give the same statutory text different meanings in different cases." *Clark*, 543 U.S. at 386. Thus, *eBay* itself confirms that its holding applies to "any number of other disputes arising under the Patent Act." 547 U.S. at 394.

55

To be sure, the traditional four-factor test may *apply* differently to different kinds of injunctions.  For example, a permanent injunction against infringement may be inappropriate under the public-interest factor if it would remove a life-saving product from the market, while an ongoing royalty award would not.  Or in some cases where the question whether to enjoin infringing conduct is close, the balance of equities may favor ongoing royalties.  *Cf. Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361-62 (Fed. Cir. 2008) (upholding award of post-judgment royalties where injunction was warranted but stayed pending appeal).  But whatever its application to ongoing royalties in particular cases, the four-factor test *governs* all injunctions issued under § 283.  *eBay*, 547 U.S. at 390, 391-92, 394.

Thus, this Court's recent *Whitserve* decision directed a district court to take "all relevant equitable considerations" into account when determining whether to award post-judgment royalties or other equitable relief.  694 F.3d at 36.  This Court has likewise stressed that ongoing royalty awards should not be everyday occurrences:  "Under *some* circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate."  *Paice*, 504 F.3d at 1314 (emphasis added).  But courts should not award "such relief as a matter of course whenever a permanent injunction is not imposed."  *Id.* at 1315; *accord id.* at 1316 (Rader, J., concurring).  Those and other decisions of this Court recognize that an award of post-judgment royalties may sometimes be appropriate, and provide

guidance about how to determine the amount of such an award. *See, e.g.*, *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (2009). But they do not articulate the standard the district court should use to decide *whether* to award such relief in the first place—other than admonishing district courts not to do so as a matter of routine. *See, e.g.*, *Whitserve*, 694 F.3d at 34-36.

The district court nonetheless treated post-judgment royalties as common occurrences, not all that different from awards of taxable costs. The court held that a post-judgment royalty award was appropriate solely because the parties had tried but failed to negotiate a license setting forth agreed-upon terms for post-judgment royalties. *See* JA21. That is a necessary, not a sufficient, condition. This Court has stated that district courts should not award a royalty without permitting the parties to try to agree to one first, and has indicated that is an important consideration. *See Whitserve*, 694 F.3d at 34-36; *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1367 (Fed. Cir. 2010); *Fresenius*, 582 F.3d at 1303; *Amado*, 517 F.3d at 1361-62. But that is not the *only* requirement. If it were, post-judgment royalties would be available whenever settlement efforts failed—which is to say, they would *always* be available, a result that cannot be squared with either the Supreme Court's square holding in *eBay* or this Court's admonition in *Paice* that post-judgment royalty awards should not be routine.

Because the court did not apply the correct legal standard, this Court should, at a minimum, vacate and remand. *See Amado*, 517 F.3d at 1362. It appears, however, that remand would be futile. Soverain has never attempted to satisfy the traditional test for prospective relief, and it does not appear that Soverain could. There is nothing unusual about this case that would cause a post-judgment royalty award to be more appropriate in this case than in any other. And, as explained above, post-judgment royalties are not to be awarded lightly as a matter of course.

### B.    The District Court Lacked Authority To Increase The Ongoing Royalty Award 2.5 Times For Willfulness.

Even if traditional principles of equity do not apply to ongoing royalties, the district court's enhancement of the jury's imputed royalty rates by 2.5 times, based solely on its finding of willfulness pursuant to 35 U.S.C. § 284, is reversible error.

First, willfulness has no place in a post-judgment royalty analysis. Section 284, entitled "Damages," authorizes courts to increase "damages" by up to three times the amount found at trial. 35 U.S.C. § 284. As explained above, prospective royalties are not damages, and are therefore governed by Section 283, not Section 284. *See Paice*, 504 F.3d at 1316. Enhancing equitable relief under Section 284 is a statutory mismatch. Nonetheless, the district court based its enhancement on the factors that govern enhancements under that inapplicable section. *See* JA22-23; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992).

This Court has indicated that, in selecting a reasonable royalty for post-judgment infringement under the *Georgia-Pacific* framework, it may be appropriate to select a royalty rate higher than the jury's imputed rate if circumstances have changed since the hypothetical negotiation. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012); *Fresenius*, 582 F.3d at 1303 (explaining that ongoing royalty amount should be "influenced by the *Georgia Pacific* factors") (citing *Georgia-Pac. Corp v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). As the district court found, however, enhancement on that basis is unwarranted because the jury considered everything that Soverain later pointed to as a changed circumstance. *See* JA22, JA24. After finding that no enhancement was warranted on the grounds recognized by this Court, the court erred by granting one on another, erroneous ground (willfulness).

Moreover, the district court erroneously based its determination of willfulness solely on its view that, in light of its own judgment, any further infringement would necessarily be willful. *See* JA22. Simply put, appealing to this Court is not inherently willful. This is a serious and, in Defendants' view, clearly meritorious appeal—a point emphatically underscored by this Court's decision in *Newegg*. *See* JA31355-56. At a minimum, Defendants' appeal is not objectively baseless or reflective of subjective bad faith, and therefore is not willful

as a matter of law.  *See iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377 (Fed. Cir. 2011).

Nonetheless, the district court's enhancement took effect immediately upon entry of judgment, well before this appeal will conclude.  JA2.  And given that the last patent expires two years from now in 2015, a significant amount of the post-judgment award is attributable to the enhancement during appeal.  At a minimum, therefore, this Court should vacate the finding of willfulness through appeal.

Moreover, the court erred in selecting a 2.5 multiplier for willfulness, which exceeds even Soverain's request for a 2.0 multiplier on this basis.  *See* JA29640. The court's sole reason for choosing such a high multiplier is that Defendants are large companies that lost in the district court.  *See* JA23.  Although district courts have discretion in selecting a multiplier, this case starkly presents the question whether a court may award a multiplier at or near the top end of the range in *routine* cases, based solely on the fact that a large defendant lost in the district court.  The answer is no.  Neither Congress in the Patent Act nor the traditional equity practice incorporated in that Act contemplated that jury awards could routinely be dwarfed by vastly higher court-ordered royalties.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand for entry of judgment as a matter of law of invalidity and non-infringement.  Alternatively, this

60

Court should order a new trial on infringement.  Alternatively, this Court should reinstate the jury's damages award for youravon.com and either remit the award for avon.com or order a new trial on avon.com.  Alternatively, this Court should remit both of those damages awards or order a new trial on both.

Respectfully submitted on this 22d day of January, 2013.

  /s/ Daryl L. Joseffer
Daryl L. Joseffer
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 737-0500

Adam M. Conrad
KING & SPALDING LLP
100 N. Tryon Street, Suite 3900
Charlotte, NC  28202
Tel: (704) 503-2600

Gaston Kroub
LOCKE LORD, LLP
3 World Financial Center, 20th Floor
New York, NY 10281
Tel: (212) 415-8600

*Counsel for Defendant-Appellant
Avon Products, Inc.*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that the foregoing brief, exclusive of the exempted portions as provided in Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), contains 13,977 words and therefore complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(A)(i).


January 22, 2013                                     /s/ Daryl L. Joseffer
Date                                                          Daryl L. Joseffer

# ADDENDUM

# **TABLE OF CONTENTS**

Final Judgment,

    Dkt. No. 559, Aug. 22, 2012 .............................................................................JA1

Memorandum Opinion and Order,

    Dkt. No. 555, Aug. 9, 2012 .............................................................................JA3

Verdict Form,

    Dkt. No. 505, Nov. 18, 2011 .........................................................................JA25

Order,

    Dkt. No., 420, Apr. 21, 2011 .........................................................................JA28

U.S. Patent No. 5,715,314..................................................................................JA63

U.S. Patent No. 5,909,492..................................................................................JA113

Oral Order, Excerpts of Transcript of Nov. 17, 2011

    Dkt. No. 524, Nov. 22, 2011 .....................................................................JA3365

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| **SOVERAIN SOFTWARE LLC,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:09-CV-274** |
| | § | |
| **J.C. PENNEY CORPORATION, INC.** | § | |
| **ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

### FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, consistent with the Court's Memorandum Opinion and Order (Docket No. 555), and in consideration of the jury verdict delivered on November 18, 2011, and the entirety of the record available to this Court, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Victoria's Secret Direct Brand Management, LLC and Avon Products, Inc. (collectively "Defendants") are found to have unlawfully infringed U.S. Patent Nos. 5,715,314 ("the '314 Patent") and 5,909,492 ("the '492 Patent").

- The '314 Patent is not invalid and is enforceable.

- The '492 Patent is not invalid and is enforceable.

- The Court awards damages to Soverain Software LLC ("Soverain") for Victoria's Secret Direct Brand Management, LLC's infringement of the '314 and '492 Patents in the amount of $9,200,000.00.

- The Court awards damages to Soverain for Avon Products, Inc.'s infringement of the '314 and '492 Patents in the amount of $8,700,000.00.

## JA0001

- Soverain is further awarded post-verdict damages from November 19, 2011, until the date of this Final Judgment at the following rates: (1) 0.4% for victoriassecret.com; (2) 0.42% for avon.com; and (3) 0.35% for youravon.com.

- Soverain is further awarded prejudgment and post-judgment interest on the actual damages found by the jury and those awarded as post-verdict damages calculated at the prime rate as of the date of this Final Judgment, compounded quarterly.

- Soverain is awarded its prejudgment Costs of Court.

- Soverain is entitled to post-judgment interest as provided for by 28 U.S.C. § 1961 for any time period between the entry of this Final Judgment and the date upon which Soverain receives payment from Defendants as ordered herein.

- For the reasons stated in the Court's Memorandum Opinion and Order (Docket No. 555), Defendants are hereby **ORDERED**, for the remaining life of the '314 and '492 Patents and so long as their infringement continues, to pay Soverain an ongoing royalty at the following rates: (1) 1.0% for victoriassecret.com; (2) 1.05% for avon.com; and (3) 0.875% for youravon.com.

- All relief not granted in this Final Judgment is **DENIED**.

- All pending motions not previously resolved are **DENIED**.

**So ORDERED and SIGNED this 22nd day of August, 2012.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **SOVERAIN SOFTWARE LLC,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:09-CV-274** |
| | § | |
| **J.C. PENNEY CORPORATION, INC.** | § | |
| **ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER**

The following motions are before the Court:

- Defendants' Motion for Summary Judgment of Non-Infringement Based on Divided Infringement (Docket No. 386);

- Defendants' Post-Trial Motion for Judgment as a Matter of Law and Alternatively for Remittitur and New Trial (Docket No. 534);

- Soverain's Motion for Attorney's Fees and Expenses (Docket No. 532);

- Soverain's Motion for Post-Judgment Royalties (Docket No. 531);

- Soverain's Motion for an Award of Pre- and Post-Judgment Interest, and Post-Verdict Damages (Docket No. 530); and

- Soverain Software LLC's Motion for Sanctions (Docket No. 422).

For the reasons stated below, Defendants' motions (Docket Nos. 386 & 534) are **DENIED**;

Soverain's motions for fees and sanctions (Docket Nos. 532 & 422) are **DENIED**; and

Soverain's motions for royalties and interest (Docket Nos. 531 & 530) are **GRANTED**.

**BACKGROUND**

On June 25, 2009, Soverain Software LLC ("Soverain") filed this action against eighteen

defendants alleging infringement of U.S. Patent Nos. 5,715,314 ("the '314 Patent"); 5,909,492

**JA0003**

("the '492 Patent"); and 7,272,639 ("the '639 Patent"). Before trial, Soverain dropped its allegations regarding the '639 Patent. The '492 Patent is a continuation of the '314 Patent, and the patents share a common specification. The '314 and '492 Patents were subject to reexaminations, and the U.S. Patent and Trademark Office ("PTO") issued Reexamination Certificates in 2007 affirming all of the original claims and adding additional claims.

The patents generally relate to performing electronic commerce transactions over the Internet; the asserted claims specifically relate to the use of shopping cart features and online statements. As shown in Figure 1 of the '314 Patent, a buyer's computer is connected to a network, such as the Internet, for connection to a merchant's computer and a payment computer. '314 Patent col. 4:35–45 & fig. 1.



FIG. 1

A shopping cart database is coupled to the payment computer. *Id.* A user reviews advertisements on a merchant computer and eventually requests a product. *Id.* col. 5:26–30. This results in a payment URL being sent from the buyer to the payment computer. *Id.* Rather than purchasing

immediately, the buyer computer may request that the product be added to a shopping cart. *Id.* col. 7:55–60. The payment computer may validate that the buyer is authorized (i.e., has approved credit) to purchase the product. The payment computer responds to the buyer computer with a message that gets redirected from the buyer computer to the merchant computer. In this manner, the merchant computer does not have to directly communicate with the payment computer. *Id.* cols. 1:50–2:18.

This Court construed the disputed terms of the patents-in-suit on January 13, 2011. *See* Docket No. 332 (*Markman* opinion). Only two of the initial eighteen defendants—Victoria's Secret Direct Brand Management, LLC ("Victoria's Secret") and Avon Products, Inc. ("Avon") (collectively "Defendants")—remained for trial, which was conducted on November 14–18, 2011. The jury found that Defendants infringed claims 34 and 51 of the '314 Patent and claims 15, 17, and 39 of the '492 Patent. Further, the jury found that none of the asserted claims were invalid as anticipated or obvious. Finally, the jury awarded $8.7 million in damages against Avon—$8,215,000 for the avon.com website and $485,000 for the youravon.com website—and $9.2 million in damages against Victoria's Secret for the victoriassecret.com website. *See* Docket No. 506 (jury verdict).

## DEFENDANTS' JUDGMENT AS A MATTER OF LAW REGARDING NON-INFRINGEMENT AND DAMAGES

Defendants move for judgment as a matter of law that they do not infringe the patents in suit for the following reasons: (1) divided infringement; (2) patent misuse; (3) prosecution history estoppel; and (4) insufficient evidence regarding Avon's item entry form. Defendants further argue that there was no admissible evidence of damages. Avon contends that it is entitled to remittitur with regard to the damage award relating to the avon.com website. Finally, Defendants alternatively request a new trial.

***Judgment as a Matter of Law, New Trial, and Remittitur Standards***

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must be supported by "substantial evidence" relating to each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The moving party is entitled to judgment as a matter of law, "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

Under the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages

4

**JA0006**

awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.3d 610, 612–13 (5th Cir. 1985).

Remittitur is within the sound discretion of the trial court and is only appropriate when the damages verdict is "clearly excessive." *See Alameda Films S.A. v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482 (5th Cir. 2003).

### *Divided Infringement*

Defendants contend that they are entitled to judgment as a matter of law of non-infringement because Defendants do not put the entire claimed system into use, citing *Centillion Data Systems, LLC v. Qwest Communications International, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011). *Centillion* involved a patent that claimed "a system for collecting, processing, and delivering information from a service provider, such as a telephone company, to a customer." *Centillion*, 631 F.3d at 1281. The system claims at issue included both a back-end component (server-side) maintained by the service provider and a front-end component (client-side) maintained by an end user. *Id.* The client-side of the system was a "personal computer data processing means adapted to perform additional processing," and included "front-end applications that a user may [download and] install on a personal computer." *Id.* The parties in *Centillion* disputed whether the user (client-side) or Qwest (server-side) used the claimed system under § 271(a).

The *Centillion* court held that the use of a system for infringement purposes required a party to "control the system *as a whole* and obtain benefit from it." *Id.* at 1284 (emphasis added) (citing *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)). Use of a system does not require "physical or direct control over each individual element of the system." *Id.* Applying this standard, the court determined that the end-users "used" the system because they put the entire system into service by initiating a request and downloading the results for

further processing on the user's personal computer. *Id.* at 1285. However, the court found that Qwest did not use the system because "it never puts into service the personal computer data processing means." *Id.* Further, "[s]upplying the software for the customer to use is not the same as using the system." *Id.*

In the instant case, Defendants argue that they—like Qwest in *Centillion*—do not use the claimed system because the claims require a buyer computer[1] (client-side) and a shopping cart computer (server-side). Claim 34 of the '314 Patent is representative and states:

> A network-based sales system, comprising:
>> at least one buyer computer for operation by a user desiring to buy products;
>> at least one shopping cart computer; and
>> a shopping cart database connected to said shopping cart computer;
>> said buyer computer and said shopping cart computer being interconnected by a computer network;
>> said buyer computer being programmed to receive a plurality of requests from a user . . . ;
>> said shopping cart computer being programmed to receive a plurality of shopping cart messages . . . ;
>> said buyer computer being programmed to receive a request from said user . . . ;
>> said shopping cart being a stored representation of a collection of products . . . .

'314 Patent cols. 13:62–14:28. The buyer computer is: (1) for operation by a user; (2) connected to a computer network; and (3) programmed to receive requests. The first two limitations of the buyer computer describe its general characteristics as a component of the overall system: namely, as a networked computer for operation by an end-user. The third limitation enables the buyer computer to operate as a meaningful component of the system, providing programming to permit the buyer computer to interact with the other components of the system, such as the

---

[1] Some claims require a buyer computer (claims 34 and 51 of the '314 Patent and claim 17 of the '492 Patent), while others require a client computer (claims 15 and 39 of the '492 Patent). The parties agree that the buyer computer and client computer are essentially the same for the purpose of a divided infringement analysis.

**JA0008**

shopping cart computer. Defendants argue that this third characteristic, requiring the computer to be programmed, dictates that they cannot infringe as a matter of law because "supplying software for the customer to use is not the same as 'using' the system." Docket No. 534, at 27.

Defendants' argument relies on the Federal Circuit's statement in *Centillion* that "[s]upplying the software for the customer to use is not the same as using the system." *Centillion*, 631 F.3d at 1286. In *Centillion*, the "personal computer data processing means" was "adapted to perform additional processing" by software provided by Qwest. Customers were required to download and install the software to take advantage of the "additional processing." Here, unlike Qwest, Defendants do not require their customers to download and install software so that the buyer computer is able to interact with the shopping cart computer as required by the claims. Rather, the delivery of Defendants' web page itself provides the programming required by the claims; the user is not required to install anything. Thus, Defendants' web server, by delivering web pages containing embedded programming, puts the system as a whole into service so that Defendants may benefit from the system. Accordingly, Defendants use the system under § 271(a) by putting the system into service, i.e., controlling the system as a whole and deriving benefit from it. Defendants' motion for judgment as a matter of law that it does not use the system claimed by the patents-in-suit is **DENIED**. Further, Defendants' Motion for Summary Judgment of Non-Infringement Based on Divided Infringement (Docket No. 386), raising the same arguments just addressed, is **DENIED AS MOOT**.

### *Patent Misuse*

Defendants argue that the patents-in-suit are unenforceable under the doctrine of patent misuse because Soverain "presented a reasonable royalty model that includes fees charged well past the expiration of the asserted patents." Docket No. 534, at 41. Patent misuse is "grounded in the policy-based desire to 'prevent a patentee from using the patent to obtain market benefit

7

**JA0009**

beyond that which inheres in the statutory patent right.'" *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) (quoting *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992)). Patent misuse is typically found when a patentee seeks to obtain post-expiration royalties via licensing agreement or ties use of the patented invention to required purchases of non-patented products. *See, e.g.*, *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) (finding patent misuse for charging licensing fees beyond expiration of the licensed patent); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917) (finding patent misuse for licensing patented projectors only for use with films leased from the patentee).

Here, Soverain argued that the Transact system was an alternative to licensing the patents-in-suit and presented evidence regarding how much it would cost to implement this alternative during the relevant period. The costs of adopting the system included initial licensing fees, implementation costs, and maintenance and support costs. The maintenance and support costs were calculated from 1998 to perpetuity; however, Soverain's expert, Mr. Raymond Sims, explained that the discounted costs become virtually nothing beyond twenty years. Tr. Trial Morning Session 133–34, Nov. 15, 2011. He further explained that a party to the hypothetical negotiation would have considered the entire cost of the alternative system in determining what constituted a reasonable royalty rate for the patents-in-suit. On cross-examination, Defendants highlighted that the maintenance costs went beyond the 2015 expiration date of the patents-in-suit. The jury was able to consider whether these costs should form the basis for a reasonable royalty. Soverain did not attempt to extract post-expiration royalties; rather, it considered the entire cost of implementing an alternative system for the purpose of determining what reasonable royalty rate would have been agreed to as part of the hypothetical negotiation. Soverain's

arguments do not equate to patent misuse, which is a narrowly construed doctrine. *See Princo Corp.*, 616 F.3d at 1329 (recognizing the narrow scope of the patent misuse doctrine).

***Prosecution History Estoppel***

Defendants contend that they are entitled to judgment as a matter of law of non-infringement under the doctrine of equivalents based on amendments made to claim 34 of the '314 Patent during prosecution. The amendment to claim 34 added the following language:

> said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database

Docket No. 534 attach. 9, at 2. This language was added to "define the terms 'shopping cart,' 'shopping cart computer,' and 'shopping cart database' in context . . . ." *Id.* at 4. Defendants argue that this amendment places a physical limitation on the shopping cart computer, prohibiting a shopping cart computer comprised of multiple physical computers.

Defendants' argument is contrary to the Court's construction of the term "shopping cart computer" and the parties' agreed construction of the term "computer." This Court construed "shopping cart computer" as "a computer processing data associated with one or more shopping carts." *See* Docket No. 332, at 16–17. Further, the parties agreed to a construction of "computer" as "a functional unit that can perform substantial computation, including numerous arithmetic operations, or logic operations without human intervention." *Id.* at 1, 27. This agreed construction of computer does not limit a computer to a single physical computing device; it permits a plurality of physical computing devices to operate in concert as a computer. Soverain's amendment to claim 34 does not prohibit a computer comprised of multiple physical computing devices. The amendment merely clarifies that a shopping cart computer is "a *computer* that modifies said stored representations of collections of products in said database." Docket No. 534

attach. 9, at 2 (emphasis added). The amendment provides functional limitations on the computer, not physical or structural limitations. Accordingly, Soverain was not prohibited from arguing that multiple physical computing devices acting in concert met the "shopping cart computer" limitation either directly or via the doctrine of equivalents.

### Avon's Item Entry Form

Avon argues that it is entitled to judgment as a matter of law that the youravon.com "item entry form" does not infringe the patents-in-suit because Soverain failed to present evidence regarding the item entry form. Avon's youravon.com website has two methods for ordering products: (1) the item entry form and (2) the electronic brochure. Soverain accused the electronic brochure method. Avon argued at trial that 70–80% of its online orders were via the item entry form. Tr. Trial Afternoon Session 113, Nov. 15, 2011. However, this figure was contested, leaving a fact issue for the jury to determine. *See id.* at 121–23. The issue is whether there was substantial evidence to support the jury's damage award regarding youravon.com, not whether the item entry form infringed. As explained in the next section, the damages award—as corrected—is supported by substantial evidence.

### Damages Evidence

Defendants argue that they are entitled to judgment as a matter of law because Soverain failed to present admissible evidence of damages. Defendants contend that Soverain's expert, Sims, improperly used the entire market value rule, improperly used the cost of Transact as the starting point for a hypothetical negotiation analysis, and improperly applied the *Georgia-Pacific*[2] factors.

---

[2] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

Sims used the value of products sold via the infringing websites as the royalty base.[3] He then determined the profit earned on these products. Finally, he evaluated the cost of implementing the Transact system—a stipulated embodiment of the patents-in-suit—to derive a starting point for his *Georgia-Pacific* factor analysis to arrive at a final royalty rate. *See* Tr. Trial Morning Session 111–15, Nov. 15, 2011.

Neither Sims nor Napper used the entire market value to determine the royalty base. The patented system is implemented via Defendants' websites; thus, the patents relate to features of these websites. Had Soverain used the cost of implementing the entire website as its royalty base, the entire market value would have been implicated. Here, the patented system permits online sales, which provides the base for both damages experts' analysis. Sims's analysis was appropriately tied to the facts of this case and presented a justifiable royalty rate measured against online sales enabled by the patented technology.

The parties agreed that the Transact system embodied the patents-in-suit, and this system was available at the time Defendants' infringement began. Thus, it was appropriate for Sims to use the cost of implementing the Transact system in establishing a starting point rate for the hypothetical negotiation. Further, Sims performed an analysis of the *Georgia-Pacific* factors to justify increasing his initial rate, which was based on the Transact alternative. Defendants contend that Sims ignored evidence pertaining to certain factors; however, their arguments are an effort to reweigh the evidence pertaining to each of the factors. Sims presented his *Georgia-Pacific* factor analysis, and Napper presented his. It was for the jury, not the Court, to weigh the evidence in arriving at a reasonable royalty. Accordingly, the damages evidence presented to the jury was properly admitted and considered.

---

[3] Defendants' expert, Mr. Brian Napper, also relied on online sales to arrive at his proposed royalty base. *See* Tr. Trial Afternoon Session 80–81, Nov. 16, 2011.

*Remittitur*

Defendants alternatively argue that the damages award pertaining to avon.com should be remitted because it is against the great weight of the evidence. Soverain contends that the damages award, as to Avon, is supported by the evidence, and the jury merely transposed the numbers for avon.com and youravon.com on the verdict form.

Soverain sought approximately $9.7 million in damages against Avon—for the avon.com and youravon.com sites—and $9.2 million in damages against Victoria's Secret—for the victoriassecret.com site. The verdict form provided three entries for damages, one for each of the accused websites: (1) avon.com; (2) youravon.com; and (3) vistoriassecret.com. The jury awarded $8,215,000 for avon.com; $485,000 for youravon.com; and $9,200,000 for victoriassecret.com. *See* Docket No. 506. Evidence at trial indicated that approximately 95% of Avon's online sales were conducted through the youravon.com site. The jury's damages award regarding victoriassecret.com matches the amount sought by Soverain. The jury's award for youravon.com represents 5% of the amount Soverain sought from Avon, while the award for avon.com represents $1 million less than 95% of the amount Soverain sought from Avon. Thus, the jury elected to award Soverain $8.7 million in damages against Avon rather than the requested $9.7 million. However, the allocation between the two Avon websites does not match the evidence presented. The evidence showed that the bulk of the orders were through youravon.com; however, the jury awarded the bulk of the damages for infringement relating to the avon.com site.

The discrepancy is easily explained by Defendants' closing arguments. Defendants' demonstrative transposed the amounts their damages expert, Napper, proposed throughout his testimony. The demonstrative proposed $20,628 in damages relating to youravon.com and $457,991 in damages relating to avon.com—transposing the amounts that Napper had proposed

during his damages analysis. *Compare* Tr. Trial 101:14–18, Nov. 18, 2011 (discussing the closing argument demonstrative), *with* Tr. Trial Afternoon Session 99–100, Nov. 16, 2011 (Napper's testimony regarding damages for avon.com). Defendants' counsel informed the jury that the amounts were transposed. Tr. Trial 101:17–21, Nov. 18, 2011. However, counsel then stated that the demonstrative was correct. *Id.* at 101:22–102:3. Finally, counsel again asserted that the numbers on the slide were reversed. *Id.* at 102:6–12.

That counsel transposed these numbers during closing arguments is understandable. Likewise, it is understandable that the jury transposed its damages awards for youravon.com and avon.com. The $8,215,000 award corresponding to avon.com is not supported by the evidence, and both parties seemingly acknowledge this. *See* Docket No. 534, at 24–26 (Defendants arguing that the avon.com award is not supported by the evidence); Docket No. 539, at 3–9 (Soverain arguing that the damages for the Avon sites should be transposed to align with the evidence presented at trial). However, the jury's Avon award—after transposition—almost mirrors the 95%–5% division of online orders between the two sites. This Court has the power to correct clerical mistakes "in a judgment, order, or other part of the record." FED. R. CIV. P. 60(a); *see also Robert Tyer & Assocs., Inc. v. Envtl. Dynamics, Inc.*, 1997 U.S. App. LEXIS 19101 (Fed. Cir. 1997) (unpublished) (recognizing the broad discretion courts have under Rule 60 to correct errors in verdict forms). Here, the jury made a clerical error in filling-out the verdict form, and the damages award for the two Avon sites shall be transposed as follows: $8,215,000 for youravon.com and $485,000 for avon.com. The corrected verdict is supported by substantial evidence in the record, and Defendants' request for remittitur is **DENIED**.

*New Trial*

Defendants argue that they are entitled to a new trial based on improperly excluded evidence and because the verdict was against the great weight of the evidence. Specifically, Dr.

Glenn Trewitt, a former employee at Digital Equipment Corporation, was prepared to testify about the operation of an online bookstore website, the Future Fantasy Bookstore ("FFB"). Trewitt was also prepared to testify about a technical note he wrote concerning the Tcl language that mentioned the FFB. *See* Tr. Trial Afternoon Session 41, Nov. 15, 2011 (describing the Tcl technical note to the jury). Defendants contend that this evidence supported a finding that the patents are invalid as obvious. The Court did not permit testimony about the operation of the FFB beyond what was covered in the Tcl technical note because Trewitt's testimony was not corroborated.

"[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Finnigan Corp. v. Int'l Trade Commission*, 180 F.3d 1354, 1369 (Fed. Cir. 1999). "Both physical evidence and oral testimony of a disinterested party can serve to satisfy the corroboration requirement." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004).

Trewitt developed and hosted the FFB from 1993 to 1999. However, he only had a 1999 version of the code that implemented the FFB website. This code included a "What's New" page describing high-level changes to the site throughout the time it was hosted. The critical date for the patents-in-suit was in 1994. Defendants offered Trewitt's testimony to invalidate the patents-in-suit as obvious; thus, the relevant corroborating FFB code would be from the 1994 timeframe, not the 1999 code that Defendants tendered. Defendants argued that the What's New page was essentially a change-tracking mechanism. Source code change-tracking systems typically allow reconstruction of older versions of the source code; however, the high-level descriptions provided by the What's New page did not allow for that type of reverse-engineering. Further, the What's New page focused on customer-visible features of an ecommerce website, while the

asserted claims address the underpinnings (often invisible to end-users) of such an ecommerce website. Due to the absence of corroborating evidence, the Court prohibited Trewitt from testifying about the features of the FFB website beyond what was revealed in the Tcl technical note. *See* Tr. Trial Afternoon Session 33–34, Nov. 15, 2011.

Trewitt's uncorroborated testimony was properly excluded, and Defendants' are not entitled to a new trial on that basis. Further, there is sufficient evidence in the record to support the jury's verdict that the patents are infringed and not invalid. Thus, Defendants' request for a new trial is **DENIED**.

### SOVERAIN'S MOTION FOR ATTORNEY'S FEES AND EXPENSES

Soverain asks the Court to declare this case exceptional under 35 U.S.C. § 285 and award attorney's fees. "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Awarding attorney's fees under § 285 is a two-step process. *Cybor Corp. v. FAS Tech.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998). "First, the district court must determine whether a case is exceptional, a factual determination reviewed for clear error. After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate." *Id.* (internal citation omitted).

Soverain argues that the instant case is exceptional for the following three reasons: (1) Defendants intentionally withheld expert discovery; (2) Defendants sought to admit source code at trial as prior art that they knew was not prior art; and (3) Defendants intentionally withheld factual discovery. Soverain's first argument that this case is exceptional pertains to the depositions of Defendants' experts, Drs. Arthur Keller and Andrew Cromarty. Soverain argues that Keller and Cromarty were unresponsive during their depositions and both read lengthy portions of their expert report into the record when answering questions. Soverain contends that the witnesses were coached to be non-responsive and evasive. Defendants respond that the

experts attempted to answer the questions and often relied directly on their expert reports to avoid being caught in a "memory-test trap" by deposing counsel. Defendants further explained that Keller and Cromarty were not experienced deponents—in fact, this was Cromarty's first deposition.

Thorough review of the deposition transcripts reveals that the actions of Keller, Cromarty, and Defendants' counsel throughout the depositions do not warrant a finding that the case is exceptional under § 285. The Court is sensitive to discovery misconduct and will apply sanctions as needed. *See VirnetX Inc. v. Cisco Sys., Inc.*, No. 6:10-cv-417 (E.D. Tex. Aug. 8, 2012) (imposing sanctions for misconduct during a deposition). Though the depositions of Keller and Cromarty may not have been as smooth as Soverain would like, it appears that counsel was generally able to obtain answers to his questions. Keller and Cromarty did not blatantly evade the questions being asked. While not desirable, their lengthy answers (at times) and hesitation to deviate from the language of their expert reports do not rise to the level of warranting sanctions or a finding that the case is exceptional.

Soverain's remaining two arguments that this case is exceptional are also unavailing. As discussed earlier, Defendants sought to admit the testimony of Dr. Trewitt regarding the FSB online bookstore. The Court did not permit this testimony for lack of corroboration. Losing on an evidentiary ruling is not a basis for finding a case exceptional. Likewise, Soverain's mere argument that Defendants failed to produce documents does not tip the scale. Defendants have consistently indicated that they produced documents in a timely manner. *See* Docket No. 543, at 14–16, 21–24. Soverain infers the existence of documents based on generic statements about business models or plans. *See* Docket No. 532, at 22–25. Defendants have asserted that the requested documents either do not exist or have already been produced. Absent more significant

proof of withholding, the Court will not conclude that Defendants withheld discoverable

materials. Accordingly, the instant case is not an exceptional case under § 285, and Soverain's

motion for attorney's fees (Docket No. 532) and motion for sanctions (Docket No. 422) are

**DENIED**.

### SOVERAIN'S MOTION FOR AN AWARD OF PRE- AND POST-JUDGMENT INTEREST, AND POST-VERDICT DAMAGES

Soverain seeks an award of pre- and post-judgment interest on the damages award.

Defendants argue that Soverain is not entitled to interest because it delayed bringing the instant

suit. Soverain also seeks post-verdict damages. Defendants agree that Soverain is entitled to

post-verdict damages, but dispute the royalty rate that should apply.

A court should award interest in patent cases after a finding of infringement. 35 U.S.C.

§ 284. The purpose of prejudgment interest is to place the patentee in as good a position as he

would have been had the infringer paid a reasonable royalty instead of infringing. *Beatrice

Foods v. New England Printing*, 923 F.2d 1576, 1580 (Fed. Cir. 1991). Prejudgment interest

should be awarded unless there is a significant justification for withholding such an award, such

as a delay in bringing suit against the infringer. *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S.

648, 657 (1983); *Bio-Rad Labs. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).

The interest rate used to calculate prejudgment interest and the method and frequency of

compounding are left to the discretion of the district court. *See Uniroyal, Inc. v. Rudkin-Wiley

Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.,

Inc.*, 862 F.2d 1564, 1579–80 (Fed. Cir. 1988) (citing *Bio-Rad Labs.*, 807 F.2d at 969).

Defendants argue that Soverain intentionally waited to file the instant suit in order to reap

a larger damage award due to Defendants' increased online sales. Soverain responds that it was

actively enforcing its patents in other cases while also defending the patents in reexamination

proceedings. "[T]he withholding of prejudgment interest based on delay is the exception, not the rule . . . ." *Lummus Industries, Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988). There was not unreasonable delay in bringing suit, and Soverain is entitled to prejudgment and post-judgment interest calculated at the prime rate as of the date of this order, compounded quarterly. *See Clear With Computers, LLC v. Hyundai Motor Am., Inc.*, No. 6:09-cv-479, slip op. at 14 (E.D. Tex. Jan. 9, 2012) (awarding interest at the prime rate, compounded quarterly).

Soverain also seeks post-verdict, prejudgment damages. Defendants agree that Soverain is entitled to post-verdict damages, but dispute the rate. The parties agree that the jury arrived at a 0.4% royalty rate regarding Victoria's Secret. Soverain argues, by combining the damages award pertaining to the avon.com and youravon.com sites, that the jury arrived at a 0.36% royalty rate regarding Avon. Avon, however, determines the rate on a per-site basis: 7.18% for avon.com and 0.02% for youravon.com.[4] Avon does not dispute the 0.02% rate for youravon.com, but argues that the 7.18% rate for avon.com is excessive.

In light of the corrected verdict form, the appropriate per-site rate for Avon is: 0.42% for avon.com and 0.35% for youravon.com. Thus, the royalty rate per site for infringement occurring between verdict and judgment is: (1) 0.4% for victoriassecret.com; (2) 0.42% for avon.com; and (3) 0.35% for youravon.com.[5]

## SOVERAIN'S MOTION FOR POST-JUDGMENT ROYALTIES

Soverain asks the Court to impose a post-judgment royalty that is quadruple the royalty implied by the jury verdict. Defendants object to the royalty for many of the reasons that they objected to the damages evidence presented in this case. Further, Defendants contend that

---

[4] Avon's rates are supported by the data presented in Sims's declaration. *See* Docket No. 530, attach. 1.
[5] These rates were derived from the data presented in Sims's declaration using the corrected verdict form numbers.

Soverain's 4x multiplier results from an erroneous analysis regarding changed factors post-judgment.

"The award of an ongoing royalty instead of a permanent injunction to compensate for future infringement is appropriate in some cases." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012) (citing *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007)). An ongoing royalty is a form of equitable relief authorized under 35 U.S.C. § 283. *See Paice*, 504 F.3d at 1315 n.16. The Court is not bound by the prejudgment royalty rate found by the jury. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361–62 (Fed. Cir. 2008). "[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors." *Paice*, 504 F.3d at 1317 (Rader, J., concurring).

The Court ordered the parties to mediate prior to filing post-verdict motions "[i]n an effort to reach a business solution in a timely and efficient manner." Docket No. 515. The parties were unable to arrive at such a business solution and, based on their post-verdict briefing, have not agreed to an ongoing royalty rate. *See* Docket No. 529 (reporting a post-verdict mediation impasse). Soverain argues that it is entitled to an enhanced ongoing royalty rate based on changed factors in the hypothetical negotiation and Defendants' now willful infringement. Defendants argue that Soverain has improperly reconsidered factors that were before the jury in arriving at its proposed rate.

Soverain contends that multiple changed circumstances warrant a higher royalty rate than that found by the jury, including: (1) litigation expenses; (2) Defendants' enhanced profitability in 2012 versus 1998[6]; (3) the proven success of ecommerce technology in 2012 versus 1998; and (4) the cost of implementing Transact in 2012 versus 1998. Applying these considerations,

---

[6] The parties agreed during trial that 1998 was the appropriate timeframe for the hypothetical negotiation.

Soverain argues that the jury's royalty rate should be doubled. Then, Soverain argues that the rate should be doubled again under the *Read*[7] factors based on continued willful infringement.

Soverain seeks to double the jury's implied royalty rate based on changed circumstances between 1998 and 2012. The "book of wisdom" rubric permits damages experts to consider post-infringement information in arriving at a hypothetically negotiated royalty rate. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (quoting *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933)). Accordingly, Soverain's expert, Sims, considered post-1998 evidence in arriving at his damages model. The jury also heard and considered this evidence. *See* Tr. Trial Morning Session 109, Nov. 15, 2011 (discussing how the patented technology was used to improve the profitability of Defendants' businesses); *id.* at 111 (discussing the success of ecommerce sales in 2004 and 2009). Further, as discussed earlier, the cost of implementing the Transact alternative to licensing the patents-in-suit was presented to the jury. This alternative included the costs of implementing Transact through the life of the patents-in-suit. Thus, the jury has already heard and considered the evidence of changed circumstances that Soverain now contends should be considered in a post-judgment royalty analysis. The jury's implied royalty rate provides a starting point for determining the ongoing post-judgment royalty rate. *See Affinity Labs of Tx., LLC. v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 898 (E.D. Tex. 2011) ("[T]he trial testimony and jury findings with respect to past damages can provide a basis for calculating a market royalty for any ongoing infringement."). Here, there are no changed market circumstances that should now alter the royalty rate implied by the corrected verdict.

The *Read* factors provide guidance in determining whether and how much damages should be enhanced in light of Defendants' ongoing willful infringement. These factors include:

---

[7] *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992).

(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *See Read*, 970 F.2d at 827.

The first *Read* factor—whether Defendants copied the patents-in-suit—is neutral because there is no evidence of copying. Factors two and five—whether Defendants had a good faith belief that the patents are invalid or not infringed and the closeness of the case—strongly favor enhancement. Defendants are now adjudged infringers and the patents were deemed not invalid. Accordingly, Defendants cannot assert a good-faith belief of non-infringement or invalidity, and the case is no longer a close one. Factor three—the Defendants' litigation conduct—does not favor enhancement for the reasons discussed earlier regarding Soverain's motion for attorney's fees. Factor four—the size and financial condition of Defendants—also favors enhancement. Both Victoria's Secret and Avon are large, profitable companies. *See* Docket No. 531, at 20–21. Factor six, regarding the duration of misconduct, is neutral because it is unknown how long Defendants may opt to continue infringement. Factor seven, regarding remedial action, favors enhancement because there is no evidence that Defendants have taken any steps to stop infringement. Finally, factors eight and nine—Defendants' motivation for harm and attempts at concealment—are neutral because there is no evidence that Defendants intended to harm Soverain or attempted to conceal their infringing activity.

Defendants have challenged Soverain's allegations of infringement and the validity of the patents. The jury, supported by substantial evidence, determined that Defendants infringe and that the patents are not invalid. Thus, should Defendants continue infringing, they do so in a willful manner. Taking all of the *Read* factors into consideration, a 2.5x enhancement to the jury's implied royalty rate is appropriate. Thus, Soverain is entitled to the following ongoing royalty rates: (1) 1.0% for victoriassecret.com; (2) 1.05% for avon.com; and (3) 0.875% for youravon.com.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment of Non-Infringement Based on Divided Infringement (Docket No. 386) is **DENIED as MOOT**; Defendants' Post-Trial Motion for Judgment as a Matter of Law and Alternatively for Remittitur and New Trial (Docket No. 534) is **DENIED**; Soverain's Motion for Attorney's Fees and Expenses (Docket No. 532) is **DENIED**; Soverain's Motion for Post-Judgment Royalties (Docket No. 531) is **GRANTED**; Soverain's Motion for an Award of Pre- and Post-Judgment Interest, and Post-Verdict Damages (Docket No. 530) is **GRANTED**; and Soverain Software LLC's Motion for Sanctions (Docket No. 422) is **DENIED**.

**So ORDERED and SIGNED this 9th day of August, 2012.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

SOVERAIN SOFTWARE LLC,

Plaintiff,

vs.                                        CASE NO. 6:09-CV-274

J.C. PENNEY CORPORATION, INC.,
ET AL.,

Defendants.

## VERDICT FORM

1

**JA0025**

In answering these questions, you are to follow the instructions I have given you in the Charge of Court.

1. Did Soverain Software prove by a preponderance of the evidence that Defendants' respective websites infringe any of the asserted claims of the '314 or '492 Patents?

   Answer "Yes" or "No" for each listed asserted claim by writing "Yes" or "No" in the space provided. Each space should be answered.

| '314 Patent | Avon.com | yourAvon.com | Victoriassecret.com |
|---|---|---|---|
| Claim 34 | Yes | Yes | Yes |
| Claim 51 | Yes | Yes | Yes |

| '492 Patent | Avon.com | yourAvon.com | Victoriassecret.com |
|---|---|---|---|
| Claim 15 | Yes | Yes | Yes |
| Claim 17 | Yes | Yes | Yes |
| Claim 39 | Yes | Yes | Yes |

2. Did Defendants prove by clear and convincing evidence that any of the following asserted claims of the '314 or '492 patents are invalid as anticipated or obvious?

   If you find the asserted claim invalid, answer "Yes" or "No" for each listed asserted claim by writing "Yes" or "No" in the space provided. Answer for all asserted claims regardless of whether you have found those claims were infringed. Each space should be answered.

| '314 Patent | Anticipated? | Obvious? |
|---|---|---|
| Claim 34 | No | No |
| Claim 51 | No | No |

2

**JA0026**

| '492 Patent | Anticipated? | Obvious? |
|---|---|---|
| Claim 15 | No | No |
| Claim 17 | No | No |
| Claim 39 | No | No |

### DAMAGES

ANSWER THIS QUESTION ONLY FOR THE ASSERTED CLAIMS YOU
FOUND INFRINGED AND NOT INVALID, IF ANY.  IF YOU FOUND NO
CLAIMS INFRINGED AND NOT INVALID, PLEASE DO NOT ANSWER THIS
QUESTION.

3. For each Defendant's website, what sum of money, if any, do you find from a
preponderance of the evidence would fairly and reasonably compensate Soverain
Software for each Defendants' infringement of the patent claims that you have found
were infringed through the time of trial.

avon.com              $ _8,215,000_____

yourAvon.com          $ _485,000_____

victoriassecret.com   $ _9,200,000_____


Signed this _18th_ day of November 2011


✏ JURY FOREPERSON

3

**JA0027**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **SOVERAIN SOFTWARE LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:09-CV-274** |
| | § | **PATENT CASE** |
| **J.C. PENNEY CORPORATION, INC., et al.,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**ORDER**

Upon consideration of the parties' written submissions and oral arguments, the following

lists the parties' motions and the Court's rulings on whether the requested relief is granted or

denied as provided by the Court during the pre-trial hearing:

| Docket No. | Motion | Ruling |
|---|---|---|
| (Docket No. 262) | **Motion to Stay** | **DENIED** |
| (Docket No. 296) | **Plaintiff's Motion to Compel Document Production, Interrogatory Responses and 30(b)(6) Testimony from Defendants Victoria's Secret Stores Brand Management, Inc., and Victoria's Secret Direct Brand Management, LLC** | **DENIED** |
| (Docket No. 306) | **Motion for Leave to File Amended Answer and Counterclaims** | **GRANTED** |

**JA0028**

Case 6:09-cv-00274-LED   Document 420   Filed 04/21/11   Page 2 of 4 PageID #:  10398

| (Docket No. 307) | **Supplemental Motion to Compel** | **DENIED** |
|---|---|---|
| (Docket No. 344) | **Defendants' Motion for Leave to Amend Invalidity Contentions** | **GRANTED** |
| (Docket No. 365) | **Motion Pursuant to Rule 16(b) for Leave to Serve Infringement Contentions and Expert Reports Regarding QVCs Customer Service/Order Entry Website** | **DENIED AS MOOT** |
| (Docket No. 377) | **Motion to Strike Certain Portions of the Supplemental Expert Report of Dr. Jack D. Grimes** | **DENIED**<br><br>In response to Dr. Grimes' Supplemental Expert Report, Defendants may supplement their experts' reports on April 26, 2011 by 12:00 p.m.  Plaintiff may file a Motion to Strike those reports by April 29, 2011, and Defendants shall respond by May 2, 2011. Absent the Court's ruling to strike Defendants' supplemental reports, Plaintiff shall have 90 minutes and Defendants 60 minutes of additional expert deposition discovery to address the supplemental reports. |
| (Docket No. 384) | **Defendants' Motion for Partial Summary Judgment of No Willful Infringement** | **GRANTED** |
| (Docket No. 385) | **Defendant J.C. Penney Corporation Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction** | **DENIED** |
| (Docket No. 392) | **Defendants' Motion to Strike and Preclude the Expert Report and Testimony of Raymond S. Sims** | **DENIED**<br><br>A memorandum opinion will follow. |

| (Docket No. 409) | **Motion *in Limine* No. 1** | The Court encourages the parties to discuss and resolve the remaining *in limine* disputes before trial.  If necessary, Plaintiff's remaining motions *in limine* may be reurged at trial.<br><br>**Motions *in Limine* No. 1:  DENIED WITHOUT PREJUDICE**<br><br>The Court grants Plaintiff leave to file a motion for sanctions, with an expedited briefing  schedule, regarding its contentions that Defendants' experts failed to sufficiently disclose their infringement and invalidity opinions. |
| (Docket No. 411) | **Motion *in Limine* Nos. 1 and 10** | The Court encourages the parties to discuss and resolve the remaining *in limine* disputes before trial.  If necessary, Defendants' remaining motions *in limine* may be addressed in due course at trial.<br><br>**Motion *in Limine* No. 1: GRANTED**<br><br>The parties shall approach the bench before presenting evidence or argument related to *Soverain Software LLC v. Newegg Inc.*, 6:07-CV-00511-LED.<br><br>**Motion *in Limine* No. 10:  DENIED** |
| (Docket No. 418) | **Joint Motion to Continue Trial Date** | **DENIED**<br><br>This case shall immediately follow *Fractus v. Samsung, et.al.,* 6:09cv203.  *See* Docket No. 407.  However, once the trial date is finalized, the  parties may file a new motion for continuance if they have an insurmountable scheduling conflict.  It is in the Court's and the parties' best interest to proceed on this schedule unless absolutely impossible. |

Case 6:09-cv-00274-LED   Document 420    Filed 04/21/11   Page 4 of 4 PageID #:  10400

Having considered the parties' proposals, the Court will allow the each party 30 minutes

for voir dire, 30 minutes for opening, 45 minutes for closing, and 12 hours for direct and cross

examination.  The 12 hour allocation for direct and cross examination apples to all issues, both

jury and non-jury.

**So ORDERED and SIGNED this 21st day of April, 2011.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

US005715314A

# United States Patent [19]

Payne et al.

[11] Patent Number: 5,715,314

[45] Date of Patent: Feb. 3, 1998

[54] **NETWORK SALES SYSTEM**

[75] Inventors: **Andrew C. Payne**, Lincoln; **Lawrence C. Stewart**, Burlington; **David J. Mackie**, Cambridge, all of Mass.

[73] Assignee: **Open Market, Inc.**, Cambridge, Mass.

[21] Appl. No.: **328,133**

[22] Filed: **Oct. 24, 1994**

[51] **Int. Cl.**$^{6}$ .......... **H04L 9/00**

[52] **U.S. Cl.** .......... **380/24**; 380/23; 380/25; 380/49; 380/50

[58] **Field of Search** .......... 380/4, 21, 23, 380/24, 25, 49, 50; 364/401, 406, 408, 284.4; 235/379, 380; 395/200.01, 200.02, 200.09, 925

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,305,059 | 12/1981 | Benton | 340/825.33 |
| 4,578,530 | 3/1986 | Zeidler . | |
| 4,734,858 | 3/1988 | Schlafly | 364/408 |
| 4,755,940 | 7/1988 | Brachtl et al. | 364/408 |
| 4,775,935 | 10/1988 | Yourick | 364/401 |
| 4,795,890 | 1/1989 | Goldman | 235/380 |
| 4,799,156 | 1/1989 | Shavit et al. | 364/401 |
| 4,812,628 | 3/1989 | Boston et al. | 235/380 |
| 4,827,508 | 5/1989 | Shear | 380/4 |
| 4,922,521 | 5/1990 | Krikke et al. | 379/95 |
| 4,935,870 | 6/1990 | Burk, Jr. et al. . | |
| 4,947,028 | 8/1990 | Gorog | 235/381 |
| 4,977,595 | 12/1990 | Ohta et al. | 380/24 |
| 4,982,346 | 1/1991 | Girouard et al. | 364/550 |
| 4,992,940 | 2/1991 | Dworkin | 364/401 |
| 5,025,373 | 6/1991 | Keyser, Jr. et al. | 364/408 |
| 5,060,153 | 10/1991 | Nakagawa | 364/405 |
| 5,077,607 | 12/1991 | Johnson et al. . | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0-542-298-A2 | 5/1993 | European Pat. Off. | G07F 7/10 |
| 2102606 | 2/1983 | United Kingdom | G07F 7/10 |
| WO 91/16691 | 10/1991 | WIPO | G07F 7/10 |
| WO 95/16971 | 6/1995 | WIPO . | |

OTHER PUBLICATIONS

Rivest, R.L. et al., "A Method for Obtaining Digital Signatures and Public-Key Cryptosystems," Laboratory for Computer Science, Massachusetts Institute of Technology, Cambridge, Massachusetts, no date.

Bellcore Internal E-Mail, Nov. 24, 1993.

Sirbu, Marvin A.; "Internet Billing Service Design and Prototype Implementation"; *An Internet Billing Server*; pp. 1-19, no date.

*Payment Systems*, "United States"; pp. 115-135, no date.

National Westminster Bank Group Brochure; pp. 1-29, no date.

(List continued on next page.)

*Primary Examiner*—Bernarr E. Gregory
*Attorney, Agent, or Firm*—Fish & Richardson P.C.

[57] **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

**48 Claims, 25 Drawing Sheets**

Microfiche Appendix Included
(1 Microfiche, 34 Pages)

buyer computer 12
merchant computer 14
payment computer 16
12
10
16
22
buyer computer
network
payment computer
settlement database
21
shopping cart database
14
merchant computer
15
20
creation computer
advertising document database
18
digital advertisement database

**5,715,314**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,220,501 | 6/1993 | Lawlor et al. | 364/408 |
| 5,247,575 | 9/1993 | Sprague et al. | 380/9 |
| 5,305,195 | 4/1994 | Murphy | 364/401 |
| 5,336,870 | 8/1994 | Hughes | 235/379 |
| 5,341,429 | 8/1994 | Stringer et al. | 380/23 |
| 5,347,632 | 9/1994 | Filepp et al. | 395/200.09 |
| 5,351,186 | 9/1994 | Bullock et al. | 364/401 |
| 5,351,293 | 9/1994 | Michener et al. | 380/21 |
| 5,383,113 | 1/1995 | Kight et al. | 364/401 |
| 5,414,833 | 5/1995 | Hershey et al. | 395/575 |

### OTHER PUBLICATIONS

Even et al.; "Electronic Wallet"; pp. 383–386; 1983.

Okamoto et al.; "Universal Electronic Cash"; pp. 324–337; 1991.

Pfitzmann et al.; "How to Break and Repair a 'Provably Secure' Untraceable Payment System"; pp. 338–350; 1991.

Intuit Corp Quicken User's Guide; "Paying Bills Electronically"; pp. 171–192, no date.

Compuserve International; Compuserve Information Service Users Guide; pp. 109–114; 1986.

Gifford, David; "Notes on Community Information Systems" MIT LCS TM–419; Dec., 1989.

Vittal, J. "Active Message Processing: Messages as Messengers"; pp. 175–195; 1981.

Bos et al.; "SmartCash: A Practical Electronic Payment System"; pp. 1–8; Aug. 1990.

American National Standard; "Financial Institution Retail Message Authentication"; ANSI X9.19; 1986.

American National Standard; "Interchange Message Specification for Debit and Credit Card Message Exchange Among Financial Institutions"; ANSI X9.2; 1988.

Chaum et al., "Achieving Electronic Privacy"; *Scientific American*; pp. 319–327; 1988.

Bürk et al.; "Value Exchange Systems Enabling Security and Unobservability"; *Computers & Security*, 9; pp. 715–721; 1990.

Chaum et al.; "Untraceable Electronic Cash"; *Advances in Cryptology*; pp. 319–327; 1988.

Schamüller–Bichl, I.; "IC–Cards in High–Security Applications"; Selected Papers from the Smart Card 2000 Conference; *Springer Verlag*; pp. 177–199; 1991.

Newman, B.C.; "Proxy–Based Authorization and Accounting for Distributed Systems"; *Proc. 13th Int. Conf. on Dist. Comp. Sys.*; May, 1993.

Medvinsky et al.; "Electronic Currency for the Internet"; *Electronic Markets*; pp. 30–31, Sep., 1993.

Anderson, Ross J.; "UEPS—A Second Generation Electronic Wallet"; Proc. of the Second European Symposium on Research in Computer Security (ESORICS); Touluse, France; pp. 411–418. no date.

Anderson, Ross; "Why Cryptosystems Fail"; Proc. 1st Conf. Computer and Comm. Security; pp. 215–227; Nov., 1993.

Dukach, Semyon; "SNPP: A Simple Network Payment Protocol"; MIT Laboratory for Computer Science; Cambridge, Massachusetts; 1993.

Medvinsky et al.; "NetCash: A Design for Practical Electronic Currency on the Internet"; Proc. 1st ACM Conf. on Comp. and Comm. Security; Nov., 1993.

Society for Worldwide Interbank Financial Telecommunications S.C.; "A S.W.I.F.T. Overview", no date.

Case Study: The CIRRUS Banking Network; Comm. ACM 8, 28' pp. 797–8078; Aug., 1985.

Intel Corporation; Power Technology; Marketig Brochure, no date.

Bender, M.; "EFTS: Electronic Funds Transfer Systems"; Kennikat Press; Port Washington, New York; pp. 43–46; 1975.

Abadi, M. et al.; "Authentication and Delegation with Smart–Cards" Report 67; Systems Research Center; Digital Equipment Corporation; Palo Alto, California; Oct. 22, 1990, revised Jul. 30, 1992.

Information Network Institute, Carnegie Mellon University; Internet Billing Server; Prototype Scope Document; Oct. 14, 1993.

Krajewski, M.; "Concept for a Smart Card Kerberos"; 15th National Computer Security Conference; Oct., 1992.

Krajewski, M.; "Smar Card Augmentation of Kerberos"; Privacy and Security Research Group Workshop on Network and Distributed System Security; Feb., 1993.

Krajewski, M. et al.; "Applicability of Smart Cards to Network User Authentication"; *Computing Systems*; vol. 7, No. 1; 1994.

Harty et al.; "Case Study: The VISA Transaction Processing System"; 1988.

International Organization for Standardization; "International Standard: Bank Card Originated Messages—Interchange Message Specifications—Content for Financial Transactions"; ISO 8583; 1987.

Rivest, R.; "The MD5 Message–Digest Algorithm"; MIT Laboratory for Computer Science and RSA Data Security, Inc.; Apr., 1992.

Voydock, Victor et al.; "Security Mechanisms in High–Level Network Protocols"; Computer Surveys; vol. 15, No. 2; Jun., 1981.

Needham, Roger M., "Adding Capability Access to Conventional File Servers"; Xerox Palo Alto Research Center; Palo Alto, California; no date.

Gligor, Virgil D. et al.; "Object Migration and Authentication"; IEEE Transactions on Software Engineering; vol. SE–5, No. 6; Nov., 1979.

Chaum, D.L. et al.; "Implementing Capability–Based Protection Using Encryption"; Electronics Research Laboratory, College of Engineering, University of California, Berkeley, California; Jul. 17, 1978.

Gifford, David K.; "Cryptographic Sealing for Information Secrecy and Authentication"; Stanford University and Xerox Palo Alto Research Center; Communications of the ACM; vol. 25, No. 4; Apr., 1982.

Mosaic Communications Corp. press release; "Mosaic Communications Unveils Network Navigator and Server Software for the Internet"; Sep. 12, 1994.

Rescorla, E. and Schiffman, A.; "The Secure HyperText Transfer Protocol"; Enterprise Integration Technologies; Jun., 1994.

Tenenbaum, Jay M. and Schiffman, Allan M.; "Development of Network Infrastructure and Services for Rapid Acquisition"; adapted from a white paper submitted to DARPA by MCC in collaboration with EIT and ISI.

Cohen, Danny; "Computerized Commerce"; ISI Reprint Series IS/RS–89–243; Oct., 1989; Reprinted from Information Processing 89, Proceedings of the IFIP World Computer Congress, held Aug. 28–Sep. 1 1989.

Cohen, Danny; "Electronic Commerce"; University of Southern California Information Sciences Institute, Research Report ISI/RR–89–244; Oct., 1989.



**FIG. 1**



**FIG. 2A**

buyer computer 12          merchant computer 14          payment computer 16



**FIG. 2B**



FIG. 2C



buyer computer 12        merchant computer 14        payment computer 16

54
user enters new account name, account password credit card number, security information and expiration date of credit card and presses a "submit" button

56
buyer computer sends new account information to payment computer

58
payment computer enters new account

payment computer creates account name and password request message

64

66
payment computer sends account name and password request message to buyer computer

68
user enters account name and password

70
buyer computer sends account name and password to payment computer

72
payment computer verifies whether user name and password are correct

payment computer sends document to buyer computer indicating that access to the networks sales system is denied

End ◄—

OR

73

**FIG. 2D**



buyer computer 12        merchant computer 14        payment computer 16

72

payment computer determines whether additional security is warranted. based on. e.g. whether the payment amount exceeds a threshold

73

OR

if additional security is warranted. payment computer creates a challenge form document and sends it to buyer computer

75

user enters security information

77

buyer computer sends security information to payment computer

79

payment computer determines whether security information is correct

81

payment computer sends document to buyer computer indicating that access to the network sales system is denied

83

OR

End

82        82

**FIG. 2E**



buyer computer 12     merchant computer 14     payment computer 16

**FIG. 2F**



**FIG. 2G**



FIG. 2H



FIG. 2l



FIG. 3A



**FIG. 3B**



**FIG. 4A**



FIG. 4B



**FIG. 4C**

**FIG. 5**

---

| File | Options | Navigate | Annotate | | Help |

Document Title: [ Open Market Payment ]

Document URL: [ http://payment.openmarket.com/ben/nph-payment ]

**Open Market Payment**

You have selected an item that requires payment

**Merchant:** Test Merchant
**Description:** Mead Data Central Article
**Amount:** 2.85 (US currency)

If you have an Open Market account click on "continue" below and you will be prompted for your account name and password. If you do not have an account, you can establish one on-line and return to this page to continue your purchase.

[ Open ]  an account on-line

[ Continue ]  with payment transaction.

**NOTE:** For demonstrations use the account name **testuser@openmarket.com** with the password **testuser**.

*Open Market, Inc.*

Data transfer complete:

[Back] [Forward] [Home] [Reload] [Open...] [Save As...] [Clone] [New Window] [Close Window]

**FIG. 6**

*File*    *Options*    *Navigate*    *Annotate*                              *Help*

Document Title: | Establish OpenMarket Account

Document URL: | http://payment.openmarket.com/service/destabli.

Card Number: [          ]

Expiration Date: [      ] (format MM/YY)

Check the appropriate boxes:
- ☐ I am the owner of the above credit card.
- ☐ The above address is also the billing address for this credit card.

Your OpenMarket account statement is available on-line. At your option you may a copy of your statement automatically sent to your e-mail address at weekly or monthly intervals. Please choose a statement option.

◇ Weekly statements    ◇ Monthly statements    ◇ No e-mail statements

**Account name and password**

Please choose an account name and password for your OpenMarket account. We suggest using an account name that is unique and easy to remember such as your e-mail address. Your password should be 8 characters or longer.

Account Name [          ]

Password [          ]

[Back] [Forward] [Home] [Reload] [Open...] [Save As...] [Clone] [New Window] [Close Window]

**FIG. 7**

JA0082



FIG. 8

U.S. Patent    Feb. 3, 1998    Sheet 20 of 25    5,715,314

File    Options    Navigate    Annotate                    Help

Document Title: Open Market Payment

Document URL: http://payment.openmarket.com/ben/nph-payment

**Open Market Payment**

You have selected an item that you have purchased recently.

Merchant: Test Merchant
Description: Mead Data Central Article
Amount: 2.85(US currency)

This could happen because you would like to buy the item again or it may have happened by accident.

You can:
- Go directly to the previous item
- Go ahead and buy the item again

*Open Market, Inc.*

Back  Forward  Home  Reload  Open...  Save As...  Clone  New Window  Close Window

**FIG. 9**



**FIG. 10**



**FIG. 11**

_File_      _Options_      _Navigate_      _Annotate_                          _Help_

Document Title: | Smart Statement Detail

Document URL: | http://payment.openmarket.com/@c632f154cc8021

**Smart Statement Detail**

This is the detailed information about a particular transaction from your Smart Statement

**Transaction Information**

url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1

**Merchant Information**

telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

**FIG. 12**



**FIG. 13**

| _File_   _Options_   _Navigate_   _Annotate_ | _Help_ |
|---|---|

Document Title: | Open Market Feedback

Document URL: | http://payment.openmarket.com/ben/feedback.cg

Or if you prefer, you can send your comments via electronic mail to
feedback@openmarket.com or via FAX to +1.617.621.1703. If you would like a reply
please include your e-mail address.

_____

Your Open Market accound name (optional):

Your E-mail address (optional):

Subject:

Your comments:

Submit Feedback

Back  Forward  Home  Reload  Open...  Save As...  Clone  New Window  Close Window

## FIG. 14

JA0089

5,715,314

1

# NETWORK SALES SYSTEM

## REFERENCES TO APPENDICES

Microfiche appendices A–G, 4 sheets of 192 images total, are being submitted with the present application.

A claim of copyright is hereby made by Open Market, Incorporated with respect to the software code contained in the microfiche appendices, as of the date of first issuance of a U.S. patent based on this application. The copyright owner has no objection to the facsimile reproduction by anyone of the microfiche appendices as they appear in the Patent and Trademark office patent file or records, but reserves all other copyright rights whatsoever.

This invention relates to user-interactive network sales systems for implementing an open marketplace for goods or services over computer networks such as the Internet.

U.S. patent application Ser. No. 08/168,519, filed Dec. 16, 1993 by David K. Gifford and entitled "Digital Active Advertising," the entire disclosure of which is hereby incorporated herein in its entirety by reference, now abandoned, describes a network sales system that includes a plurality of buyer computers, a plurality of merchant computers, and a payment computer. A user at a buyer computer asks to have advertisements displayed, and the buyer computer requests advertisements from a merchant computer, which sends the advertisements to the buyer computer. The user then requests purchase of an advertised product, and the buyer computer sends a purchase message to the merchant computer. The merchant computer constructs a payment order that it sends to the payment computer, which authorizes the purchase and sends an authorization message to the merchant computer. When the merchant computer receives the authorization message it sends the product to the buyer computer.

The above-mentioned patent application also describes an alternative implementation of the network sales system in which, when the user requests purchase of an advertised product, the buyer computer sends a payment order directly to the payment computer, which sends an authorization message back to the buyer computer that includes an unforgeable certificate that the payment order is valid. The buyer computer then constructs a purchase message that includes the unforgeable certificate and sends it to the merchant computer. When the merchant computer receives the purchase request it sends the product to the buyer computer, based upon the pre-authorized payment order.

## SUMMARY OF THE INVENTION

In one aspect, the invention provides a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic

2

key, and to cause the product to be sent to the user desiring to buy the product.

The invention provides a simple design architecture for the network sales system that allows the merchant computer to respond to payment orders from the buyer computer without the merchant computer having to communicate directly with the payment computer to ensure that the user is authorized to purchase the product and without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products. Rather, when the merchant computer receives an access message from the buyer computer identifying a product to be purchased, the merchant computer need only check the access message to ensure that it was created by the payment computer (thereby establishing for the merchant computer that the buyer is authorized to purchase the product), and then the merchant computer can cause the product to be sent to the buyer computer who has been authorized to purchase the product.

In another aspect, the invention features a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer. The buyer computer and the shopping cart computer are interconnected by a computer network. The buyer computer is programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages to the shopping cart computer each of which includes a product identifier identifying one of the plurality of products. The shopping cart computer is programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and to cause a payment message associated with the shopping cart to be created. The buyer computer is programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart.

In another aspect, the invention features a network-based link message system that includes at least one client computer for operation by a client user and at least one server computer for operation by a server user. The client computer and the server computer are interconnected by a computer network. The client computer is programmed to send an initial link message to the server computer. The server computer is programmed to receive the initial link message from the client computer and to create, based on information contained in the initial link message, a session link message that encodes a state of interaction between the client computer and the server computer. The session link message includes a session link authenticator, computed by a cryptographic function of the session link contents, for authenticating the session link message. The server computer is programmed to cause the session link message to be sent to the client computer. The client computer is programmed to cause the session link message to be sent to a computer in the network that is programmed to authenticate the session link message by examining the session link authenticator and that is programmed to respond to the session link message based on the state of the interaction between the client computer and the server computer.

In another aspect, the invention features a network-based sales system that includes a merchant database having a

5,715,314

3

plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating the merchant database, and at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user. The creation computer and the merchant computer are interconnected by a computer network. The creation computer is programmed to create the merchant database, and to transmit the digital advertisements and the product fulfillment items to the merchant computer. The merchant computer is programmed to receive the digital advertisements and product fulfillment items, to receive a request for a digital advertisement from a user, to cause the digital advertisement to be sent to the user, to receive from the user an access message identifying an advertised product, and to cause the product to be sent to the user in accordance with a product fulfillment item corresponding to the product.

In another aspect, the invention features a hypertext statement system that includes a client computer for operation by a client user and one or more server computers for operation by a server user. The client computer and the server computers are interconnected by a computer network. At least one of the server computers is programmed to record purchase transaction records in a database. Each of the purchase transaction records includes a product description. The server computer is programmed to transmit a statement document that includes the purchase transaction records to the client computer. The client computer is programmed to display the product descriptions, to receive a request from the client user to display a product corresponding to a product description displayed by the client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated. At least one of the server computers is programmed to respond to activation of the product hypertext link by causing the product to be sent to the client computer.

In another aspect, the invention features a network payment system that includes at least one buyer computer for operation by a user desiring to buy a product and at least one payment computer for processing payment messages from the buyer computer. The buyer computer and the payment computer are interconnected by a computer network. The buyer computer is programmed to cause a payment message to be sent to the payment computer. The payment message includes a product identifier identifying the product that the user desires to buy. The payment computer is programmed to receive the payment message, to cause an access message to be created to enable the user to access the product, and to record a purchase transaction record in the settlement database. The buyer computer is programmed to cause a request for purchase transaction records to be sent to the payment computer. The payment computer is programmed to receive the request for purchase transaction records and to cause a document derived from the purchase transaction records to be sent to the buyer computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a network sales system in accordance with the present invention.

FIG. 2 (2-A through 2-I) is a flowchart diagram illustrating the operation of a purchase transaction in the network sales system of FIG. 1.

FIG. 3 (3-A through 3-B) is a flowchart diagram illustrating the use of a shopping cart for the purchase of products in connection with the network sales system of FIG. 1.

4

FIG. 4 (4-A through 4-C) is a flowchart diagram illustrating the operation of a smart statement in the network sales system of FIG. 1.

FIG. 5 is a screen snapshot of an advertising document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 6 is a screen snapshot of a confirmation document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 7 is a screen snapshot of a new account document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 8 is a screen snapshot of an account name prompt that the buyer computer creates in FIG. 2.

FIG. 9 is a screen snapshot of a document that the payment computer sends to the buyer computer in FIG. 2 and that provides an option either to repurchase or to use a previously purchased access.

FIG. 10 is a screen snapshot of a fulfillment document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 11 is a screen snapshot of a smart statement document that the payment computer sends to the buyer computer in FIG. 4.

FIGS. 12 and 13 are screen snapshots of a transaction detail document that the payment computer sends to the buyer computer in FIG. 4.

FIG. 14 is a screen snapshot of a customer service form that the payment computer sends to the buyer computer in FIG. 4.

## DETAILED DESCRIPTION

With reference to FIG. 1, a network sales system in accordance with the present invention includes a buyer computer 12 operated by a user desiring to buy a product, a merchant computer 14, which may be operated by a merchant willing to sell products to the buyer or by a manager of the network sales system, a payment computer 16 typically operated by a manager of the network sales system, and a creation computer 20 typically operated by the merchant. The buyer, merchant, payment, and creation computers are all inter-connected by a computer network 10 such as the Internet.

Creation computer 20 is programmed to build a "store" of products for the merchant. A printout of a computer program for use in creating such a "store" in accordance with the present invention is provided as Appendix F.

The products advertised by merchant computer 14 may be, for example, newspaper or newsletter articles available for purchase by buyers. Creation computer 20 creates a digital advertisement database 18 that stores advertising documents (which may for example be in the form of summaries of newspaper or newsletter articles, accompanied by prices) and product fulfillment items (which may be the products themselves if the products can be transmitted over the network, or which may be hard goods identifiers if the products are hard goods, i.e., durable products as opposed to information products). Creation computer 20 transmits contents of the advertising document database 18 to merchant computer 14 to enable the merchant computer to cause advertisements and products to be sent to buyers. Merchant computer 14 maintains advertising documents locally in advertising document database 15. In an alternative embodiment, the creation computer does not have a local digital advertisement database, but instead updates a remote

5,715,314

5

advertising document database on a merchant computer. These updates can be accomplished using HTML forms or other remote database technologies as is understood by practitioners of the art.

Payment computer 16 has access to a settlement database 22 in which payment computer 16 can record details of purchase transactions. The products may be organized into various "domains" of products, and payment computer 16 can access settlement database 22 to record and retrieve records of purchases of products falling within the various domains. Payment computer 16 also has access to a shopping cart database 21 in which a "shopping cart" of products that a user wishes to purchase can be maintained as the user shops prior to actual purchase of the contents of the shopping cart.

With reference to FIG. 2, a purchase transaction begins when a user at buyer computer 12 requests advertisements (step 24) and buyer computer 12 accordingly sends an advertising document URL (universal resource locator) to merchant computer 14 (step 26). The merchant computer fetches an advertising document from the advertising document database (step 28) and sends it to the buyer computer (step 30). An example of an advertising document is shown in FIG. 5. Details of URLs and how they are used are found in the microfiche Appendix G.

The user browses through the advertising document and eventually requests a product (step 32). This results in the buyer computer sending payment URL A to the payment computer (step 34). Payment URL A includes a product identifier that represents the product the user wishes to buy, a domain identifier that represents a domain of products to which the desired product belongs, a payment amount that represents the price of the product, a merchant computer identifier that represents merchant computer 14, a merchant account identifier that represents the particular merchant account to be credited with the payment amount, a duration time that represents the length of time for which access to the product is to be granted to the user after completion of the purchase transaction, an expiration time that represents a deadline beyond which this particular payment URL cannot be used, a buyer network address, and a payment URL authenticator that is a digital signature based on a cryptographic key. The payment URL authenticator is a hash of other information in the payment URL, the hash being defined by a key shared by the merchant and the operator of the payment computer.

In an alternative embodiment, step 34 consists of the buyer computer sending a purchase product message to the merchant computer, and the merchant computer provides payment VRL A to the buyer computer in response to the purchase product message. In this alternative embodiment, payment URL A contains the same contents as above. The buyer computer then sends the payment URL A it has received from the merchant computer to the payment computer.

When the payment computer receives the payment URL it verifies whether the payment URL authenticator was created from the contents of the payment URL using the cryptographic key (step 36). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 38). Otherwise, the payment computer determines whether the expiration time has past (step 40). If it has, the payment computer sends a document to the buyer computer indicating that the time has expired (step 41). Otherwise, the payment computer checks the buyer computer network

6

address to see if it matches the one specified in the payment URL (step 42). If it does not match, the payment computer sends a document to the buyer computer indicating that access to the network payment system is denied (step 43). Otherwise, the payment computer sends a payment confirmation document to the buyer computer, the payment confirmation document including an "open" link and a "continue" link (step 44).

An example of a confirmation document is shown in FIG. 6. The confirmation document asks the user to click on a "continue" button if the user already has an account with the payment computer, or to click on an "open" button if the user does not already have an account and wishes to open one.

If the user clicks on the "open" button (step 46), the buyer computer sends payment URL C to the payment computer (step 48), payment URL C being similar to payment URL A but also indicating that the user does not yet have an account. The payment computer creates a new account document (step 50) and sends it to the buyer computer (step 52). An example of a new account document is shown in FIG. 7. When the user receives the new account document he enters the new account name, an account password, a credit card number, the credit card expiration date, and security information such as the maiden name of the user's mother (step 54), and presses a "submit" button (not shown in FIG. 7). The buyer computer sends the new account information to the payment computer (step 56), which enters the new account in the settlement database (step 58).

If the user clicks on the "continue" button (step 60), the buyer computer sends payment URL B to the payment computer (step 62), payment URL B being similar to payment URL A but also indicating that the user already has an account. The payment computer then instructs the buyer computer to provide the account name and password (steps 64 and 66), and the buyer computer prompts the user for this information by creating an account name prompt (example shown in FIG. 8) and a similar password prompt. The user enters the information (step 68) and the buyer computer sends the account name and password to the payment computer (step 70).

The payment computer verifies whether the user name and password are correct (step 72). If they are not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 74). Otherwise, the payment computer determines whether additional security is warranted, based on, e.g., whether the payment amount exceeds a threshold (step 73). If additional security is warranted, the payment computer creates a challenge form document and sends it to the buyer computer (step 75). The user enters the security information (step 77), the buyer computer sends the security information to the payment computer (step 79), and the payment computer determines whether the security information is correct (step 81). If it is not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 83).

If the security information is correct, or if additional security was not warranted, the payment computer checks the settlement database to determine whether the user has unexpired access to the domain identifier contained in the payment URL (step 82). If so, the payment computer sends to the buyer computer a document providing an option either to repurchase or to use the previously purchased access (step 84). An example of such a document is shown in FIG. 9. The

5,715,314

7

user can respond to the recent purchase query document by choosing to access the previously purchased document (step 85) or to go ahead and buy the currently selected product (step 86).

If the user chooses to access the previously purchased document, the buyer computer skips to step 92 (see below). If the user chooses to buy the currently selected product, the payment computer calculates an actual payment amount that may differ from the payment amount contained in the payment URL (step 87). For example, the purchase of a product in a certain domain may entitle the user to access other products in the domain for free or for a reduced price for a given period of time.

The payment computer then verifies whether the user account has sufficient funds or credit (step 76). If not, the payment computer sends a document to the buyer computer indicating that the user account has insufficient funds (step 78). Otherwise, the payment computer creates an access URL (step 80) that includes a merchant computer identifier, a domain identifier, a product identifier, an indication of the end of the duration time for which access to the product is to be granted, the buyer network address, and an access URL authenticator that is a digital signature based on a cryptographic key. The access URL authenticator is a hash of other information in the access URL, the hash being defined by a key shared by the merchant and the operator of the payment computer. The payment computer then records the product identifier, the domain, the user account, the merchant account, the end of duration time, and the actual payment amount in the settlement database (step 88).

The payment computer then sends a redirect to access URL to the buyer computer (step 90), which sends the access URL to the merchant computer (step 92). The merchant computer verifies whether the access URL authenticator was created from the contents of the access URL using the cryptographic key (step 94). If not, the merchant computer sends a document to the buyer computer indicating that access to the product is denied (step 96).

Otherwise, the merchant computer verifies whether the duration time for access to the product has expired (step 98). This is done because the buyer computer can request access to a purchased product repeatedly. If the duration time has expired, the merchant computer sends a document to the buyer computer indicating that the time has expired (step 100). Otherwise the merchant computer verifies that the buyer computer network address is the same as the buyer network address in the access URL (step 101), and if so, sends a fulfillment document to the buyer computer (step 102), which is displayed by the buyer computer (step 104). An example of a fulfillment document is shown in FIG. 10. Otherwise, the merchant computer sends a document to the buyer computer indicating that access is not allowed (step 103).

With reference now to FIG. 3, when the merchant computer sends the advertising document to the buyer computer, the user may request that a product be added to a shopping cart in the shopping cart database rather than request that the product be purchased immediately. The buyer computer sends a shopping cart URL to the payment computer (step 108), the shopping cart URL including a product identifier, a domain identifier, a payment amount, a merchant computer identifier, a merchant account identifier, a duration time, an expiration time, and a shopping cart URL authenticator that is a digital signature based on a cryptographic key. The shopping cart URL authenticator is a hash of other information in the shopping cart URL, the hash being defined by

8

a key shared by the merchant and the operator of the payment computer.

The payment computer verifies whether the shopping cart URL authenticator was created from the contents of the shopping cart URL using a cryptographic key (step 110). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 112). Otherwise, before any modification to a user's shopping cart is allowed, user authentication is performed (step 113) in a manner analogous to steps 40–81. Once the user is authenticated, the payment computer creates or updates a payment URL for the shopping cart (step 114).

The user then either requests more advertisements (step 24 in FIG. 2) and possibly adds another product to the shopping cart, requests display of the shopping cart (step 116), or requests purchase of the entire contents of the shopping cart (step 124). If the user requests display of the shopping cart (step 116), the buyer computer sends a fetch shopping cart request to the payment computer (step 118), and the payment computer and buyer computer (step 119) perform steps analogous to steps 64–81. The payment computer returns the contents of the shopping cart to the buyer computer (step 120), which displays the contents of the shopping cart (step 122). If the user requests that the entire contents of the shopping cart be purchased (step 124) the buyer computer causes the payment URL for the shopping cart to be activated (step 126) and the payment URL is processed in a manner analogous to the processing of payment URLs for individual products (beginning with step 36 in FIG. 2).

With reference now to FIG. 4, a user can request display of a "smart statement" that lists purchase transactions for a given month (step 128). When the buyer computer receives such a request, it sends a smart statement URL to the payment computer (step 130).

When the payment computer receives the smart statement URL, it verifies whether the smart statement URL authenticator was created from the contents of the smart statement URL using a cryptographic key (step 132). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 134). Otherwise, the payment computer checks to determine whether the buyer network address in the smart statement URL matches the buyer computer's actual network address (step 136). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 138). Otherwise (step 140), the payment computer and buyer computer perform a set of steps analogous to steps 64–81 in FIG. 2 (payment computer requests account name and password, user provides the requested information, and payment computer verifies the information).

In an alternative embodiment steps 132–138 are omitted.

After verification of account information is complete, the payment computer retrieves the requested settlement data from the settlement database, creates a smart statement document for the buyer, and sends the smart statement document to the buyer computer (step 142). An example of a smart statement document is shown in FIG. 11. Each purchase transaction record in the smart statement document includes the data of the transaction, the name of the merchant, an identification of the product, and the payment amount for the product. The smart statement document also includes a transaction detail URL for each purchase transaction (these URLs, or hypertext links, are discussed below and are not shown in FIG. 11). The smart statement docu-

5,715,314

| 9 | 10 |
|---|---|

ment also identifies previous statements that the user may wish to have displayed.

The buyer computer displays the retrieved document (step 144), and the user may request transaction details for a particular transaction listed on the smart statement (step 146). If so, the buyer computer sends a transaction detail URL (or "payment detail URL") to the payment computer (step 148). The transaction detail URL includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator. When the payment computer receives the transaction detail URL, it performs (step 150) a set of steps analogous to steps 132–140 (verification of URL authenticator, buyer network address, and account information). The payment computer then retrieves from the settlement database data corresponding to the payment transaction specified in the transaction detail URL, creates a transaction detail document, and sends it to the buyer computer (step 152).

An example of a transaction detail document is shown in FIGS. 12 and 13. The document displays a number of items of information about the transaction, including the transaction date, end of the duration time ("expiration"), a description of the product, the payment amount, the domain corresponding to the product, an identification of the merchant, and the merchant's address.

The smart statement document and the transaction detail document both include customer service URLs (hypertext links) that allow the user to request customer service (i.e., to send comments and suggestions to the payment computer). When the user requests customer service (step 154), the buyer computer sends the customer service URL to the payment computer (step 156), which creates a customer service form and sends it to the buyer computer (step 158). An example of a customer service form is shown in FIG. 14. The user types comments into the customer service form (step 160), and the buyer computer sends the user's comments to the payment computer (step 162). The payment computer then posts the user comments and sends a thank you document to the buyer computer (step 164).

A user may request display of a product included in the smart statement. When the user requests that the product be displayed (step 166), the buyer computer sends the access URL contained in the smart statement document to the merchant computer (step 168), and the buyer computer and merchant computer perform a set of steps analogous to steps 94–104 in FIG. 2 (authentication of access URL, verification whether duration time has expired, verification of buyer network address, and transmission of fulfillment document to buyer computer).

Whenever the present application states that one computer sends a URL to another computer, it should be understood that in preferred embodiments the URL is sent in a standard HTTP request message, unless a URL message is specified as a redirection in the present application. The request message includes components of the URL as described by the standard HTTP protocol definition. These URL components in the request message allow the server to provide a response appropriate to the URL. The term "URL" as used the present application is an example of a "link," which is a pointer to another document or form (including multimedia documents, hypertext documents including other links, or audio/video documents).

When the present application states that one computer sends a document to another computer, it should be understood that in preferred embodiments the document is a success HTTP response message with the document in the body of the message. When the present application states that a server sends an account name and password request message to the client, it should be understood that in preferred embodiments the account name and password request message is an unauthorized HTTP response. A client computer sends account name and password information to a server as part of a request message with an authorization field.

The software architecture underlying the particular preferred embodiment is based upon the hypertext conventions of the World Wide Web. Appendix A describes the Hypertext Markup Language (HTML) document format used to represent digital advertisements. Appendix B describes the HTML forms fill out support in Mosaic 2.0. Appendix C is a description of the Hypertext Transfer Protocol (HTTP) between buyer and merchant computers. Appendix D describes how documents are named with Uniform Resource Locators (URLs) in the network of computers, and Appendix E describes the authentication of URLs using digital signatures.

A printout of a computer program for use in creating and operating such a "store" in accordance with the present invention is provided as Appendix F. A printout of a computer program for use in operating other aspects of the network sales system in accordance with the present invention is provided in the microfiche appendix G.

There has been described a new and useful network-based sales system. It is apparent that those skilled in the art may make numerous modifications and departures from the specific embodiments described herein without departing from the spirit and scope of the claimed invention.

What is claimed is:

1. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

at least one merchant computer; and

at least one payment computer;

said buyer computer, said merchant computer, and said payment computer being interconnected by a computer network;

said buyer computer being programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to said payment computer that comprises a product identifier identifying said product;

said payment computer being programmed to receive said payment message, to cause an access message to be created that comprises said product identifier and an access message authenticator based on a cryptographic key, and to cause said access message to be sent to said merchant computer; and

said merchant computer being programmed to receive said access message, to verify said access message authenticator to ensure that said access message authenticator was created using said cryptographic key, and to cause said product to be sent to said user desiring to buy said product.

2. A network-based sales system in accordance with claim 1, wherein said payment message and said access message each comprises a universal resource locator.

3. A network-based sales system in accordance with claim 1, wherein said payment computer is programmed to identify said merchant computer upon receipt of said payment message from said buyer computer.

4. A network-based sales system in accordance with claim 1, wherein said access message comprises a buyer network address.

JA0094

5,715,314

11

5. A network-based sales system in accordance with claim 4, wherein:

said product can be transmitted from one computer to another; and

said merchant computer causes said product to be sent to said user by transmitting said product to said buyer network address only.

6. A network-based sales system in accordance with claim 4, wherein said merchant computer is programmed to verify whether said buyer network address in said access message matches the actual network address of said buyer computer.

7. A network-based sales system in accordance with claim 1, wherein said payment message comprises a buyer network address.

8. A network-based sales system in accordance with claim 7, wherein said payment computer is programmed to verify whether said buyer network address in said payment message matches the actual network address of said buyer computer.

9. A network-based sales system in accordance with claim 1, wherein said access message authenticator comprises a cryptographic function of contents of said access message based on said cryptographic key.

10. A network-based sales system in accordance with claim 1, wherein said payment computer is programmed to verify said payment message authenticator to ensure that said payment message authenticator was created using said cryptographic key.

11. A network-based sales system in accordance with claim 10, wherein said payment message authenticator comprises a cryptographic function of contents of said payment message based on said cryptographic key.

12. A network-based sales system in accordance with claim 1, wherein said payment message comprises a payment amount.

13. A network-based sales system in accordance with claim 1, wherein said payment message comprises a merchant account identifier that identifies a merchant account.

14. A network-based sales system in accordance with claim 1, wherein said buyer computer is programmed to transmit a user account identifier to said payment computer that identifies a user account.

15. A network-based sales system in accordance with claim 14, wherein:

said payment message comprises a payment amount; and

said payment computer is programmed to ensure that said user account has sufficient funds or credit to cover said payment amount.

16. A network-based sales system in accordance with claim 14, wherein:

said payment message comprises a payment amount and a merchant account identifier that identifies a merchant account; and

said payment computer is programmed to record said payment amount, said user account, and said merchant account in a settlement database.

17. A network-based sales system in accordance with claim 16, wherein:

said payment message comprises a domain identifier; and

said payment computer is programmed to record said domain identifier and said user account in a settlement database.

18. A network-based sales system in accordance with claim 17, wherein said payment computer is programmed to check said settlement database, upon receipt of said payment message, to determine whether said user account has previously purchased a product associated with said domain identifier.

12

19. A network-based sales system in accordance with claim 18, wherein said payment computer is programmed to determine an actual payment amount for said product identified by said product identifier in said payment message based on whether said user account has previously purchased a product associated with said domain identifier.

20. A network-based sales system in accordance with claim 1, wherein said buyer computer is programmed to transmit a user authenticator to said payment computer and said payment computer is programmed to verify said user authenticator.

21. A network-based sales system in accordance with claim 20, wherein said user authenticator comprises a password.

22. A network-based sales system in accordance with claim 20, wherein:

said buyer computer is programmed to transmit security information to said payment computer;

said payment computer is programmed to transmit a challenge form to said buyer computer under a predetermined condition, said challenge form asking for said security information previously transmitted by said buyer computer to said payment computer;

said payment computer is programmed to respond to said challenge form by querying said user for said security information and transmitting said security information to said payment computer; and

said payment computer is programmed to verify authenticity of said security information.

23. A network-based sales system in accordance with claim 22, wherein:

said payment message comprises a payment amount; and

said predetermined condition comprises receipt of a payment amount in said payment message that exceeds a threshold.

24. A network-based sales system in accordance with claim 1, wherein said payment message comprises a merchant computer identifier that identifies said merchant computer.

25. A network-based sales system in accordance with claim 24, wherein said access message comprises said merchant computer identifier.

26. A network-based sales system in accordance with claim 1, wherein said payment message comprises a duration time that specifies a length of time for which access to said product is to be granted.

27. A network-based sales system in accordance with claim 26, wherein said payment computer is programmed to use said duration time to compute an end of duration time and to cause said end of duration time to be included in said access message.

28. A network-based sales system in accordance with claim 27, wherein said merchant computer is programmed to verify, upon receipt of said access message, that said end of duration time has not past.

29. A network-based sales system in accordance with claim 1, wherein said payment message comprises an expiration time after which said payment message can no longer be used.

30. A network-based sales system in accordance with claim 29, wherein said payment computer is programmed to verify, upon receipt of said payment message, that said expiration time has not past.

31. A network-based sales system in accordance with claim 1, wherein:

said payment computer is programmed to cause said access message to be sent to said buyer computer; and

5,715,314

## 13

said buyer computer is programmed to cause said access message received from said payment computer to be sent to said merchant computer.

**32.** A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

at least one merchant computer; and

at least one payment computer;

said buyer computer, said merchant computer, and said payment computer being interconnected by a computer network;

said buyer computer being programmed to receive a user request for purchasing a product, and to cause a payment URL to be sent to said payment computer that comprises a product identifier identifying said product, a payment amount, and a payment URL authenticator comprising a cryptographic function of contents of said payment URL based on a cryptographic key;

said payment computer being programmed to receive said payment URL, to verify said payment URL authenticator to ensure that said payment URL authenticator was created using said cryptographic key, to ensure that said user has sufficient funds or credit to cover said payment amount, to identify said merchant computer operated by said merchant willing to sell said product to said buyer, to cause an access URL to be created that comprises said product identifier and an access URL authenticator comprising a cryptographic function of contents of said access URL based on a cryptographic key, and to cause said access URL to be sent to said buyer computer;

said buyer computer being programmed to cause said access URL received from said payment computer to be sent to said merchant computer; and

said merchant computer being programmed to receive said access URL, to verify said access URL authenticator to ensure that said access URL authenticator was created using said cryptographic key, and to cause said product to be sent to said user desiring to buy said product.

**33.** A method of operating a payment computer in a computer network comprising at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer, the method comprising the steps of:

receiving, at said payment computer, a payment message that said buyer computer has caused to be sent to said payment computer in response to a user request for purchasing a product, said payment message comprising a product identifier identifying said product;

causing an access message to be created that comprises said product identifier and an access message authenticator based on a cryptographic key; and

causing said access message to be sent to said merchant computer, said merchant computer being programmed to receive said access message, to verify said access message authenticator to ensure that said access message was created using said cryptographic key, and to cause said product to be sent to said user desiring to buy said product.

**34.** A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to said shopping cart computer;

## 14

said buyer computer and said shopping cart computer being interconnected by a computer network;

said buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database, and, in response to said requests to add said products, to send a plurality of respective shopping cart messages to said shopping cart computer each of which comprises a product identifier identifying one of said plurality of products;

said shopping cart computer being programmed to receive said plurality of shopping cart messages, to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart, and to cause a payment message associated with said shopping cart to be created; and

said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart;

said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database.

**35.** A network-based sales system in accordance with claim **34**, wherein said shopping cart computer is programmed to cause said payment message to be created before said buyer computer causes said payment message to be activated.

**36.** A network-based sales system in accordance with claim **34**, wherein said buyer computer is programmed to receive a request from said user to display said plurality of products added to said shopping cart.

**37.** A network-based sales system in accordance with claim **36**, wherein said buyer computer is programmed to transmit a fetch shopping cart request to said payment computer in response to receipt of said request from said user.

**38.** A network-based sales system in accordance with claim **37**, wherein:

said payment computer is programmed to respond to said fetch shopping cart request by transmitting a message to said buyer computer indicating said plurality of products added to said shopping cart; and

said buyer computer is programmed to display said plurality of products added to said shopping cart.

**39.** A method of operating a shopping cart computer in a computer network comprising at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to said shopping cart computer, said method comprising the steps of:

receiving, at said shopping cart computer, a plurality of shopping cart messages sent to said shopping cart computer by said buyer computer in response to receipt of a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database, each of said shopping cart messages comprising a product identifier identifying one of said plurality of products;

modifying said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart; and

5,715,314

15

causing a payment message associated with said shopping cart to be created;

said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart;

said shopping cart being a stored representation of a collection of products, said shopping cart database being a database of stored representations of collections of products, and said shopping cart computer being a computer that modifies said stored representations of collections of products in said database.

**40.** A network-based link message system, comprising:

at least one client computer for operation by a client user; and

at least one server computer for operation by a server user;

said client computer and said server computer being interconnected by a computer network;

said client computer being programmed to send an initial link message to said server computer;

said server computer being programmed to receive said initial link message from said client computer, to create, based on information contained in said initial link message, a session link message that encodes a state of interaction between said client computer and said server computer, said session link message comprising a session link authenticator, computed by a cryptographic function of said session link contents, for authenticating said session link message, and to cause said session link message to be sent to said client computer;

said client computer being programmed to cause said session link message to be sent to a computer in said network that is programmed to authenticate said session link message by examining said session link authenticator and that is programmed to respond to said session link message based on said state of said interaction between said client computer and said server computer.

**41.** A network-based link message system in accordance with claim **40**, wherein:

said client computer comprises a buyer computer for operation by a user desiring to buy a product;

said server computer comprises a payment computer for operation by a manager of said network-based link message system; and

said network-based link message system further comprises a merchant computer for operation by a merchant willing to sell said product to said buyer.

**42.** A network-based link message system in accordance with claim **41**, wherein said computer that is programmed to

16

authenticate said session link message comprises said merchant computer.

**43.** A network-based link message system in accordance with claim **41**, wherein said initial link message comprises a payment message to said payment computer that comprises a product identifier identifying said product.

**44.** A network-based link message system in accordance with claim **43**, wherein said session link message comprises an access message that comprises said product identifier to be created.

**45.** A network-based link message system in accordance with claim **44**, wherein said merchant computer is programmed to respond to said access message by causing said product to be sent to said user desiring to buy said product.

**46.** A network-based link message system in accordance with claim **40**, wherein said initial link message and said session link message comprise universal resource locators.

**47.** A network-based link message system in accordance with claim **40**, wherein:

said session link authenticator comprises a cryptographic function of contents of said session link message based on a cryptographic key; and

said computer to which said client computer is programmed to cause said session link message to be sent is programmed to verify that said session link authenticator was created using said cryptographic key.

**48.** A method of operating a server computer in a network-based link message system comprising at least one client computer for operation by a client user and at least one server computer for operation by a server user, said client computer and said server computer being interconnected by a computer network, said method comprising the steps of:

receiving, at said server computer, an initial link message sent to said server computer by said client computer;

creating, based on information contained in said initial link message, a session link message that encodes a state of interaction between said client computer and said server computer, said session link message comprising a session link authenticator, computed by a cryptographic function of said session link contents, for authenticating said session link message; and

causing said session link message to be sent to said client computer;

said client computer being programmed to cause said session link message to be sent to a computer in said network that is programmed to authenticate said session link message by examining said session link authenticator and that is programmed to respond to said session link message based on said state of said interaction between said client computer and said server computer.

* * * * *

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Certificate**

Patent No. 5,715,314                                                      Patented: February 3, 1998

On petition requesting issuance of a certificate for correction of inventorship pursuant to 35 U.S.C. 256, it has been found that the above identified patent, through error and without any deceptive intent, improperly sets forth the inventorship.

Accordingly, it is hereby certified that the correct inventorship of this patent is: Andrew C. Payne, Lincoln, MA; Lawrence C. Stewart, Burlington, MA; and G. Winfield Treese, Wayland, MA.

Signed and Sealed this Sixth Day of April 2004.

THOMAS H. TARCZA
*Supervisory Patent Examiner*
Art Unit 3662

**JA0098**



US005715314C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5932nd)

# United States Patent
Payne et al.

(10) **Number:**          US 5,715,314 C1

(45) **Certificate Issued:**       *Oct. 9, 2007

(54) **NETWORK SALES SYSTEM**

(75) Inventors: **Andrew C. Payne**, Lincoln, MA (US);
**Lawrence C. Stewart**, Burlington, MA
(US); **G. Winfield Treese**, Wayland,
MA (US)

(73) Assignee: **Soverain Software LLC**, Chicago, IL
(US)

**Reexamination Request:**
No. 90/007,287, Nov. 3, 2004

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,715,314** |
| Issued: | **Feb. 3, 1998** |
| Appl. No.: | **08/328,133** |
| Filed: | **Oct. 24, 1994** |

( * ) Notice:    This patent is subject to a terminal dis-
claimer.

Certificate of Correction issued Apr. 6, 2004.

(51) **Int. Cl.**
| | |
|---|---|
| *G06Q 30/00* | (2006.01) |
| *G06Q 10/00* | (2006.01) |
| *G06Q 20/00* | (2006.01) |
| *G07F 7/00* | (2006.01) |

(52) **U.S. Cl.** ............................. **705/78**; 705/26; 705/75;
713/162

(58) **Field of Classification Search** ....................... None
See application file for complete search history.

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,484,304 A | 11/1984 | Anderson et al. |
| 4,528,643 A | 7/1985 | Freeny, Jr. |
| 4,529,870 A | 7/1985 | Chaum |
| 4,566,078 A | 1/1986 | Crabtree |
| 4,759,063 A | 7/1988 | Chaum |
| 4,759,064 A | 7/1988 | Chaum |

| | | |
|---|---|---|
| 4,891,503 A | 1/1990 | Jewell |
| 4,926,480 A | 5/1990 | Chaum |
| 4,941,089 A | 7/1990 | Fischer |
| 4,947,430 A | 8/1990 | Chaum |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0172 670 | 2/1986 |
| EP | 0456920 | 11/1991 |
| EP | 0645688 | 3/1995 |
| JP | 3278230 | 12/1991 |
| JP | 4-10191 | 1/1992 |

(Continued)

OTHER PUBLICATIONS

Trewitt, Glenn, *Using Tcl to Process HTML Forms,* Digital
Equipment Corporation Network Systems Laboratory
TN–14, dated Mar. 1994.

(Continued)

*Primary Examiner*—Michael O'Neill

(57)          **ABSTRACT**

A network-based sales system includes at least one buyer
computer for operation by a user desiring to buy a product,
at least one merchant computer, and at least one payment
computer. The buyer computer, the merchant computer, and
the payment computer are interconnected by a computer
network. The buyer computer is programmed to receive a
user request for purchasing a product, and to cause a
payment message to be sent to the payment computer that
comprises a product identifier identifying the product. The
payment computer is programmed to receive the payment
message, to cause an access message to be created that
comprises the product identifier and an access message
authenticator based on a cryptographic key, and to cause the
access message to be sent to the merchant computer. The
merchant computer is programmed to receive the access
message, to verify the access message authenticator to
ensure that the access message authenticator was created
using the cryptographic key, and to cause the product to be
sent to the user desiring to buy the product.



US 5,715,314 C1

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,949,380 | A | 8/1990 | Chaum |
| 4,972,318 | A | 11/1990 | Brown et al. |
| 4,987,593 | A | 1/1991 | Chaum |
| 4,991,210 | A | 2/1991 | Chaum |
| 4,996,711 | A | 2/1991 | Chaum |
| 5,035,515 | A | 7/1991 | Crossman et al. |
| 5,105,184 | A | 4/1992 | Pirani et al. |
| 5,204,947 | A | 4/1993 | Bernstein et al. |
| 5,276,736 | A | 1/1994 | Chaum |
| 5,297,249 | A | 3/1994 | Bernstein et al. |
| 5,309,437 | A | 5/1994 | Perlman et al. |
| 5,311,594 | A | 5/1994 | Penzias |
| 5,319,542 | A | 6/1994 | King, Jr. et al. |
| 5,321,751 | A | 6/1994 | Ray et al. |
| 5,325,362 | A | 6/1994 | Aziz |
| 5,347,632 | A | 9/1994 | Filepp et al. ............... 395/200 |
| 5,353,283 | A | 10/1994 | Tsuchiya |
| 5,388,257 | A | 2/1995 | Bauer |
| 5,457,738 | A | 10/1995 | Sylvan |
| 5,475,585 | A | 12/1995 | Bush |
| 5,483,652 | A | 1/1996 | Sudama et al. |
| 5,491,820 | A | 2/1996 | Belove et al. |
| 5,521,631 | A | 5/1996 | Budow et al. |
| 5,530,852 | A | 6/1996 | Meske, Jr. et al. |
| 5,535,229 | A | 7/1996 | Hain, Jr. et al. |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,544,322 | A | 8/1996 | Cheng et al. |
| 5,550,984 | A | 8/1996 | Gelb |
| 5,557,516 | A | 9/1996 | Hogan |
| 5,557,518 | A | 9/1996 | Rosen |
| 5,557,798 | A | 9/1996 | Skeen et al. |
| 5,560,008 | A | 9/1996 | Johnson et al. |
| 5,577,209 | A | 11/1996 | Boyle et al. |
| 5,583,996 | A | 12/1996 | Tsuchiya |
| 5,590,197 | A | 12/1996 | Chen et al. |
| 5,592,378 | A | 1/1997 | Cameron et al. ........... 395/227 |
| 5,594,910 | A | 1/1997 | Filepp et al. |
| 5,596,642 | A | 1/1997 | Davis et al. |
| 5,596,643 | A | 1/1997 | Davis et al. |
| 5,604,802 | A | 2/1997 | Holloway |
| 5,619,648 | A | 4/1997 | Canale et al. |
| 5,621,797 | A | 4/1997 | Rosen |
| 5,623,547 | A | 4/1997 | Jones et al. |
| 5,623,656 | A | 4/1997 | Lyons |
| 5,642,419 | A | 6/1997 | Rosen |
| 5,664,110 | A | 9/1997 | Green et al. |
| 5,664,111 | A | 9/1997 | Nahan et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,694,551 | A | 12/1997 | Doyle et al. |
| 5,708,780 | A | 1/1998 | Levergood et al. |
| 5,710,884 | A | 1/1998 | Dedrick |
| 5,724,424 | A | 3/1998 | Gifford |
| 5,724,521 | A | 3/1998 | Dedrick |
| 5,727,164 | A | 3/1998 | Kaye et al. |
| 5,732,219 | A | 3/1998 | Blummer et al. |
| 5,734,719 | A | 3/1998 | Tsevdos et al. |
| 5,761,662 | A | 6/1998 | Dasan |
| 5,768,142 | A | 6/1998 | Jacobs |
| 5,768,521 | A | 6/1998 | Dedrick |
| 5,774,670 | A | 6/1998 | Montulli |
| 5,784,565 | A | 7/1998 | Lewine |
| 5,790,793 | A | 8/1998 | Higley |
| 5,806,077 | A | 9/1998 | Wecker |
| 5,812,776 | A | 9/1998 | Gifford |
| 5,826,241 | A | 10/1998 | Stein et al. |
| 5,826,242 | A | 10/1998 | Montulli |
| 5,848,399 | A | 12/1998 | Burke ......................... 705/27 |
| 5,848,413 | A | 12/1998 | Wolff |
| 5,870,552 | A | 2/1999 | Dozier et al. |
| 5,895,454 | A | 4/1999 | Harrington |

| | | | |
|---|---|---|---|
| 5,897,622 | A | 4/1999 | Blinn et al. |
| 5,909,492 | A | * 6/1999 | Payne et al. ................... 705/78 |
| 5,920,847 | A | 7/1999 | Kolling et al. |
| 5,982,891 | A | 11/1999 | Ginter et al. |
| 6,006,199 | A | 12/1999 | Berlin et al. |
| 6,023,683 | A | 2/2000 | Johnson et al. |
| 6,041,316 | A | 3/2000 | Allen |
| 6,049,785 | A | 4/2000 | Gifford |
| 6,134,592 | A | 10/2000 | Montulli |
| 6,195,649 | B1 | 2/2001 | Gifford |
| 6,199,051 | B1 | 3/2001 | Gifford |
| 6,205,437 | B1 | 3/2001 | Gifford |
| 6,449,599 | B1 | 9/2002 | Payne et al. |
| 6,708,157 | B2 | 3/2004 | Stefik et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 05-158963 | 6/1993 |
| JP | 5274275 | 10/1993 |
| JP | 6162059 | 6/1994 |
| JP | 6291776 | 10/1994 |
| WO | WO 93/10503 | 5/1993 |
| WO | WO 94/03859 | 2/1994 |

OTHER PUBLICATIONS

Viescas, John L., The Official Guide to the Prodigy Service, Microsoft Press, 1991, ISBN 1–55615–374–0.

BizNet Technologies, Versatile Virtual Vending, published at http://www.bnt.com, Sep. 12, 1994.

Amazon "Welcome First Time Visitors" Jun. 1998 pp. 1–4.

"CompuServe Videotex Network Offers Marketing Research Service, ad Test", Marketing News, Nov. 25, 1993, p. 21.

"Electronic In–Home Shopping: 'Our Stores are Always Open'," Chain Store Age Executive, Mar. 1985, pp. 111, 116.

"Mall Offers a Holiday Treat for Hackers," Advertising Age, Nov. 13, 1985, p. 76.

"Suddenly, VideoTex is Finding an Audience", Business Week, Oct. 19, 1987, pp. 92–94.

"Redcoats Join Communications Fight", Industry Week, Feb. 22, 1982, pp. 108–109.

"Taking Advantage of the Past",Advertising Age, Apr. 11, 1983, pp. M36–37.

Beutelspacher et al., "Payment Applications with Multifunctional Smart Cards", Smart Card 2000, 1989, pp. 95–101.

Booz, Allen & Hamilton, "How to Buy Information with a First Virtual Account", Apr. 11, 1994, 63 pages.

Burk et al., "Digital Payment Systems Enabling Security and Unobservability", Computers & Security, 1989, pp. 399–415.

Computer Shopper, "Internet for Profit", Nov. 1994, pp. 180–182; 190–192; 522–528, 532, 534.

"Consumers Plugging into New Electronic Mail", Adversiting Age, Mar. 4, 1985, p. 74.

Damgard, "Payment Systems and Credential Mechanisms with Provable Security Against Abuse by Individuals", Advances in Cryptology—CRYPTO '88, 1988, pp. 328–335.

Davies et al., "Security for Computer Networks: An Introduction to Data Security In Teleprocessing and Electronic Funds Transfer", John Wiley & Sons, Dec. 5, 1985, pp. 304–336.

Ferrarini, E., "Direct Connections for Software Selections", Business Computer Systems, Feb. 1985, pp. 35–38.

US 5,715,314 C1

Page 3

Fujioka, et al., "ESIGN: An Efficient Digital Signature Implementation for Smart Cards," Advances in Cryptology—Eurocrypt '91, Apr. 1991, pp. 446–457.

Hakota., et al., A System for Automatic Value Exchange Exchange, Proceedings—Fall Joint Computer Conference, Nov. 1966, pp. 579–589.

Hirschfeld, "Making Electronic Refunds Safer", Laboratory for Computer Science, MIT, 1992, 4 pages.

Jansson, L., "General Electronic Payment System", 7th Proceedings of the International Conference on Computer Communication, 1985, pp. 832–835.

Kenny, "EDI Security: Risks and Solutions", SD–Scion UK Limited,1992, 12 pages.

Knapskog, "Privacy Protected Payments—Relioazation of a Protocol that Guarantees Payer Anonymity", EuroCrypt 1988, pp. 107–121.

Lai et al., "Endorsements, Licensing, and Insurance for Distributed System Services", Information Sciences Institute, U. of Southern California, undated, 6 pages.

Low et al., "Anonymous Credit Cards", undated, pp. 1–16.

Messmer, "NIST Stumbles on Proposal for Public–Key Encryption", Network World, Jul. 27, 1992, pp. 1–6.

Perry, "Electronic Banking Goes to Market", IEEE Spectrum, Feb. 1988, pp. 46–49.

Ph. van Heurck, "TRASEC: Belgian Security Systems for Electronic Funds Transfers," Computers & Security, 1987, pp. 261–268.

Pongratz, et al., "IC Cards in Videotex Systems", Smart Card 2000, 1989, pp. 179–186, 1 page.

Recommendation X.509: The Directory—Authentication Framework, Fascicle VIII.8 (Melbourne 1988) pp. 48–82.

Remery, P., et al., "Le paiement electronique", L'Echo des Recherches, No. 134, 1988, pp. 15–23.

Rescorla E., et al., "The Secure HyperText Transfer Protocol", Enterprise Integration Technologies, Dec. 1994, 35 pages.

Shain, "Security in Electronic Funds Transfer: Message Integrity in Money Transfer and Bond Settlements through GE Information Services' Global Network", Computers & Security, vol. 8, No. 3 1989, pp. 209–221.

Staskauskas, "The Formal Specification and Design of a Distributed Electronic Funds–Transfer System", *EEE, 1988, pp. 1515–1528.

Stol, "Privacy Protected Payments—A Possible Structure for a Real Implementation and Some Resource Considerations", Reproduced by U.S. Department of Commerce, 83 pages.

Strazewski, "Computerized Service Sets Shoppers Hacking", Advertising Age, Feb. 33, 1988, p. 62.

Takei, Videotex Information System and Credit System Connecting with MARS 301–of JNR, Japanese Railway Engineering, No. 95, Sep. 1985, pp. 9–11.

Tanaka et al., "Untraceable Electronic Funds Transfer Systems", Electronics and Communications in Japan, Part 3, vol. 72, No. 9, 1989, pp. 47–54.

Tunstall, "Electronic Currency", Smart Card 2000: The Future of IC Cards, Oct. 1987, pp. 47–48.

Waidner, et al., "Loss–Tolerance for Electronics Wallets", Fault–Tolerant Computing: 20th International Symposium, Jun. 26–28, 1990, pp. 140–147.

Weber, "Controls in Electronic Funds Transfer Systems: A Survey and Synthesis", Computers & Security, 1989, pp. 123–137.

Williams, "Debit Program Cuts Fraud—CompuServe Plan a Success", Pensions & Investment Age, Feb. 4, 1985, pp. 31–33.

Joint Claim Construction Chart (Patent Local Rule 4–5D)), filed Dec. 27, 2004 with Appendix A.

Order Denying Amazon's Motion to Stay Proceedings Pending Completion of the Reexamination.

Transcript of the Markmam Hearing Before the Honorable Leonard David United States District Judge, Jan. 6, 2005.

Complaint for Patent Infringement filed Jan. 12, 2004.

Amazon.com's Answer, Affirmative Defenses, and Counterclaims to Soverain Software's Complaint filed Mar. 9, 2004.

Amazon.com's Response to Plaintiff's First Set of Interrogatories (Nos. 1–22) filed Jun. 11, 2004.

Soverain's Responses and Objections to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Jun. 11, 2004.

Disclosure of Preliminary Invalidity Contentions by Defendants Amazon.com and the Gap (with Exhibit A) filed Jul. 6, 2004.

Soverains'Supplemental Responses to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Aug. 13, 2004.

Soverain's Second Supplemental Response to Amazon. com's First Set of Interrogatories (Nos. 1–14) filed Sep. 21, 2004.

Soverain's Third Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14).

Soverain's Preliminary Claim Construction (Patent Local Rule 4–2) filed Sep. 2, 2004.

Joint Disclosure of Prelminary Claim Construction and Extrinsic Evidence by Defendants Amazon.com and the Gap (with Exhibits A–B) filed Sep. 2, 2004.

Joint Claim Construction and Prehearing Statement (Patent Local Rule 4–3) (with Exhibits A–D) filed Oct. 4, 2004.

Amazon.com's First Amended Answer, Affirmative Defenses, and Counterclaims to Soverain's Complaint filed Oct. 6, 2004.

Declaration of Jack D. Grimes Ph.D., dated Nov. 15, 2004.

Soverain's Claim Construction Brief Pursuant to Patent Rule 4–5(a) dated Nov. 16, 2004.

Declaration of Dr. Richard N. Taylor in Support of Defendants' Markman Brief dated Nov. 29, 2004.

Joint Claim Construction Brief of Amazon.com and Gap dated Nov. 30, 2004.

Soverain's Claim Construction Reply Brief Pusuant to Patent Rule 4–5(c) dated Dec. 7, 2004.

Bina, E., et al., "Secure Access to Data Over the Internet," 1994 IEEE, pp. 99–102.

Xiuchi, T., et al., "C–HTTP—The Development of a Secure, Closed HTTP–Based Network on the Internet," 1996 IEEE, pp. 64–75.

Berners–Lee, T., et al., "Target a Common Internet Syntax Where the User Password is Appended to a Specific URL," http://www.ietf.org/rfc/rfc1738.txt?number=1738.

57 USPQ2D, "Amazon.com, Inc. v. Barnesandnoble.com, Inc." pp. 1746–1763.

Pitkow, J.E., "Webviz: A Tool for World–Wide Web Access Log Analysis." First International World Wide Web Conf., May 1994, 7 pgs.

Lim, Jong–Gyun, "Using Coollists to Index HTML Documents in the Web." http://www.ncsa.uiuc.edu/SDG/TT94/Proceedings/Searching/lim/coollist. htm, pp. 1–8.

JA0101

US 5,715,314 C1
Page 4

Sedayao, J., "Mosiac Will Kill My Network!—Studying Network Traffic Patterns of Mosaic Use", http://www.ncsa.uiuc.edu/SDG/TT94/P...gs/DDay/sedayao/mos_traf_paper.htm.

Catledge, L.D., "Characterizing Browsing Strategies in the World–Wide Web," http:www.igd.thg.de/archive/1995_.../UserPatterns.Paper4.formatted.htm.

Menefee, C., "New host for Internet Commercial Site Index," Newsbytes Nov. 9, 1994, p. 15.

Michalski, J., "Content in context: the Future of SGML and HTML," Release 1.0, Sep. 27, 1994, pp. 1–10.

Metcalf, R.M., "Commercialization of the Internet Opens Gateways to Interpreneurs," InfoWorld, Aug. 8, 1994, p. 44.

"MaX.500—a Macintosh X.500 Directory Client", contents of WWW website, http://www.umich.edu/~dirsvcs/ldap/max500/index.htlm as of Jul. 7, 1997.

Droms, R.E., "Access to Heterogenous Directory Services," Proceedings IEEE INFOCOM '90, pp. 1054–1061, San Francisco, CA, Jun. 3–7, 1990.

Good, B., "Experience with Bank of America's Distributive Computing System," pp. 2–8, IEEE 1983.

Inselberg, A., "An Approach to Successful Online Transaction Processing Applications," AFIPS Conference Proceedings, 1985 National Computer Conference, pp. 419–427, Chicago, IL, Jul. 15–18, 1985.

Bowman, et al., "Univers: An Attribute–Based Name Server," Software Practice and Experience, vol. 20(4) 403–424 (Apr. 1990).

NCSA HTTPd 1.5 Beta How to Redirect, "The New Redirect Directives."

Housel, B.C., et al., "SNA Distribution Services," IBM Systems Journal, pp. 319–343, vol. 22, No. 4, 1983.

Zatti, et al., "Naming and Registration for IBM Distributed Systems," IBM Systems Journal, pp. 353–380, vol. 31, No. 2, 1992.

Welch, B., et al., "Prefix Tables: A Simple Mechanism for Locating Files in a Distributed System," pp. 184–189, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1996.

Schwartz, et al., "A Name Service for Evolving, Heterogeneous Systems," Proceedings of the 11th ACM Symposium on Operating Systems Principles, vol. 21, No. 5, pp. 52–62, Austin, TX, Nov. 1987.

Hitchens, M., et al., "Bindings Between Names and Objects in a Persistent System," Proceedings of the 2nd International Workshop on Object Orientation in Operating Systems, IEEE Computer Society, pp. 26–37, Dourdan, FR, Sep. 1992.

Sheltzer, et al., "Name Service Locality and Cache Design in a Distributed Operating System," University of California, Los Angeles, 8 pgs.

Andrade, et al., "Open On–Line Transaction Processing with the Tuxedo System," pp. 368–371, Digest of Papers, IEEE Computer Society Press, Compson Spring 1992, San Francisco, California.

Terry, D.B., "Structure–free Name Management for Evolving Distributed Envrivonments," pp. 502–508, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1986.

Cheriton D.R., et al., "Uniform Access to Distributed Name Interpretation in the V–System," pp. 290–297, 4th International Conference on Distributed Computing System, IEEE Computer Society, San Francisco, CA, May 1984.

Lampson, B.W., "Designing a Global Name Service,", pp. 1–10, Proceedings of the 5th Annual ACM Symposium on Principles of Distributed Computing, ACM, Calgary, Alberta, Canada, Aug. 1986.

Curtis, R., et al., "Naming in Distributed Language Systems," pp. 298–302, 4th International Conference on Distributed Computing Systems, IEEE Computer Society, San Francisco, CA May 1984.

Squillante, M.C., et al., Integrating Heteregeneous Local Mail Systems, pp. 59–67, IEEE Software, Nov. 1989.

Schwartz, M.F., et al., Experience with a Semantically Cognizant Internet White Pages Directory Tool, Journal of Internetworking: Research and Experience, pp. 1–22 (1990).

Ordille, J.J., et al., "Nomenclater Descriptive Query Optimization for Large X.500 Environments," pp. 185–196, SIGCOM '91 Conference, Communication Architectures & Protocols, vol. 21, No. 4, Zurich, Switzerland, Sep. 1991.

Notkin, D., "Proxies: A Software Structure for Accomodating Hetergeneity," Software–Practice and Experience, vol. 20(4), 357–364, Apr. 1990.

Bjorn N. Freeman–Benson," Using the Web to Provide Private Information," First International Conference on the World Wide Web, WWW94, May 1994, 5 pages.

Rescorla, E., et al., "The Secure HyperTest Transfer Protocol," Aug. 1999.

Lou Montulli, Electronic Mail to Multiple Recipients of the www–talk list (www–talk.1995q2/0134.html on "Session Tracking" (omi.mail.www–talk, Apr. 18, 1995).

Ramanathan, Sirvivas, et al., "Architectures for Personalized Multimedia," IEEE Multimedia, vol. 1, No. 1, Computer Society, pp. 37–46, 1994.

Choudhury, Abhijit K., et al., "Copyright Protection for Electronic Publishing Over Computer Networks," IEEE Network, The Magazine of Computer Communications, vol. 9, No. 3, pp. 12–20, May 1995.

"Persistent Client State HTTP Cookies," http://search-.netscape.com/newsref/std/cookie_spec.html (Jan. 9, 1998).

"HTTP State Management Mechanism," http://www.internic.net/rfc/rfc2109.txt (Jan. 9, 1998)—http://www.cse.o-hio–state.edu/cgi–bin/rfc/rfc2965.html.

Pitkow, J.E., and Recker, M.M., Using the Web as a Survey Tool: Results from Second WWW User Survey,: http://www.igd.fhg.de/archive/1995_www95/papers/79/survey/survey_2_paper.html.

Peterson, Larry L., "A Yellow–Pages Service for a Local–Area Network," ACM Proceedings of the ACM SIG-COMM 87 Workshop, ACM Press, 1988, pp. 235–242.

Kahan, Jose, "A Distributed Authorization Model for WWW," http://www.isoc.org/HMP/PAPER/107/html/paper.html, pp. 1–16.

Kahan, Jose, "A capability–based authorization model for the World–Wide Web," http://www.igd.fhg.de/archive/1995_www95/proceedings/papers/86/CaMWWW.htlm, pp. 1–14.

Kahan, Jose, "A New Authorization Model for Distributed Multimedia Information Consultation Systems," English Translation, pp. 1–21.

Berners–Lee, T., et al., http://www.ietf.org/rfc/rfc1738.txt?numbers=178.

Gary Welz "The Media Business on the WWW", Proceedings of the Second World Wide Web Conference 1994: Mosaic and the Web, Oct. 1994, 6 pages.

Clickstream, Oct. 1996, The word Spy, [http:www.wordspy.com/words/clickstream.asp], 2 pages.

**US 5,715,314 C1**

Bob Novick, (9503) Internet Marketing: The Clickstream, Mar. 1995, [http://www.i–m.com/archives/9503/0375.html] 3 pages.

Kahan, Jose, "Un nouveau modele d–autorisation pour les systemes de consultation d–information multimedia repartee," pp. 45–57.

Brian W. Kernighan and Dennis M. Ritchie, "The C Programming Language" second edition, AT&T Bell Laboratories, (N.J., Prentice Hall) pp. 17–21 (1998).

Computer and Business Equipment Manufacturers Association, "American National Standard for Information Systems–Database Language SQL" (N.Y., American National Standards Institute) pp. 27–28 (1986).

Aho, A.V., et al., "Reports and Databases." In the AWK Programming Language, M.A. Harrison, ed., (Addison–Wesley), pp. 100–101 (1988).

Kelley, A., and Pohl, I., "Arrays, Strings, and Pointers." In a Book on C, A. Apt. ed., (the Benjamin/Cummings Publishing Company, Inc.,) pp. 35–37 (1984).

WordPerfect for Macintosh, pp. 153–162 (1990).

"Here it is, World" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Oct. 13, 1994–Oct. 17, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/3666fe4e21b3a9c2/9a210e5f72278328?lnk=st&rnum=5&hl=en#/9a210e5f72278328.

"Netscape 0.93 Setup Questions" internet postings to comp.infosystems.www.misc discussion list re: Mosaic Netscape (Nov. 21, 1994–Nov. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/da4e82efc6512f67/8dabc347291409d5?lnk=st&rnum=1&hl=en/#8dabc347291409d5.

"Netscape and Cookies" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 11, 1994–Dec. 13, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/5347cb89bbae572b/3583cab5e6c13e94?lnk=st&rnum=3&hl=en/#3583cab5e6c13e94.

"Cookies.txt" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 23, 1994–Dec. 27, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/613e81948e9cf6e4/134ade72dfc1c58d?lnk=st&rnum=2&hl=en/#134ade72dfc1c58d.

"How to get statefull HTML documents" internet postings to comp.infosystems.www.misc discussion list (Jun. 24, 1994–Jun. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/fd304fedb645529a/b8f6dab2aa73ae71?lnk=st&rnum=7&hl=en/#b8f6dab2aa73ae71.

"How to add state info to a form" internet postings to comp.infosystems.www.providers discussion list (Jun. 30, 1994–Jul. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www.providers/browse_thread/thread/2acad6cdc8ebb8a/bf368e630add2c94?lnk=st&rnum=8&hl=en/#bf368e630add2c94.

"Transactional Services on WWW" internet postings to comp.infosystems.www discussion list (May 12, 1994–Jun. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www/browse_thread/thread/bf430e6df8e6e7d/8ed77a97f5d0b9d6?lnk=st&hl=en/#8ed77a97f5d0b9d6.

Dan Aronson, "access and session control" posting to www–talk discussion list (Sep. 14, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0901.html.

Rick Troth, "access and session control" (Sep. 15, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0923.html.

alain@hyperman.co.il, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at http://1997.webhistory.org/www.lists/www–talk.1994q4/1098.html.

Joe English, "Re: Identifying Mosaic session", posting to www–talk discussion list (Dec. 20, 1994 available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1109.html.

Steven Majewski, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1111.html.

Nick Arnett, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0562.html.

Jared Rhine, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0563.html.

Simon Spero, "Statelessness" posting to www–talk discussion list (May 17, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0579.html.

Jim McBeath, "Statelessness" posting to www–talk discussion list (May 27, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0683.html.

Phillip Hallam–Baker, "Statelessness" posting to www–talk discussion list (May 30, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0705.html.

Gifford, Stewart, Payne, Treese, "Payment Switches for Open Networks," presented at 40th IEEE, IEEE, COMPCON '95, Mar. 5–9, 1995, San Francisco, CA.

Defendant Amazon.com Inc.'s Unopposed Motion for Leave to Amend its Answer to Include Allegations Regarding Stuff.com.

Declaration of James E. Geringer in Support of Amazon.com, Inc's Motion for Leave to Amend its Answer and Counterclaims to Add Stuff.com.

Exhibit 1 of Geringer Declaration: Excerpts of Deposition of Michael Kuniavsky.

Exhibit 2 of Geringer Declaration: E–mail from Brooks Cutter to Mike Kuniavsky (Jun. 14, 1994).

Exhibit 3 of Geringer Declaration: Excerpts of Deposition of Richard Boake.

Exhibit 5 of Geringer Declaration: Excerpts of Deposition of Andrew Payne.

Exhibit 6 of Geringer Declaration: E–mail from Andrew Payne to Winfield Treese, et al. (Jun. 15, 1994).

Exhibit 7 of Geringer Declaration: Excerpts of Deposition of Winfield Treese.

Exhibit 8 of Geringer Declaration: Amazon.com, Inc.'s [Proposed] fourth Amended Answer, Affirmative Defenses, and Counterclaims to Soverain Software, LLC's Complaint (Redlined Version).

Amazon.com's Motion for Partial Summary Judgment that '314 claims 34–39, '492 claims 17–18 and 35–36, and '780 claims 1, 4, and 22–24 are invalid under 35 U.S.C. 102.

Amazon.com's Motion for Partial Summary Judgment that claims are indefinite under 35 U.S.C. 112.

US 5,715,314 C1

Page 6

Berners–Lee, T., et al., http://www.ietf.org/rfc/rfc1738.txt?numbers=1738.

Changes to wwwStat at http://ftp.ics.uci.edu/pub/websoft/wwwstat/Changes.

Berners–Lee, T., RFC 1630: Universal Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World–Wide Web.

Berners–Lee, T., et al. RFC 1738: Uniform Resource Locators.

Fielding, R., RFC 1808: Relative Uniform Resource Locators.

Berners–Lee, T., et al. RFC 1945: Hypertext Transfer Protocol—HTTP/1.0.

Fielding, R., et al. RFC 2068: Hypertext Transfer Protocol—HTTP/1.1.

Fielding, R., et al. RFC 2616: Hypertext Transfer Protocol—HTTP1/1.

Berners–Lee, T. "draft–ietf–iiir–http–00.txt" (Nov. 5, 1993).

wwwStat README file at http://ftp.ics.uci.edu/pub/websoft/wwwstat/README.

NCSA HTTPd release notes at http://hoohoo.ncsa.uiuc.edu/docs/Upgrade.html (last updated Aug. 1, 1995).

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web," Electronic Proc. of the 2nd World Wide Web Conf. '94: Mosaic and the Web!, Developers Days, (Oct. 20, 1994).

Dukach, Seymon; Prototype Implementation of the SNPP Protocol; allspic.lcs.mit.edu; 1992.

Batelaan; Butler; Chan; Chen; Evenchick; Hughes; Jen; Jeng; Millett; Riccio; Skoudis; Starace; Stoddard; "An Internet Billing Server Prototype Design"; Carnegie Mellon.

O'Mahony, Donal, Michael Peirce, & Hitesh Tewari, Electronic Payment Systems, Artech House, Inc., pp. 145–155, Jan. 1997.

Maren, Michael, "The Age of E–Mail," Home Office Computing, vol. 11, No. 12, p. 63(5).

Foster, David & Stuart Finn, "Insurers Can Benefit From E–Mail Networks", National Underwriter Property & Casualty–Rick & Benefits Management, No. 9, p. 46(2), Mar. 4.

Ferrarini, E., "Flight of Fancy: Goodbye Travel Agent", Business Computer Systems, vol. 2, No. 11, pp. 39–40, Nov. 1993.

Trip et al., "Cookies" (client–side persistent information) and their use, Netscape Technical Note 20019, Netscape Communications Corp., Oct. 1995.

Archive of WWWorder mailing list (Jun. 18, 1994–Jun. 13, 1994).

Leggett, John et al., "Hyperform: Using Extensibility to Develop Dynamic, Open and Distributed Hypertext Systems" (1992).

Bieber, Michael, "Issues in Modeling a 'Dynamic' Hypertext Interface for Non–Hypertext Systems" (1991).

Nielson, Jacob, Hypertext & Hypermedia (1990).

"Announcing: Internet Shopkeeper" (Aug. 21, 1994) posting on comp.infosystems.www and misc.forsale.

Eaasy Sabre User's Guide and Eaasy Sabre Reference Guide.

Compuserve Manual (undated).

The Major BBS: Collection of information and Advertisements concerning The Major BBS (Fall 1993).

Fielding, Roy, et al., "Principled Design of the Modern Web Architecture" ACM Transactions on Internet Technology 2, 2 pp. 115–150 (May 2002).

Smithson, Brian, and Singer, Barbara, An Information Clearinghouse Server for Industry Consortia, 2nd Int'l Conf. On the World Wide Web, Chicago, Ill., Oct. 1994.

Soverain's ANSWER to Counterclaim (Amazon's Third Amended Counterclaim) by Soverain Software LLC.(Seraphine, Jennifer) (Entered: Mar. 17, 2005).

NOTICE by Amazon.com re: Answer to Amended Complaint, Counterclaim Of Rejection Of Claims 1–45 Of U.S. Patent No. 5,708,780 (Entered: Mar. 25, 2005).

MOTION to Stay [Renewed] by Amazon.com. (Entered: Apr. 5, 2005).

Soverain's Opposition to Amazon's Renewed Motion to Stay.

Amazon.Com, Inc.'s Reply in Support of Renewed Motion to Stay.

Deposition of Glenn Arthur Hauman with Exhibits (Oct. 28, 2004).

Deposition of Glenn Crocker with Exhibits (Mar. 10, 2005).

Deposition of Glenn M. Trewitt with Exhibits (Jan. 25, 2005).

Deposition of Guy Henry Timothy Haskin with Exhbits (Mar. 18, 2005).

Deposition of Joshua Smith with Exhibits (Mar. 2, 2005).

Deposition of Kevin Ming–Wei Kadaja Hughes with Exhibits (Mar. 21, 2005).

Deposition of Michael Kuniavsky with Exhibits (Feb. 22, 2005).

Deposition of Michael Lazzaro with Exhibits (Mar. 9, 2005).

Deposition of Phillip Hallam–Baker with Exhibits (Mar. 11, 2005).

Deposition of Robert Allen Olson with Exhibits (Mar. 3, 2005).

Deposition of Thomas Soulanille with Exhibits (Mar. 14, 2005).

Expert Report of Alexander B. Trevor (Apr. 10, 2005).

Reply to Response to Motion re: Motion to Stay [Renewed] (Surreply in Opposition to Amazon's Renewed Motion to Stay) filed by Soverain Software LLC.

"It will happen", article excerpt from infoHighway, vol. 2–1, Jan. 1995.

Aronson, Dan, et al., Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Access and session control" dated Sep. 15, 1994.

Derler, Christian, "The World–Wide Web Gateway to Hyper–G: Using a Connectionless Protocol to Access Session–Oriented Services", Institut für Informationsverarbeilung and Computergestützte neue Medien, Graz, Austria, dated Mar. 1995.

English, Joe, Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Re: Identifying Mosaic session" dated Dec. 20, 1994.

Fielding, Roy, software distribution archive for the HTTP log file analysis program, wwwstat v1.01, dated Apr. 24, 1994, published at http://www.ics.uci.edu/WebSoft/wwwstat/.

Hall, Devra, et al., "Build a Web Site: The Programmer's Guide to Creating, Building, and Maintaining a Web Presence", published Apr. 1995. ISBN 0–7615–0064–2.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html.—Version 1, 64 pages.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 2, 64 pages.

McCartney, Todd, Message posted to Usenet public discussion group, rec.arts.disney, dated Nov. 21, 1994.

Pitkow, et al., "Results from the First World Wide Web Use Survey", presented at the First International Conference on the World Wide Web, Geneva, Switzerland, May 25–27, 1994, published at http://www94.web.cern.ch/WWW94/PrelimProcs.html on Jun. 2, 1994, and reprinted in the Journal of Computer Networks and ISDN Systems, vol. 27, No. 2., Nov. 1994, Elsevier Science B.V.

The NetMarket Company, NetMarket PGP Help file, from http://www.netmarket.com, dated Dec. 10, 1994.

Trewitt, Glenn, "Using Tel to Proceess HTML Forms", Digital Equipment Corporation, Network Systems Laboratory TN–14, dated Mar. 1994.

"Advanced Electronic Credit Authorization Through the Amherst Group SNET", News Release, New Haven, CT, Dec. 7, 1987, 2 pages.

Anderson, Scot et al., "Sessioneer: Flexible Session Level Authentication With Off the Shelf Servers and Clients", http//:www.igd.fhg.de/archive/1995_www95/papers/77/sessioneer2.html, pp. 1–7.

Buhle, E. Loren Jr., "Wide Area Information Servers", Digital Systems Journal, Sep./Oct. 1994, pp. 13–16.

Comer, D., et al., "The Tilde File Naming Scheme", The 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA., May 1996, pp. 509–514.

Comer, D.E., et al., "A Model of Name Resolution in Distributed Systems", The 6th International Conference on Distributed Computer Systems, IEEE Computer Society,, Cambridge, MA, May 1996, pp. 523–530.

Computer Fraud & Security Bulletin, "Underlying Security Mechansms", Mar. 1997, 2 pages.

Cookies and Privacy FAQ, http://search.netscape.com/assist/security/faqs/cookies.html Jan. 9, 1998 at 4:29 pm., pp. 1–3.

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web", 2nd International Conference on the WorldWide Web, Chicago, Illinois , Oct. 1994, 7 pages.

Net Market Company, "Numerous New Media Stories", New York Times, Front Page of Business Section, Aug. 12, 1994, 4 pages.

Phillips, K., "SuperHighway Access Eases Internet Entry", PC Week, Oct. 31, 1994, 3 pages.

Poler, Ariel, "Improving WWW Marketing Through User Information and Non–Intrusive Communications", Internet Profiles Corporation (I/PRO), 2nd WWW Conference, Chicago, Illinois, Oct. 1994, 4 pages.

Soverain's Disclosure of Asserted Claims and Preliminary Infringement Contentions dated Jun. 3, 2004.

Supplemental Disclosure of Preliminary Invalidity Contentions by Amazon and the Gap dated Jul. 26, 2004.

Deposition of G. Winfield Treese, dated Oct. 27, 2004.

Soverain's Reply to Amazon.Com's Amended Counterclaims, dated Jan. 14, 2005.

Third Supplement to Defendant Amazon's Initial Disclosures, dated Mar. 4, 2005.

VideoTaped Deposition of Mark Levergood dated Mar. 8, 2005 (2 parts).

VideoTaped Deposition of Andrew Payne dated Mar. 11, 2005.

VideoTaped Deposition of Stephen Morris dated Mar. 9, 2005.

VideoTaped Deposition of Glenn Trewitt dated Jan. 25, 2005 (2 parts).

Soverain's Fourth Supplemental Responses to Amazon's First Set of Interrogatories (Nos. 1–14) dated Mar. 21, 2005.

Soverain's Responses to Interrogatory Nos. 22, 23, 26 and 36 of Amazon's Third Set of Interrogatores (Nos. 17–28) dated Mar. 21, 2005.

Soverain's Responses to Amazon's First Set of Requests for Admission to Plaintiff Soverain Software (Nos. 1–100) dated Mar. 21, 2005.

Memorandum Opinion dated Apr. 7, 2005.

Soverain's Reply to Amazon's Third Amended Counterclaims, dated Mar. 17, 2005.

Amazon.com's Renewed Motion to Stay Proceedings Until the Patent and Trademark Office Completes Re–Examination of the Three Patents in Suit, dated Apr. 5, 2005.

NCSA "What's New"http://archive.ncsa.uiuc.edu/SDG/Software/Mosaic/Docs/old–whats–new/

whats–new–0294.html, Feb. 28, 1994, 17 pages.

Business Wire, CommerceNet Urges Government to Ease Export Restrictions on Encryption Products; Consortium's New White Paper Articulates Position on the Export of Cryptography–Based Products, Jun. 26, 1995, 2 pages.

Motoda, Toshihiro et al., *An Experimental Verification of Relational Database Access Over WWW*, NTT Software Laboratories, Nippon Telegraph and Telephone Corporation, 1995, pp. 47–54 (with English Translation—8 pages).

Ohmori et al., "An On–line Shopping System Protecting User's Privacy", Information Communication Laboratory of Matsushita Electric Industrial Co., Ltd. , pp. 25–32. Note: 12 Pages of Translation Attached.

Bina et al., "Secure Access to Data Over the Internet", Natl. Center for Supercomputing Appls., Unv. Of Illinois, Champaign, Illinois, pp. 99–102.

Farber, David, "Interesting–People Message—RSA/NCSA/EIT Announcement on Secure Mosiac" Palo Alto, California, Apr. 12, 1994, 4 pages.

Kent, Stephen T., "Internet Privacy Enhanced Mail", 8070 Communications of the ACM 36, New York, Aug. 1993, pp. 48–60.

Kohn, Dan, "Prior Art on Open Market Patents", e–mail message dated Mar. 9, 1998, 1 page.

Lewis, Peter H., "Attention Shoppers: Internet is Open", 2 pages.

Medvinsky et al., NetCash: A Design for Practical Elecronic Currency on the Internet, Information Sciences Institute, University of Southern California, 1993, pp. 102–106.

Schaefer et al., "Networked Information Discovery and Retrieval Tools: Security Capabilities and Needs", The MITRE Corporation, 1994, pp. 145–153.

European Search Report dated Jun. 19, 2006.

*Soverain Software LLC v. Amazon.Com, Inc. and The Gap, Inc.,* Form of Stipulated Request for Final Dismissals of the Actions, filed Aug. 30, 2005.

*Soverain Software LLC v. Amazon.Com, Inc. and The Gap, Inc.,* Order of Dismissal with Prejudice filed Aug. 31, 2005.

* cited by examiner

US 5,715,314 C1

# 1
# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**–**48** is confirmed.

New claims **49**–**168** are added and determined to be
patentable.

*49. A network-based sales system in accordance with
claim 34, wherein the buyer computer activates the payment
message by transmitting a message to the shopping cart
computer that causes the payment message to be activated.*

*50. A network-based sales system in accordance with
claim 34, wherein the network is a public packet switched
network.*

*51. A network-based sales system in accordance with
claim 34, wherein the network is an Internet.*

*52. A network-based sales system in accordance with
claim 34, further comprising:*

*a merchant computer that is interconnected with the buyer
computer and shopping cart computer by the computer
network; and*

*an advertising document database;*

*wherein the merchant computer is programmed to fetch
an advertising document from the advertising docu-
ment database.*

*53. A network-based sales system in accordance with
claim 52, wherein the merchant computer is programmed to
send one or more advertising documents to the buyer
computer.*

*54. A network-based sales system in accordance with
claim 53, wherein the merchant computer is programmed to
provide a product requested by the user.*

*55. A network-based sales system in accordance with
claim 54, wherein the merchant computer is programmed to
respond to payment orders from the buyer computer without
the merchant computer having to communicate directly with
the shopping cart computer to ensure that the user is
authorized to purchase the product;*

*wherein the merchant computer is programmed to
respond to payment orders from the buyer computer
without the merchant computer having to store infor-
mation in a database regarding which buyers are
authorized to purchase which products.*

*56. A network-based sales system in accordance with
claim 53, wherein the advertisement documents are in the
form of summaries of newspaper or newsletter articles;*

*wherein prior to a user's product request, the merchant
computer sends an advertising document to the buyer
computer.*

*57. A network-based sales system in accordance with
claim 34, wherein the buyer computer transmits an initial
link that comprises information from which the shopping
cart computer can create a session link message;*

# 2

*wherein the session link is transmitted from the shopping
cart computer to the buyer computer;*

*wherein the session link message includes a session link
authenticator for use by a computer to authenticate the
session link message.*

*58. A network-based sales system in accordance with
claim 57, wherein the session link authenticator is a cryp-
tographic function of the session link contents.*

*59. A network-based sales system in accordance with
claim 58, wherein the buyer computer is programmed to
cause the session link message to be sent to a computer in
the network which is programmed to authenticate the ses-
sion link message by examining the session link authenti-
cator and which is programmed to respond to the session
link message based on state of the interaction between the
buyer computer and the shopping cart computer.*

*60. A network-based sales system in accordance with
claim 34, wherein at least one of the requests comprises a
shopping cart URL.*

*61. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
domain identifier.*

*62. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
merchant identifier.*

*63. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
merchant account identifier.*

*64. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
payment amount.*

*65. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
product identifier.*

*66. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises a
duration time.*

*67. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises an
expiration time.*

*68. A network-based sales system in accordance with
claim 67, wherein the shopping cart computer transmits a
document to the buyer computer indicating that the expira-
tion time has passed.*

*69. A network-based sales system in accordance with
claim 60, wherein the URL comprises a buyer network
address.*

*70. A network-based sales system in accordance with
claim 69, wherein the buyer computer network address is
verified by matching it with a network address specified in
the shopping cart URL.*

*71. A network-based sales system in accordance with
claim 70, wherein if the computer network address verifi-
cation fails, the shopping cart computer sends a docu-
ment to the buyer computer indicating that access is not
allowed.*

*72. A network-based sales system in accordance with
claim 60, wherein the shopping cart URL comprises an
authenticator based on a cryptographic key;*

*wherein the authenticator is a function of contents of the
shopping cart URL:*

*wherein the shopping cart computer verifies whether the
shopping cart URL authenticator was created from the
contents of the shopping cart URL using a crypto-
graphic key.*

*73. A network-based sales system in accordance with
claim 72, wherein if the verification fails, the shopping cart*

US 5,715,314 C1

**3**

computer transmits a document to the buyer computer indicating that access is denied.

74. A network-based sales system in accordance with claim 34, wherein the buyer computer activates the payment message by transmitting a message to the shopping cart computer that causes the payment message to be activated;

wherein the shopping cart computer transmits a payment confirmation document to the buyer computer.

75. A network-based sales system in accordance with claim 74, wherein the payment confirmation document includes an open link and a continue link.

76. A network-based sales system in accordance with claim 75, wherein the shopping cart computer opens a new account in response to the user selecting the open link.

77. A network-based sales system in accordance with claim 76, wherein the buyer computer sends a payment URL to the shopping cart computer that indicates that an account does not yet exist.

78. A network-based sales system in accordance with claim 77, wherein the shopping cart computer creates a new account document.

79. A network-based sales system in accordance with claim 78, wherein the shopping cart computer transmits the new account document to the buyer computer.

80. A network-based sales system in accordance with claim 79, wherein the new account document comprises a challenge form that requests account information to be entered by the user.

81. A network-based sales system in accordance with claim 80, wherein the account information comprises a new account name and account password.

82. A network-based sales system in accordance with claim 80, wherein the account information comprises: a new account name, an account password, a credit card number, and an expiration date of the credit card.

83. A network-based sales system in accordance with claim 80, wherein the account information comprises security information.

84. A network-based sales system in accordance with claim 34, wherein the shopping cart computer, in response to the plurality of shopping cart messages, causes an account name and password request message to be transmitted to the buyer computer.

85. A network-based sales system in accordance with claim 34, further comprising:

a merchant computer that is interconnected with the buyer and shopping cart computers by the computer network; and

an advertising document database;

wherein the merchant computer is programmed to fetch an advertising document from the advertising document database;

wherein the advertising document database is local to the merchant computer.

86. A network-based sales system in accordance with claim 85, wherein a creation computer updates the remote advertising document database on the merchant computer.

87. A network-based sales system in accordance with claim 85, wherein the buyer computer transmits a purchase product message to the merchant computer, and, in response, the merchant computer provides a payment URL to the buyer computer.

88. A network-based sales system in accordance with claim 87, wherein the buyer computer transmits the payment URL to a payment computer.

89. A network-based sales system in accordance with claim 88, wherein the payment computer is the shopping cart computer.

**4**

90. A network-based sales system in accordance with claim 88, wherein the payment URL comprises an authenticator based on a cryptographic key;

wherein the authenticator is a function of contents of the payment URL.

91. A network-based sales system in accordance with claim 90, wherein the payment computer verifies whether the payment URL authenticator was created from the contents of the payment URL using a cryptographic key;

if the verification fails, the payment computer transmits a document to the buyer computer indicating that access is denied.

92. A network-based sales system in accordance with claim 88, wherein the payment URL further comprises an expiration time.

93. A network-based sales system in accordance with claim 92, wherein the payment computer transmits a document to the buyer computer indicating that the expiration time has passed.

94. A network-based sales system in accordance with claim 88, wherein the payment URL comprises a buyer network address.

95. A network-based sales system in accordance with claim 94, wherein the buyer computer network address is verified by matching it with the network address specified in the payment URL;

if the verification fails, then the shopping cart computer sends a document to the buyer computer indicating that access is not allowed.

96. A network-based sales system in accordance with claim 88, wherein the payment computer transmits a payment confirmation document to the buyer computer;

wherein the payment confirmation document includes an open link and a continue link;

wherein in response to the user selecting the continue link, the payment computer instructs the buyer computer to provide an account name and password that have previously been provided by the buyer computer to the payment computer.

97. A network-based sales system in accordance with claim 96, wherein the buyer computer prompts the user for the account name and password by creating an account name prompt and a password prompt.

98. A network-based sales system in accordance with claim 97, wherein the payment computer verifies that the account name and password entered by the user match a previously provided account name and password.

99. A network-based sales system in accordance with claim 98, wherein if the verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

100. A network-based sales system in accordance with claim 98, wherein if a payment amount exceeds a threshold, then the user is prompted for security information;

wherein the payment computer verifies that the security information matches a previously provided account name and password;

if the verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

101. A network-based sales system in accordance with claim 98, further comprising a settlement database that is in communication with the payment computer;

wherein the settlement database is used to determine whether the user has unexpired access to a domain identified in the payment message;

US 5,715,314 C1

**5**

wherein the user is presented with an option to repurchase or to use the unexpired access.

102. A network-based sales system in accordance with claim 101, wherein the purchase of a product in a certain domain by a user account entitles access to other products in the domain for free or at a reduced price.

103. A network-based sales system in accordance with claim 98, wherein the payment computer verifies whether the user account has sufficient funds or credit that satisfies a payment amount specified in the payment message,

if the verification fails, then the payment computer sends a document to the buyer computer indicating that the user has insufficient funds.

104. A network-based sales system in accordance with claim 98, wherein the payment computer records an end of duration time in a settlement database.

105. A network-based sales system in accordance with claim 98, wherein the payment computer creates an access URL including an access URL authenticator that is a digital signature generated based on a cryptographic key;

wherein the access URL authenticator is a hash of other information in the access URL;

wherein the payment computer sends a redirect to the access URL to the buyer computer;

wherein the buyer computer sends the access URL to a merchant computer.

106. A network-based sales system in accordance with claim 105, wherein the merchant computer verifies whether the access URL authenticator was created from said other information in the access URL using the cryptographic key;

if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.

107. A network-based sales system in accordance with claim 105, wherein the merchant computer verifies whether a duration time for access has expired;

if the verification fails, then the merchant computer sends a document to the buyer computer indicating that the duration time has expired.

108. A network-based sales system in accordance with claim 105, wherein the merchant computer verifies that a buyer computer network address is the same as a buyer network address contained in the access URL;

if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.

109. The method of claim 39, wherein the buyer computer activates the payment message by transmitting a message to the shopping cart computer that causes the payment message to be activated.

110. The method of claim 39, wherein the network is a public packet switched network.

111. The method of claim 39, wherein the network is an Internet.

112. The method of claim 39, wherein a merchant computer is interconnected with the buyer computer and shopping cart computer by the computer network;

wherein the merchant computer is programmed to fetch an advertising document from an advertising document database.

113. The method of claim 112, wherein the merchant computer is programmed to send one or more advertising documents to the buyer computer.

114. The method of claim 113, wherein the merchant computer is programmed to provide a product requested by the user.

**6**

115. The method of claim 114, wherein the merchant computer is programmed to respond to payment orders from the buyer computer without the merchant computer having to communicate directly with the shopping cart computer to ensure that the user is authorized to purchase the product;

wherein the merchant computer is programmed to respond to payment orders from the buyer computer without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products.

116. The method of claim 113, wherein the advertisement documents are in the form of summaries of newspaper or newsletter articles;

wherein prior to a user's product request, the merchant computer sends an advertising document to the buyer computer.

117. The method of claim 39, wherein the buyer computer transmits an initial link that comprises information from which the shopping cart computer can create a session link message;

wherein the session link is transmitted from the shopping cart computer to the buyer computer;

wherein the session link message includes a session link authenticator for use by a computer to authenticate the session link message.

118. The method of claim 117, wherein the session link authenticator is a cryptographic function of the session link contents.

119. The method of claim 118, wherein the buyer computer is programmed to cause the session link message to be sent to a computer in the network which is programmed to authenticate the session link message by examining the session link authenticator and which is programmed to respond to the session link message based on state of the interaction between the buyer computer and the shopping cart computer.

120. The method of claim 39, wherein at least one of the requests comprises a shopping cart URL.

121. The method of claim 120, wherein the shopping cart URL comprises a domain identifier.

122. The method of claim 120, wherein the shopping cart URL comprises a merchant identifier.

123. The method of claim 120, wherein the shopping cart URL comprises a merchant account identifier.

124. The method of claim 120, wherein the shopping cart URL comprises a payment amount.

125. The method of claim 120, wherein the shopping cart URL comprises a product identifier.

126. The method of claim 120, wherein the shopping cart URL comprises a duration time.

127. The method of claim 120, wherein the shopping cart URL comprises an expiration time.

128. The method of claim 127, wherein the shopping cart computer transmits a document to the buyer computer indicating that the expiration time has passed.

129. The method of claim 120, wherein the URL comprises a buyer network address.

130. The method of claim 129, wherein the buyer computer network address is verified by matching it with a network address specified in the shopping cart URL.

131. The method of claim 130, wherein if the computer network address verification fails, then the shopping cart computer sends a document to the buyer computer indicating that access is not allowed.

132. The method of claim 120, wherein the shopping cart URL comprises an authenticator based on a cryptographic key;

US 5,715,314 C1

**7**

wherein the authenticator is a function of contents of the shopping cart URL;

wherein the shopping cart computer verifies whether the shopping cart URL authenticator was created from the contents of the shopping cart URL using a cryptographic key.

133. The method of claim 132, wherein if the verification fails, the shopping cart computer transmits a document to the buyer computer indicating that access is denied.

134. The method of claim 39, wherein the buyer computer activates the payment message by transmitting a message to the shopping cart computer that causes the payment message to be activated;

wherein the shopping cart computer transmits a payment confirmation document to the buyer computer.

135. The method of claim 134, wherein the payment confirmation document includes an open link and a continue link.

136. The method of claim 135, wherein the shopping cart computer opens a new account in response to the user selecting the open link.

137. The method of claim 136, wherein the buyer computer sends a payment URL to the shopping cart computer that indicates that an account does not yet exist.

138. The method of claim 137, wherein the shopping cart computer creates a new account document.

139. The method of claim 138, wherein the shopping cart computer transmits the new account document to the buyer computer.

140. The method of claim 139, wherein the new account document comprises a challenge form that requests account information to be entered by the user.

141. The method of claim 140, wherein the account information comprises a new account name and account password.

142. The method of claim 140, wherein the account information comprises: a new account name, an account password, a credit card number, and an expiration date of the credit card.

143. The method of claim 140, wherein the account information comprises security information.

144. The method of claim 39, wherein the shopping cart computer, in response to the plurality of shopping cart messages, causes an account name and password request message to be transmitted to the buyer computer.

145. The method of claim 39, wherein a merchant computer is interconnected with the buyer and shopping cart computers by the computer network;

wherein the merchant computer is programmed to fetch an advertising document from an advertising document database;

wherein the advertising document database is local to the merchant computer.

146. The method of claim 145, wherein a creation computer updates the remote advertising document database on the merchant computer.

147. The method of claim 145, wherein the buyer computer transmits a purchase product message to the merchant computer, and, in response, the merchant computer provides a payment URL to the buyer computer.

148. The method of claim 147, wherein the buyer computer transmits the payment URL to a payment computer.

149. The method of claim 148, wherein the shopping cart computer is the shopping cart computer.

150. The method of claim 148, wherein the payment URL comprises an authenticator based on a cryptographic key;

wherein the authenticator is a function of contents of the payment URL.

**8**

151. The method of claim 150, wherein the payment computer verifies whether the payment URL authenticator was created from the contents of the payment URL using a cryptographic key;

if the verification fails, the payment computer transmits a document to the buyer computer indicating that access is denied.

152. The method of claim 148, wherein the payment URL further comprises an expiration time.

153. The method of claim 152, wherein the payment computer transmits a document to the buyer computer indicating that the expiration time has passed.

154. The method of claim 148, wherein the payment URL comprises a buyer network address.

155. The method of claim 154, wherein the buyer computer network address is verified by matching it with the network address specified in the payment URL;

if the verification fails, then the shopping cart computer sends a document to the buyer computer indicating that access is not allowed.

156. The method of claim 148, wherein the payment computer transmits a payment confirmation document to the buyer computer;

wherein the payment confirmation document includes an open link and a continue link;

wherein in response to the user selecting the continue link, the payment computer instructs the buyer computer to provide an account name and password that have previously been provided by the buyer computer to the payment computer.

157. The method of claim 156, wherein the buyer computer prompts the user for the account name and password by creating an account name prompt and a password prompt.

158. The method of claim 157, wherein the payment computer verifies that the account name and password entered by the user match a previously provided account name and password.

159. The method of claim 158, wherein if the verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

160. The method of claim 158, wherein if a payment amount exceeds a threshold, then the user is prompted for security information;

wherein the payment computer verifies that the security information matches a previously transmitted account name and password;

if the verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

161. The method of claim 158, wherein a settlement database is used to determine whether the user has unexpired access to a domain identified in the payment message;

wherein the user is presented with an option to repurchase or to use the unexpired access.

162. The method of claim 161, wherein the purchase of a product in a certain domain by a user account entitles access to other products in the domain for free or at a reduced price.

163. The method of claim 158, wherein the payment computer verifies whether the user account has sufficient funds or credit that satisfies a payment amount specified in the payment message;

if the verification fails, then the payment computer sends a document to the buyer computer indicating that the user has insufficient funds.

US 5,715,314 C1

**9**

164. The method of claim 158, wherein the payment computer records an end of duration time in a settlement database.

165. The method of claim 158, wherein the payment computer creates an access URL including an access URL authenticator that is a digital signature generated based on a cryptographic key;

    wherein the access URL authenticator is a hash of other information in the access URL;

    wherein the payment computer sends a redirect to the access URL to the buyer computer;

    wherein the buyer computer sends the access URL to a merchant computer.

166. The method of claim 165, wherein the merchant computer verifies whether the access URL authenticator was created from said other information in the access URL using the cryptographic key;

**10**

    if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.

167. The method of claim 165, wherein the merchant computer verifies whether a duration time for access has expired;

    if the verification fails, then the merchant computer sends a document to the buyer computer indicating that the duration time has expired.

168. The method of claim 165, wherein the merchant computer verifies that a buyer computer network address is the same as a buyer network address contained in the access URL;

    if the verification fails, then the merchant computer sends a document to the buyer computer indicating that access is not allowed.

\* \* \* \* \*



US005715314C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9300th)

# United States Patent
## Payne et al.

(10) **Number:**     **US 5,715,314 C2**

(45) **Certificate Issued:**     **Sep. 11, 2012**

(54) **NETWORK SALES SYSTEM**

(75) Inventors: **Andrew C. Payne**, Lincoln, MA (US);
**Lawrence C. Stewart**, Burlington, MA
(US); **G. Winfield Treese**, Wayland, MA
(US)

(73) Assignee: **Soverain Software LLC**, Chicago, IL
(US)

**Reexamination Request:**
No. 90/007,287, Nov. 3, 2004
No. 90/011,443, Jan. 18, 2011

**Reexamination Certificate for:**
Patent No.:     **5,715,314**
Issued:     **Feb. 3, 1998**
Appl. No.:     **08/328,133**
Filed:     **Oct. 24, 1994**

Reexamination Certificate C1 5,715,314 issued Oct. 9, 2007

(51) **Int. Cl.**
*G06Q 10/00*     (2006.01)
*G06Q 20/00*     (2006.01)
*G07F 7/00*     (2006.01)

(52) **U.S. Cl.** ......................... 705/78; 705/26.35; 705/75;
713/162

(58) **Field of Classification Search** ..................... 380/24
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited
during the proceedings for Reexamination Control Numbers
90/011,443 and 90/007,287, please refer to the USPTO's
public Patent Application Information Retrieval (PAIR) sys-
tem under the Display References tab.

*Primary Examiner*—Deandra M. Hughes

(57) **ABSTRACT**

A network-based sales system includes at least one buyer
computer for operation by a user desiring to buy a product, at
least one merchant computer, and at least one payment com-
puter. The buyer computer, the merchant computer, and the
payment computer are interconnected by a computer net-
work. The buyer computer is programmed to receive a user
request for purchasing a product, and to cause a payment
message to be sent to the payment computer that comprises a
product identifier identifying the product. The payment
computer is programmed to receive the payment message, to
cause an access message to be created that comprises the
product identifier and an access message authenticator based
on a cryptographic key, and to cause the access message to
be sent to the merchant computer. The merchant computer is
programmed to receive the access message, to verify the
access message authenticator to ensure that the access mes-
sage authenticator was created using the cryptographic key,
and to cause the product to be sent to the user desiring to buy
the product.

buyer computer 12        merchant computer 14        payment computer 16



JA0111

US 5,715,314 C2

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **34**, **35**, **36**, **39**, **49**, **50**, **51**, **84**, **109**, **110**, **111**, **134** and **144** is confirmed.

Claims **1-33**, **37-38**, **40-48**, **52-83**, **85-108**, **112-133**, **135-143**, and **145-168** were not reexamined.

\* \* \* \* \*



US005909492A

# United States Patent [19]

## Payne et al.

[11] Patent Number: 5,909,492

[45] Date of Patent: Jun. 1, 1999

[54] **NETWORK SALES SYSTEM**

[75] Inventors: **Andrew C. Payne**, Lincoln; **Lawrence C. Stewart**, Burlington, both of Mass.; **David J. Mackie**, Brookdale, Calif.

[73] Assignee: **Open Market, Incorporated,** Cambridge, Mass.

[21] Appl. No.: **08/878,396**

[22] Filed: **Jun. 18, 1997**

### Related U.S. Application Data

[63] Continuation of application No. 08/328,133, Oct. 24, 1994, Pat. No. 5,715,314.

[51] **Int. Cl.⁶** ........................................................ H04L 9/00

[52] **U.S. Cl.** ........................................ 380/24; 380/23; 380/25; 380/49; 380/50; 705/26; 705/27; 705/39; 705/40; 705/44

[58] **Field of Search** ............................ 380/4, 9, 21, 23, 380/24, 25, 49, 50; 235/379, 380; 705/26, 27, 39, 40, 41, 42, 43, 44, 14, 16

[56]                    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,305,059 | 12/1981 | Benton . | |
| 4,528,643 | 7/1985 | Freeny, Jr. . | |
| 4,529,870 | 7/1985 | Chaum .................................... | 235/380 |
| 4,578,530 | 3/1986 | Zeidler . | |
| 4,734,858 | 3/1988 | Schlafly . | |
| 4,755,940 | 7/1988 | Brachtl et al. . | |
| 4,759,063 | 7/1988 | Chaum .................................... | 380/30 |
| 4,759,064 | 7/1988 | Chaum .................................... | 380/30 |
| 4,775,935 | 10/1988 | Yourick . | |
| 4,795,890 | 1/1989 | Goldman .................................... | 235/380 |
| 4,799,156 | 1/1989 | Shavit et al. . | |
| 4,812,628 | 3/1989 | Boston et al. .................................... | 235/380 |
| 4,827,508 | 5/1989 | Shear .................................... | 380/4 |
| 4,891,503 | 1/1990 | Jewel .................................... | 235/380 |
| 4,922,521 | 5/1990 | Krikke et al. . | |
| 4,926,480 | 5/1990 | Chaum .................................... | 380/23 |
| 4,935,870 | 6/1990 | Burk, Jr. et al. . | |
| 4,947,028 | 8/1990 | Gorog . | |
| 4,947,430 | 8/1990 | Chaum .................................... | 380/25 |

| | | | |
|---|---|---|---|
| 4,949,380 | 8/1990 | Chaum .................................... | 380/30 |
| 4,972,318 | 11/1990 | Brown et al. .................................... | 705/26 |
| 4,977,595 | 12/1990 | Ohta et al. .................................... | 380/24 |
| 4,982,346 | 1/1991 | Girouard et al. . | |
| 4,987,593 | 1/1991 | Chaum .................................... | 380/3 |
| 4,991,210 | 2/1991 | Chaum .................................... | 380/30 |
| 4,992,940 | 2/1991 | Dworkin . | |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0 172 670 | 2/1986 | European Pat. Off. .......... | G07F 7/00 |
| 0-542-298-A2 | 5/1993 | European Pat. Off. . | |
| 4-10191 | 1/1992 | Japan .................................... | 705/26 |
| 2102606 | 2/1983 | United Kingdom . | |
| WO 91/16691 | 10/1991 | WIPO . | |
| WO 93/10503 | 5/1993 | WIPO .................................... | G06F 15/30 |

#### OTHER PUBLICATIONS

Contents of "Welcome first–time visitors" at www.amazon-.com on the Internet as of Jun. 29, 1998.

*Primary Examiner*—Bernarr E. Gregory
*Attorney, Agent, or Firm*—Fish & Richardson P.C.

[57]                     **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

**38 Claims, 25 Drawing Sheets**



**5,909,492**
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,996,711 | 2/1991 | Chaum | 380/30 |
| 5,025,373 | 6/1991 | Keyser, Jr. et al. . | |
| 5,060,153 | 10/1991 | Nakagawa . | |
| 5,077,607 | 12/1991 | Johnson et al. . | |
| 5,105,184 | 4/1992 | Pirani et al. . | |
| 5,220,501 | 6/1993 | Lawlor et al. . | |
| 5,247,575 | 9/1993 | Sprague et al. | 380/9 |
| 5,276,736 | 1/1994 | Chaum | 380/24 |
| 5,305,195 | 4/1994 | Murphy . | |
| 5,311,594 | 5/1994 | Penzias | 380/24 |
| 5,319,542 | 6/1994 | King, Jr. et al. | 705/27 |
| 5,321,751 | 6/1994 | Ray et al. | 380/24 |
| 5,336,870 | 8/1994 | Hughes | 235/379 |
| 5,341,429 | 8/1994 | Stringer et al. | 380/23 |
| 5,347,632 | 9/1994 | Filepp et al. . | |
| 5,351,186 | 9/1994 | Bullock et al. . | |
| 5,351,293 | 9/1994 | Michener et al. | 380/21 |
| 5,383,113 | 1/1995 | Kight et al. . | |
| 5,414,833 | 5/1995 | Hershey et al. . | |
| 5,521,631 | 5/1996 | Budow et al. . | |
| 5,535,229 | 7/1996 | Hain, Jr. et al. . | |
| 5,557,516 | 9/1996 | Hogan | 364/406 |
| 5,557,518 | 9/1996 | Rosen | 380/24 |
| 5,557,798 | 9/1996 | Skeen et al. . | |
| 5,590,197 | 12/1996 | Chen et al. | 380/24 |
| 5,592,378 | 1/1997 | Cameron et al. | 705/27 |
| 5,594,910 | 1/1997 | Filepp et al. . | |
| 5,596,642 | 1/1997 | Davis et al. | 380/24 |
| 5,596,643 | 1/1997 | Davis et al. | 380/24 |
| 5,604,802 | 2/1997 | Holloway | 380/24 |
| 5,621,797 | 4/1997 | Rosen | 380/24 |
| 5,623,547 | 4/1997 | Jones et al. | 380/24 |
| 5,642,419 | 6/1997 | Rosen | 380/24 |
| 5,694,551 | 12/1997 | Doyle et al. | 705/26 |
| 5,715,314 | 2/1998 | Payne et al. | 380/24 |
| 5,724,424 | 3/1998 | Gifford | 380/24 |

JA0114



FIG. 1



buyer computer 12          merchant computer 14          payment computer 16

```
                    ┌24
┌──────────────────────────┐
│ user requests advertisements │
└──────────────────────────┘
                         ┌ 26
        ┌────────────────────────────┐
        │ buyer computer sends         │
        │ advertising document URL     │
        │ to merchant computer         │
        └────────────────────────────┘
                                  ┌ 28
                ┌──────────────────────────────────┐
                │ merchants computer fetches        │
                │ advertising document from         │
                │ advertising document data base    │
                └──────────────────────────────────┘
    30
        ┌──────────────────────────────┐
        │ merchant computer sends        │
        │ advertising document           │
        │ to buyer computer              │
        └──────────────────────────────┘
32
┌──────────────────────────┐
│ user requests a product    │
└──────────────────────────┘
                                       ┌ 34
        ┌────────────────────────────────────────────────┐
        │ buyer computer sends payment URL A to payment    │
        │ computer; payment URL A includes product         │
        │ identifier, domain identifier, payment amount,   │
        │ merchant computer identifier, merchant account   │
        │ identifier, duration time, expiration time, payment │
        │ URL authenticator, and a buyer network address   │
        └────────────────────────────────────────────────┘
                                                    ┌ 36
                        ┌──────────────────────────────────┐
                        │ payment computer verifies          │
                        │ whether payment URL                │
                        │ authenticator was created from     │
                        │ contents of payment URL A          │
                        │ using cryptographic key            │
                        └──────────────────────────────────┘
                           ┌ 38
        ┌──────────────────────────────────────┐
End ◄── │ payment computer sends document        │
        │ to buyer computer indicating that      │
        │ access the to the network sales        │
        │ system is denied.                      │      OR
        └──────────────────────────────────────┘
                                                   ▼ 40
```

## FIG. 2A



FIG. 2B



**FIG. 2C**



**FIG. 2D**



buyer computer **12**        merchant computer **14**        payment computer **16**

FIG. 2E



FIG. 2F



FIG. 2G



FIG. 2H



FIG. 2I



FIG. 3A



**FIG. 3B**



**FIG. 4A**



**FIG. 4B**



FIG. 4C

---

| *File*    *Options*    *Navigate*    *Annotate* | | *Help* |
|---|---|---|

Document Title: | Mead Data Central: Internet Information

Document URL: | http://www.openmarketcom/demo/r15/mall/me

**Mead Data Central:   Internet Information**

---

November 28, 1993

LC's debut on the Internet: Library of Congress catalog On the

Text of Abstract
of Article

**VERONICA: A GOPHER NAVIGATIONAL TOOL ON THE INTERNET**

October, 1993

Data transfer complete:

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

**FIG. 5**

---

*File*    *Options*    *Navigate*    *Annotate*                                    *Help*

Document Title: | Open Market Payment

Document URL: | http://payment.openmarket.com/ben/nph-payment

**Open Market Payment**

You have selected an item that requires payment

    **Merchant:**Test Merchant
    **Description:**Mead Data Central Article
    **Amount:**2.85(US currency)

If you have an Open Market account click on "continue" below and you will be prompted for
your account name and password.  If you do not have an account, you can establish one
on-line and return to this page to continue your purchase.

    | Open |   an account on-line

    | Continue |   with payment transaction.

**NOTE:**For demonstrations use the account name **testuser@openmarket.com** with
the password **testuser**.

*Open Market, Inc.*

---

Data transfer complete:
[Back] [Forward] [Home] [Reload] [Open...] [Save_As...] [Clone] [New_Window] [Close_Window]

**FIG. 6**

*File*    *Options*    *Navigate*    *Annotate*                                    *Help*

Document Title: | Establish OpenMarket Account

Document URL: | http://payment.openmarket.com/service/destabli.

Card Number: [                    ]

Expiration Date: [          ]  (format MM/YY)

Check the appropriate boxes:
☐ I am the owner of the above credit card.

☐ The above address is also the billing address for this credit card.

Your OpenMarket account statement is available on-line. At your option you may a
copy of your statement automatically sent to your e-mail address at weekly or monthly
intervals. Please choose a statement option.

◇ Weekly statements    ◇ Monthly statements    ◇ No e-mail statements

**Account name and password**

Please choose an account name and password for your OpenMarket account. We
suggest using an account name that is unique and easy to remember such as your
e-mail address. Your password should be 8 characters or longer.

Account Name [                        ]

Password [                        ]

Data transfer complete:

[Back] [Forward] [Home] [Reload] [Open...] [Save As...] [Clone] [New Window] [Close Window]

**FIG. 7**



**FIG. 8**

| _File_ | _Options_ | _Navigate_ | _Annotate_ | _Help_ |

Document Title: `Open Market Payment`

Document URL: `http://payment.openmarket.com/ben/nph-payment`

**Open Market Payment**

You have selected an item that you have purchased recently.

**Merchant:** Test Merchant
**Description:** Mead Data Central Article
**Amount:** 2.85(US currency)

This could happen because you would like to buy the item again or it may have happened by accident.

You can:

- Go directly to the previous item
- Go ahead and buy the item again

*Open Market, Inc.*

Data transfer complete:

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

**FIG. 9**



**FIG. 10**



**FIG. 11**

| File | Options | Navigate | Annotate | | Help |

Document Title: Smart Statement Detail

Document URL: http://payment.openmarket.com/@c632f154cc8021

**Smart Statement Detail**

This is the detailed information about a particular transaction from your Smart Statement

**Transaction Information**

url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1

**Merchant Information**

telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant

Data transfer complete:

| Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window |

**FIG. 12**

_File_    _Options_    _Navigate_    _Annotate_                                    _Help_

Document Title: | Smart Statement Detail

Document URL: | http://payment.openmarket.com/@c632f154cc8021

```
url: http://www.openmarket.com/demos/aug15/mall/mead-fingerprint/mkarticle.cgo
transaction_log_id: 50254.0
currency: US
transaction_date: 781377633
initiator: 1.0
expiration: 2592000
description: Mead Data Central Article
amount: 2.95
beneficiary: 3.0
ip_address: 199.170.183.13
transaction_type.p
domain: mead.internet-1
```

**Merchant Information**

```
telephone: 617-621-9501
address_1: Open Market, Inc.
address_2: 215 First Street
fax: 617-621-1703
address_3: Cambridge, MA
email: testmerchant@openmarket.com
principal_name: Test Merchant
home_url:
country: US
postal_code: 02142
```

**Feedback**

You can send us comments and suggestions here.

Data transfer complete:

Back | Forward | Home | Reload | Open... | Save As... | Clone | New Window | Close Window

**FIG. 13**

File    Options    Navigate    Annotate                    Help

Document Title: | Open Market Feedback |

Document URL: | http://payment.openmarket.com/ben/feedback.cg |

Or if you prefer, you can send your comments via electronic mail to
feedback@openmarket.com or via FAX to +1.617.621.1703. If you would like a reply
please include your e-mail address.

Your Open Market accound name (optional):

Your E-mail address (optional):

Subject:

Your comments:

Submit Feedback

Data transfer complete:

Back  Forward  Home  Reload  Open...  Save As...  Clone  New Window  Close Window

**FIG. 14**

5,909,492

1

# NETWORK SALES SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This is a continuation of U.S. patent application Ser. No. 08/328,133, filed Oct. 24, 1994, now U.S. Pat. No. 5,715, 314.

## REFERENCE TO MICROFICHE APPENDICES

Microfiche Appendices A–G are being submitted with the present application, being 4 sheets with 220 total pages.

## BACKGROUND OF THE INVENTION

This invention relates to user-interactive network sales systems for implementing an open marketplace for goods or services over computer networks such as the Internet.

U.S. patent application Ser. No. 08/168,519, filed Dec. 16, 1993 by David K. Gifford and entitled "Digital Active Advertising," now abandoned, the entire disclosure of which is hereby incorporated herein in its entirety by reference, describes a network sales system that includes a plurality of buyer computers, a plurality of merchant computers, and a payment computer. A user at a buyer computer asks to have advertisements displayed, and the buyer computer requests advertisements from a merchant computer, which sends the advertisements to the buyer computer. The user then requests purchase of an advertised product, and the buyer computer sends a purchase message to the merchant computer. The merchant computer constructs a payment order that it sends to the payment computer, which authorizes the purchase and sends an authorization message to the merchant computer. When the merchant computer receives the authorization message it sends the product to the buyer computer.

The above-mentioned patent application also describes an alternative implementation of the network sales system in which, when the user requests purchase of an advertised product, the buyer computer sends a payment order directly to the payment computer, which sends an authorization message back to the buyer computer that includes an unforgeable certificate that the payment order is valid. The buyer computer then constructs a purchase message that includes the unforgeable certificate and sends it to the merchant computer. When the merchant computer receives the purchase request it sends the product to the buyer computer, based upon the pre-authorized payment order.

## SUMMARY OF THE INVENTION

In one aspect, the invention provides a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access

2

message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

The invention provides a simple design architecture for the network sales system that allows the merchant computer to respond to payment orders from the buyer computer without the merchant computer having to communicate directly with the payment computer to ensure that the user is authorized to purchase the product and without the merchant computer having to store information in a database regarding which buyers are authorized to purchase which products. Rather, when the merchant computer receives an access message from the buyer computer identifying a product to be purchased, the merchant computer need only check the access message to ensure that it was created by the payment computer (thereby establishing for the merchant computer that the buyer is authorized to purchase the product), and then the merchant computer can cause the product to be sent to the buyer computer who has been authorized to purchase the product.

In another aspect, the invention features a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer. The buyer computer and the shopping cart computer are interconnected by a computer network. The buyer computer is programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages to the shopping cart computer each of which includes a product identifier identifying one of the plurality of products. The shopping cart computer is programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and to cause a payment message associated with the shopping cart to be created. The buyer computer is programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart.

In another aspect, the invention features a network-based link message system that includes at least one client computer for operation by a client user and at least one server computer for operation by a server user. The client computer and the server computer are interconnected by a computer network. The client computer is programmed to send an initial link message to the server computer. The server computer is programmed to receive the initial link message from the client computer and to create, based on information contained in the initial link message, a session link message that encodes a state of interaction between the client computer and the server computer. The session link message includes a session link authenticator, computed by a cryptographic function of the session link contents, for authenticating the session link message. The server computer is programmed to cause the session link message to be sent to the client computer. The client computer is programmed to cause the session link message to be sent to a computer in the network that is programmed to authenticate the session link message by examining the session link authenticator and that is programmed to respond to the session link message based on the state of the interaction between the client computer and the server computer.

5,909,492

3

In another aspect, the invention features a network-based sales system that includes a merchant database having a plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating the merchant database, and at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user. The creation computer and the merchant computer are interconnected by a computer network. The creation computer is programmed to create the merchant database, and to transmit the digital advertisements and the product fulfillment items to the merchant computer. The merchant computer is programmed to receive the digital advertisements and product fulfillment items, to receive a request for a digital advertisement from a user, to cause the digital advertisement to be sent to the user, to receive from the user an access message identifying an advertised product, and to cause the product to be sent to the user in accordance with a product fulfillment item corresponding to the product.

In another aspect, the invention features a hypertext statement system that includes a client computer for operation by a client user and one or more server computers for operation by a server user. The client computer and the server computers are interconnected by a computer network. At least one of the server computers is programmed to record purchase transaction records in a database. Each of the purchase transaction records includes a product description. The server computer is programmed to transmit a statement document that includes the purchase transaction records to the client computer. The client computer is programmed to display the product descriptions, to receive a request from the client user to display a product corresponding to a product description displayed from the client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated. At least one of the server computers is programmed to respond to activation of the product hypertext link by causing the product to be sent to the client computer.

In another aspect, the invention features a network payment system that includes at least one buyer computer for operation by a user desiring to buy a product and at least one payment computer for processing payment messages from the buyer computer. The buyer computer and the payment computer are interconnected by a computer network. The buyer computer is programmed to cause a payment message to be sent to the payment computer. The payment message includes a product identifier identifying the product that the user desires to buy. The payment computer is programmed to receive the payment message, to cause an access message to be created to enable the user to access the product, and to record a purchase transaction record in the settlement database. The buyer computer is programmed to cause a request for purchase transaction records to be sent to the payment computer. The payment computer is programmed to receive the request for purchase transaction records and to cause a document derived from the purchase transaction records to be sent to the buyer computer.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a network sales system in accordance with the present invention.

FIG. 2 (2-A through 2-I) is a flowchart diagram illustrating the operation of a purchase transaction in the network sales system of FIG. 1.

FIG. 3 (3-A through 3-B) is a flowchart diagram illustrating the use of a shopping cart for the purchase of products in connection with the network sales system of FIG. 1.

4

FIG. 4 (4-A through 4-C) is a flowchart diagram illustrating the operation of a smart statement in the network sales system of FIG. 1.

FIG. 5 is a screen snapshot of an advertising document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 6 is a screen snapshot of a confirmation document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 7 is a screen snapshot of a new account document that the payment computer sends to the buyer computer in FIG. 2.

FIG. 8 is a screen snapshot of an account name prompt that the buyer computer creates in FIG. 2.

FIG. 9 is a screen snapshot of a document that the payment computer sends to the buyer computer in FIG. 2 and that provides an option either to repurchase or to use a previously purchased access.

FIG. 10 is a screen snapshot of a fulfillment document that the merchant computer sends to the buyer computer in FIG. 2.

FIG. 11 is a screen snapshot of a smart statement document that the payment computer sends to the buyer computer in FIG. 4.

FIGS. 12 and 13 are screen snapshots of a transaction detail document that the payment computer sends to the buyer computer in FIG. 4.

FIG. 14 is a screen snapshot of a customer service form that the payment computer sends to the buyer computer in FIG. 4.

DETAILED DESCRIPTION

With reference to FIG. 1, a network sales system in accordance with the present invention includes a buyer computer 12 operated by a user desiring to buy a product, a merchant computer 14, which may be operated by a merchant willing to sell products to the buyer or by a manager of the network sales system, a payment computer 16 typically operated by a manager of the network sales system, and a creation computer 20 typically operated by the merchant. The buyer, merchant, payment, and creation computers are all inter-connected by a computer network 10 such as the Internet.

Creation computer 20 is programmed to build a "store" of products for the merchant. A printout of a computer program for use in creating such a "store" in accordance with the present invention is provided as Appendix F.

The products advertised by merchant computer 14 may be, for example, newspaper or newsletter articles available for purchase by buyers. Creation computer 20 creates a digital advertisement database 18 that stores advertising documents (which may for example be in the form of summaries of newspaper or newsletter articles, accompanied by prices) and product fulfillment items (which may be the products themselves if the products can be transmitted over the network, or which may be hard goods identifiers if the products are hard goods, i.e., durable products as opposed to information products). Creation computer 20 transmits contents of the advertising document database 18 to merchant computer 14 to enable the merchant computer to cause advertisements and products to be sent to buyers. Merchant computer 14 maintains advertising documents locally in advertising document database 15. In an alternative embodiment, the creation computer does not have a local digital advertisement database, but instead updates a remote

5,909,492

5

advertising document database on a merchant computer. These updates can be accomplished using HTML forms or other remote database technologies as is understood by practitioners of the art.

Payment computer 16 has access to a settlement database 22 in which payment computer 16 can record details of purchase transactions. The products may be organized into various "domains" of products, and payment computer 16 can access settlement database 22 to record and retrieve records of purchases of products falling within the various domains. Payment computer 16 also has access to a shopping cart database 21 in which a "shopping cart" of products that a user wishes to purchase can be maintained as the user shops prior to actual purchase of the contents of the shopping cart.

With reference to FIG. 2, a purchase transaction begins when a user at buyer computer 12 requests advertisements (step 24) and buyer computer 12 accordingly sends an advertising document URL (universal resource locator) to merchant computer 14 (step 26). The merchant computer fetches an advertising document from the advertising document database (step 28) and sends it to the buyer computer (step 30). An example of an advertising document is shown in FIG. 5. Details of URLs and how they are used are found in Appendix G.

The user browses through the advertising document and eventually requests a product (step 32). This results in the buyer computer sending payment URL A to the payment computer (step 34). Payment URL A includes a product identifier that represents the product the user wishes to buy, a domain identifier that represents a domain of products to which the desired product belongs, a payment amount that represents the price of the product, a merchant computer identifier that represents merchant computer 14, a merchant account identifier that represents the particular merchant account to be credited with the payment amount, a duration time that represents the length of time for which access to the product is to be granted to the user after completion of the purchase transaction, an expiration time that represents a deadline beyond which this particular payment URL cannot be used, a buyer network address, and a payment URL authenticator that is a digital signature based on a cryptographic key. The payment URL authenticator is a hash of other information in the payment URL, the hash being defined by a key shared by the merchant and the operator of the payment computer.

In an alternative embodiment, step 34 consists of the buyer computer sending a purchase product message to the merchant computer, and the merchant computer provides payment URL A to the buyer computer in response to the purchase product message. In this alternative embodiment, payment URL A contains the same contents as above. The buyer computer then sends the payment URL A it has received from the merchant computer to the payment computer.

When the payment computer receives the payment URL it verifies whether the payment URL authenticator was created from the contents of the payment URL using the cryptographic key (step 36). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 38). Otherwise, the payment computer determines whether the expiration time has past (step 40). If it has, the payment computer sends a document to the buyer computer indicating that the time has expired (step 41). Otherwise, the payment computer checks the buyer computer network

6

address to see if it matches the one specified in the payment URL (step 42). If it does not match, the payment computer sends a document to the buyer computer indicating that access to the network payment system is denied (step 43). Otherwise, the payment computer sends a payment confirmation document to the buyer computer, the payment confirmation document including an "open" link and a "continue" link (step 44).

An example of a confirmation document is shown in FIG. 6. The confirmation document asks the user to click on a "continue" button if the user already has an account with the payment computer, or to click on an "open" button if the user does not already have an account and wishes to open one.

If the user clicks on the "open" button (step 46), the buyer computer sends payment URL C to the payment computer (step 48), payment URL C being similar to payment URL A but also indicating that the user does not yet have an account. The payment computer creates a new account document (step 50) and sends it to the buyer computer (step 52). An example of a new account document is shown in FIG. 7. When the user receives the new account document he enters the new account name, an account password, a credit card number, the credit card expiration date, and security information such as the maiden name of the user's mother (step 54), and presses a "submit" button (not shown in FIG. 7). The buyer computer sends the new account information to the payment computer (step 56), which enters the new account in the settlement database (step 58).

If the user clicks on the "continue" button (step 60), the buyer computer sends payment URL B to the payment computer (step 62), payment URL B being similar to payment URL A but also indicating that the user already has an account. The payment computer then instructs the buyer computer to provide the account name and password (steps 64 and 66), and the buyer computer prompts the user for this information by creating an account name prompt (example shown in FIG. 8) and a similar password prompt. The user enters the information (step 68) and the buyer computer sends the account name and password to the payment computer (step 70).

The payment computer verifies whether the user name and password are correct (step 72). If they are not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 74). Otherwise, the payment computer determines whether additional security is warranted, based on, e.g., whether the payment amount exceeds a threshold (step 73). If additional security is warranted, the payment computer creates a challenge form document and sends it to the buyer computer (step 75). The user enters the security information (step 77), the buyer computer sends the security information to the payment computer (step 79), and the payment computer determines whether the security information is correct (step 81). If it is not correct, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 83).

If the security information is correct, or if additional security was not warranted, the payment computer checks the settlement database to determine whether the user has unexpired access to the domain identifier contained in the payment URL (step 82). If so, the payment computer sends to the buyer computer a document providing an option either to repurchase or to use the previously purchased access (step 84). An example of such a document is shown in FIG. 9. The

5,909,492

7

8

user can respond to the recent purchase query document by choosing to access the previously purchased document (step 85) or to go ahead and buy the currently selected product (step 86).

If the user chooses to access the previously purchased document, the buyer computer skips to step 92 (see below). If the user chooses to buy the currently selected product, the payment computer calculates an actual payment amount that may differ from the payment amount contained in the payment URL (step 87). For example, the purchase of a product in a certain domain may entitle the user to access other products in the domain for free or for a reduced price for a given period of time.

The payment computer then verifies whether the user account has sufficient funds or credit (step 76). If not, the payment computer sends a document to the buyer computer indicating that the user account has insufficient funds (step 78). Otherwise, the payment computer creates an access URL (step 80) that includes a merchant computer identifier, a domain identifier, a product identifier, an indication of the end of the duration time for which access to the product is to be granted, the buyer network address, and an access URL authenticator that is a digital signature based on a cryptographic key. The access URL authenticator is a hash of other information in the access URL, the hash being defined by a key shared by the merchant and the operator of the payment computer. The payment computer then records the product identifier, the domain, the user account, the merchant account, the end of duration time, and the actual payment amount in the settlement database (step 88).

The payment computer then sends a redirect to access URL to the buyer computer (step 90), which sends the access URL to the merchant computer (step 92). The merchant computer verifies whether the access URL authenticator was created from the contents of the access URL using the cryptographic key (step 94). If not, the merchant computer sends a document to the buyer computer indicating that access to the product is denied (step 96).

Otherwise, the merchant computer verifies whether the duration time for access to the product has expired (step 98). This is done because the buyer computer can request access to a purchased product repeatedly. If the duration time has expired, the merchant computer sends a document to the buyer computer indicating that the time has expired (step 100). Otherwise the merchant computer verifies that the buyer computer network address is the same as the buyer network address in the access URL (step 101), and if so, sends a fulfillment document to the buyer computer (step 102), which is displayed by the buyer computer (step 104). An example of a fulfillment document is shown in FIG. 10. Otherwise, the merchant computer sends a document to the buyer computer indicating that access is not allowed (step 103).

With reference now to FIG. 3, when the merchant computer sends the advertising document to the buyer computer, the user may request that a product be added to a shopping cart in the shopping cart database rather than request that the product be purchased immediately. The buyer computer sends a shopping cart URL to the payment computer (step 108), the shopping cart URL including a product identifier, a domain identifier, a payment amount, a merchant computer identifier, a merchant account identifier, a duration time, an expiration time, and a shopping cart URL authenticator that is a digital signature based on a cryptographic key. The shopping cart URL authenticator is a hash of other information in the shopping cart URL, the hash being defined by

a key shared by the merchant and the operator of the payment computer.

The payment computer verifies whether the shopping cart URL authenticator was created from the contents of the shopping cart URL using a cryptographic key (step 110). If not, the payment computer sends a document to the buyer computer indicating that access to the network sales system is denied (step 112). Otherwise, before any modification to a user's shopping cart is allowed, user authentication is performed (step 113) in a manner analogous to steps 40–81. Once the user is authenticated, the payment computer creates or updates a payment URL for the shopping cart (step 114).

The user then either requests more advertisements (step 24 in FIG. 2) and possibly adds another product to the shopping cart, requests display of the shopping cart (step 116), or requests purchase of the entire contents of the shopping cart (step 124). If the user requests display of the shopping cart (step 116), the buyer computer sends a fetch shopping cart request to the payment computer (step 118), and the payment computer and buyer computer (step 119) perform steps analogous to steps 64–81. The payment computer returns the contents of the shopping cart to the buyer computer (step 120), which displays the contents of the shopping cart (step 122). If the user requests that the entire contents of the shopping cart be purchased (step 124) the buyer computer causes the payment URL for the shopping cart to be activated (step 126) and the payment URL is processed in a manner analogous to the processing of payment URLs for individual products (beginning with step 36 in FIG. 2).

With reference now to FIG. 4, a user can request display of a "smart statement" that lists purchase transactions for a given month (step 128). When the buyer computer receives such a request, it sends a smart statement URL to the payment computer (step 130).

When the payment computer receives the smart statement URL, it verifies whether the smart statement URL authenticator was created from the contents of the smart statement URL using a cryptographic key (step 132). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 134). Otherwise, the payment computer checks to determine whether the buyer network address in the smart statement URL matches the buyer computer's actual network address (step 136). If not, the payment computer sends a document to the buyer computer indicating that access is denied (step 138). Otherwise (step 140), the payment computer and buyer computer perform a set of steps analogous to steps 64–81 in FIG. 2 (payment computer requests account name and password, user provides the requested information, and payment computer verifies the information).

In an alternative embodiment steps 132–138 are omitted.

After verification of account information is complete, the payment computer retrieves the requested settlement data from the settlement database, creates a smart statement document for the buyer, and sends the smart statement document to the buyer computer (step 142). An example of a smart statement document is shown in FIG. 11. Each purchase transaction record in the smart statement document includes the data of the transaction, the name of the merchant, an identification of the product, and the payment amount for the product. The smart statement document also includes a transaction detail URL for each purchase transaction (these URLs, or hypertext links, are discussed below and are not shown in FIG. 11). The smart statement docu-

5,909,492

9

ment also identifies previous statements that the user may wish to have displayed.

The buyer computer displays the retrieved document (step **144**), and the user may request transaction details for a particular transaction listed on the smart statement (step **146**). If so, the buyer computer sends a transaction detail URL (or "payment detail URL") to the payment computer (step **148**). The transaction detail URL includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator. When the payment computer receives the transaction detail URL, it performs (step **150**) a set of steps analogous to steps **132–140** (verification of URL authenticator, buyer network address, and account information). The payment computer then retrieves from the settlement database data corresponding to the payment transaction specified in the transaction detail URL, creates a transaction detail document, and sends it to the buyer computer (step **152**).

An example of a transaction detail document is shown in FIGS. 12 and 13. The document displays a number of items of information about the transaction, including the transaction date, end of the duration time ("expiration"), a description of the product, the payment amount, the domain corresponding to the product, an identification of the merchant, and the merchant's address.

The smart statement document and the transaction detail document both include customer service URLs (hypertext links) that allow the user to request customer service (i.e., to send comments and suggestions to the payment computer). When the user requests customer service (step **154**), the buyer computer sends the customer service URL to the payment computer (step **156**), which creates a customer service form and sends it to the buyer computer (step **158**). An example of a customer service form is shown in FIG. **14**. The user types comments into the customer service form (step **160**), and the buyer computer sends the user's comments to the payment computer (step **162**). The payment computer then posts the user comments and sends a thank you document to the buyer computer (step **164**).

A user may request display of a product included in the smart statement. When the user requests that the product be displayed (step **166**), the buyer computer sends the access URL contained in the smart statement document to the merchant computer (step **168**), and the buyer computer and merchant computer perform a set of steps analogous to steps **94–104** in FIG. 2 (authentication of access URL, verification whether duration time has expired, verification of buyer network address, and transmission of fulfillment document to buyer computer).

Whenever the present application states that one computer sends a URL to another computer, it should be understood that in preferred embodiments the URL is sent in a standard HTTP request message, unless a URL message is specified as a redirection in the present application. The request message includes components of the URL as described by the standard HTTP protocol definition. These URL components in the request message allow the server to provide a response appropriate to the URL. The term "URL" as used the present application is an example of a "link", which is a pointer to another document or form (including multimedia documents, hypertext documents including other links, or audio/video documents).

When the present application states that one computer sends a document to another computer, it should be understood that in preferred embodiments the document is a success HTTP response message with the document in the

10

body of the message. When the present application states that a server sends an account name and password request message to the client, it should be understood that in preferred embodiments the account name and password request message is an unauthorized HTTP response. A client computer sends account name and password information to a server as part of a request message with an authorization field.

The software architecture underlying the particular preferred embodiment is based upon the hypertext conventions of the World Wide Web. Appendix A describes the Hypertext Markup Language (HTML) document format used to represent digital advertisements, Appendix B describes the HTML forms fill out support in Mosaic **2.0**, Appendix C is a description of the Hypertext Transfer Protocol (HTTP) between buyer and merchant computers, Appendix D describes how documents are named with Uniform Resource Locators (URLs) in the network of computers, and Appendix E describes the authentication of URLs using digital signatures.

A printout of a computer program for use in creating and operating such a "store" in accordance with the present invention is provided as Appendix F. A printout of a computer program for use in operating other aspects of the network sales system in accordance with the present invention is provided in Appendix G.

There has been described a new and useful network-based sales system. It is apparent that those skilled in the art may make numerous modifications and departures from the specific embodiments described herein without departing from the spirit and scope of the claimed invention.

What is claimed is:

1. A network-based sales system, comprising:

a merchant database comprising a plurality of digital advertisements and a plurality of respective product fulfillment items;

at least one creation computer for creating said merchant database; and

at least one merchant computer for causing said digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to said user;

said creation computers, said merchant computer, and a payment computer being interconnected by a public packet switched computer network;

said creation computer being programmed to create said merchant database, and to transmit said digital advertisements and said product fulfillment items over said network to said merchant computer;

said merchant computer being programmed to receive said digital advertisements and product fulfillment items over said network, to receive over said network a request for a digital advertisement from a user, to cause said digital advertisement to be sent to said user over said network, to receive over said network from said user a product request message identifying an advertised product, to receive an access message over said network created by said payment computer, and to cause said product to be sent to said user in accordance with a product fulfillment item corresponding to said product and based upon receipt by the merchant computer of the access message.

2. A network-based sales system in accordance with claim 1, wherein each of said digital advertisements comprises an abstract of a product and a price.

3. A network-based sales system in accordance with claim 2, wherein:

5,909,492

| 11 | 12 |
|---|---|

at least one of said product fulfillment items comprises a product itself; and

said creation computer is programmed to transmit said product to said merchant computer with said digital advertisements.

**4.** A network-based sales system in accordance with claim **2**, wherein:

at least one of said product fulfillment items comprises a hard good identifier; and

said creation computer is programmed to transmit said hard good identifier to said merchant computer with said digital advertisements.

**5.** A method of operating a merchant computer in a network-based sales system comprising a merchant database that comprises a plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating said merchant database, and at least one merchant computer for causing said digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to said user, and at least one payment computer, said creation computer, said merchant computer, and said payment computer being interconnected by a public packet switched computer network, said method comprising the steps of:

receiving, at said merchant computer, said digital advertisements and said product fulfillment items, said digital advertisements and said product fulfillment items having been transmitted over said network to said merchant computer by said creation computer, said merchant database comprising said digital advertisements and said product fulfillment items having been created by said creation computer;

receiving over said network a request for a digital advertisement from a user;

causing said digital advertisement to be sent to said user over said network;

receiving over said network from said user a product request message identifying an advertised product;

receiving over said network an access message created by said payment computer; and

causing said product to be sent to said user in accordance with a product fulfillment item corresponding to said product and based upon receipt by the merchant computer of the access message.

**6.** A hypertext statement system, comprising:

a client computer for operation by a client user; and

a plurality of server computers for operation by a server user;

said client computer and said server computers being interconnected by a public packet switched computer network;

at least one of said server computers being programmed to record information pertaining to purchase transaction records in a database, each of said purchase transaction records comprising a product description, and to cause a statement document comprising said purchase transaction records to be transmitted to said client computer over said network;

said client computer being programmed to display said product descriptions, to receive a request from said client user to display a product corresponding to a product description displayed by said client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated;

at least one of said server computers, other than a server computer that transmitted said statement document to

said client computer, being programmed to respond to activation of said product hypertext link by causing said product to be sent to said client computer over said network.

**7.** A hypertext statement system in accordance with claim **6**, wherein:

said client computer is programmed to receive a request from said client user to display transaction details corresponding to a product description displayed by said client computer and to cause a transaction detail hypertext link corresponding to said product description to be activated; and

at least one of said server computers is programmed to respond to activation of said transaction detail hypertext link by transmitting said transaction details to said client computer as a transaction detail document.

**8.** A hypertext statement system in accordance with claim **7**, wherein:

said transaction detail document further comprises a customer service form hypertext link;

said client computer is programmed to receive a request from said client user to display a customer service form and to cause said customer service form hypertext link to be activated; and

at least one of said server computers is programmed to respond to activation of said customer service form hypertext link by transmitting said customer service form to said client computer.

**9.** A hypertext statement system in accordance with claim **6**, wherein:

said statement document further comprises a customer service form hypertext link;

said client computer is programmed to receive a request from said client user to display a customer service form and to cause said customer service form hypertext link to be activated; and

at least one of said server computers is programmed to respond to activation of said customer service form hypertext link by transmitting said customer service form to said client computer.

**10.** A method of operating a server computer in a hypertext statement system comprising a client computer for operation by a client user, and a plurality of server computers for operation by a server user, said client computer and said server computers being interconnected by a public packet switched computer network, said method comprising the steps of:

recording, at one of said server computers, information pertaining to purchase transaction records in a database, each of said purchase transaction records comprising a product description; and

causing a statement document comprising said purchase transaction records to be transmitted to said client computer over said network;

said client computer being programmed to display said product descriptions, to receive a request from said client user to display a product corresponding to a product description displayed by said client computer, and to cause a product hypertext link derived from a purchase transaction record to be activated;

at least one of said server computers, other than a server computer that transmitted said statement document to said client computer, being programmed to respond to activation of said product hypertext link by causing said product to be sent to said client computer over said network.

5,909,492

13

**11.** A network payment system, comprising:

at least one buyer computer for operation by a user desiring to buy a product; and

at least one payment computer for processing payment messages from said buyer computer;

said buyer computer, said payment computer, and a merchant computer being interconnected by a public packet switched computer network;

said buyer computer being programmed to cause a payment message to be sent to said payment computer over said network;

said payment computer being programmed to receive said payment message, to cause an access message to be created for transmission over said network to said merchant computer to enable said user to access said product upon verification by said merchant computer that said access message was created by said payment computer, and to record information pertaining to a purchase transaction record in said settlement database;

said buyer computer being programmed to cause a request for a purchase transaction record to be sent to said payment computer over said network; and

said payment computer being programmed to receive said request for said purchase transaction record and to cause a document derived from said purchase transaction record to be sent to said buyer computer over said network.

**12.** The network payment system of claim **11** wherein the payment message comprises a product identifier identifying the product that the user desires to buy.

**13.** A method of operating a payment computer in a network payment system comprising at least one buyer computer for operation by a user desiring to buy a product, and at least one payment computer for processing payment messages from said buyer computer, and at least one merchant computer, said buyer computer, said payment computer, and said merchant computer being interconnected by a public packet switched computer network, said method comprising the steps of:

receiving, at said payment computer, a payment message that said buyer computer has caused to be sent to said payment computer over said network;

causing an access message to be created for transmission to a merchant computer over said network to enable said user to access said product upon verification by said merchant computer that said access message was created by said payment computer;

recording information pertaining to a purchase transaction record in said settlement database;

receiving over said network a request for a purchase transaction record that said buyer computer has caused to be sent to said payment computer over said network; and

causing a document derived from said purchase transaction record to be sent to said buyer computer over said network.

**14.** The method of claim **13** wherein the payment message comprises a product identifier identifying the product that the user desires to buy.

**15.** A hypertext statement system, comprising:

a client computer for operation by a client user; and

one or more server computers for operation by a server user;

the client computer and the server computers being interconnected by a public packet switched computer network;

14

at least one of the server computers being programmed to record information pertaining to purchase transaction records in a database, and to transmit a statement document comprising the purchase transaction records to the client computer over the network;

the client computer being programmed to display the statement document to receive a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer, and to cause a transaction detail hypertext link corresponding to the portion of the statement document to be activated;

at least one of the server computers being programmed to respond to activation of the transaction detail hypertext link by transmitting the transaction details to the client computer over the network as a transaction detail document.

**16.** A method of operating a server computer in a hypertext statement system comprising a client computer for operation by a client user, and one or more server computers for operation by a server user, the client computer and the server computers being interconnected by a public packet switched computer network, the method comprising the steps of:

recording, at one of the server computers, information pertaining to purchase transaction records in a database; and

transmitting a statement document comprising the purchase transaction records to the client computer over the network;

the client computer being programmed to display the statement document, to receive a request from the client user to display transaction details corresponding to a portion of the statement document displayed by the client computer, and to cause a transaction detail hypertext link corresponding to the portion of the statement document to be activated;

at least one of the server computers being programmed to respond to activation of the transaction detail hypertext link by transmitting the transaction details to the client computer over the network as a transaction detail document.

**17.** A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to the shopping cart computer;

the buyer computer and the shopping cart computer being interconnected by a public packet switched computer network;

the buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages over the network to the shopping cart computer each of which comprises a product identifier identifying one of the plurality of products and at least one of which comprises a universal resource locator;

the shopping cart computer being programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and to cause a payment message

5,909,492

15

associated with the shopping cart to be created, the payment message comprising a universal resource locator; and

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

18. A method of operating a shopping cart computer in a public packet switched computer network comprising at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer, the method comprising the steps of:

receiving, at the shopping cart computer, a plurality of shopping cart messages sent over the network to the shopping cart computer by the buyer computer in response to receipt of a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, each of the shopping cart messages comprising a product identifier identifying one of the plurality of products and at least one of which comprises a universal resource locator;

modifying the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart; and

causing a payment message associated with the shopping cart to be created, the payment message comprising a universal resource locator;

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

19. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

at least one merchant computer; and

at least one payment computer;

the buyer computer, the merchant computer, and the payment computer being interconnected by a computer network;

the buyer computer being programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product;

the payment computer being programmed to receive the payment message, to cause an access message to be created that comprises a product identifier identifying the product and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer; and

16

the merchant computer being programmed to receive the access message, to cause the access message authenticator to be verified to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be received by the user desiring to buy the product.

20. A network-based sales system in accordance with claim 19 wherein the buyer computer is programmed to cause the payment message to be sent to the payment computer by sending a purchase product message to the merchant computer, the merchant computer being programmed to receive the purchase product message, and in response thereto, to send the payment message to the payment computer.

21. A network-based sales system in accordance with claim 19 wherein the merchant computer is programmed itself to verify the access message authenticator.

22. A network-based sales system in accordance with claim 19 wherein the merchant computer is programmed to cause every access message authenticator received by the merchant computer to be verified.

23. A network-based sales system in accordance with claim 19, wherein the payment message comprises a payment amount.

24. A network-based sales system in accordance with claim 19, wherein the merchant computer is programmed to record the product identifier and the payment amount.

25. A network-based sales system in accordance with claim 24, wherein the product identifier and the payment amount are recorded in a settlement database.

26. A network-based sales system in accordance with claim 19, wherein the payment message comprises a merchant computer identifier.

27. A network-based sales system in accordance with claim 19, wherein the payment message comprises a payment message authenticator based on a cryptographic key.

28. A network-based sales system in accordance with claim 27, wherein the payment computer is programmed to verify the payment message authenticator to ensure that the payment message authenticator was created using the cryptographic key.

29. A network-based sales system in accordance with claim 19 wherein the computer network is a public packet-switched communications network.

30. A method of operating a payment computer in a computer network comprising at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer, the method comprising the steps of:

receiving, at the payment computer, a payment message that the buyer computer has caused to be sent to the payment computer in response to a user request for purchasing a product, the payment message comprising a product identifier identifying the product;

causing an access message to be created that comprises a product identifier identifying the product and an access message authenticator based on a cryptographic key; and

causing the access message to be sent to the merchant computer, the merchant computer being programmed to receive the access message, to cause the access message authenticator to be verified to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be received by the user desiring to buy the product.

31. A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy a product;

5,909,492

17

at least one merchant computer; and

at least one payment computer;

the buyer computer, the merchant computer, and the payment computer being interconnected by a public packet switched computer network;

the buyer computer being programmed to receive a request from a user for purchasing a product, and to cause a payment message to be sent over the network to the payment computer;

the payment computer being programmed to receive the payment message, and, if purchase of the product by the user has not been previously recorded in a settlement database, to cause the user to be charged for the product and to create a new record in the settlement database reflecting purchase of the product by the user, to cause an access message to be created, and to cause the access message to be sent over the network to the merchant computer; and

the merchant computer being programmed to receive the access message and to cause the user to receive the product.

**32.** The network-based sales system of claim **31** wherein:

the payment computer is programmed to cause the access message to be created using a cryptographic key; and

at least one of the computers is programmed to use the access message in a cryptographic process to ensure that the user has paid for the product.

**33.** A method of operating a payment computer in a public packet switched computer network comprising at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer, the method comprising the steps of:

receiving, at the payment computer, a payment message that the buyer computer has caused to be sent over the network to the payment computer in response to a request from a user for purchasing a product, and, if purchase of the product by the user has not been previously recorded in a settlement database, causing the user to be charged for the product and creating a new record in the settlement database reflecting purchase of the product by the user;

causing an access message to be created; and

causing the access message to be sent over the network to the merchant computer, the merchant computer being programmed to receive the access message and to cause the user to receive the product.

**34.** The method of claim **33** wherein at least one of the computers is programmed to use the access message in a cryptographic process to ensure that the user has paid for the product.

**35.** A network-based sales system, comprising:

at least one buyer computer for operation by a user desiring to buy products;

at least one shopping cart computer; and

a shopping cart database connected to the shopping cart computer;

the buyer computer and the shopping cart computer being interconnected by a public packet switched computer network;

the buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart

18

messages over the network to the shopping cart computer each of which comprises a product identifier identifying one of the plurality of products;

the shopping cart computer being programmed to receive the plurality of shopping cart messages, and to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart; and

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause a payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

**36.** A method of operating a shopping cart computer in a public packet switched computer network comprising at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer, the method comprising the steps of:

receiving, at the shopping cart computer, a plurality of shopping cart messages sent over the network to the shopping cart computer by the buyer computer in response to receipt of a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, each of the shopping cart messages comprising a product identifier identifying one of the plurality of products; and

modifying the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart;

the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause a payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart;

the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and the shopping cart computer being a computer that modifies the stored representations of collections of products in the database.

**37.** A network-based sales system, comprising:

a merchant database comprising a plurality of digital advertisements and a plurality of respective product fulfillment items;

at least one creation computer for creating the merchant database; and

at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user;

the creation computer and the merchant computer being interconnected by a public packet switched computer network;

the creation computer being programmed to create the merchant database, and to transmit the digital advertisements and the product fulfillment items over the network to the merchant computer;

5,909,492

<table>
<tr><td>19</td><td>20</td></tr>
</table>

the merchant computer being programmed to receive the digital advertisements and product fulfillment items over the network, to receive over the network a request for a digital advertisement from a user, to cause the digital advertisement to be sent to the user over the network, to receive over the network from the user a product request message identifying an advertised product, and to cause the product to be sent to the user in accordance with a product fulfillment item corresponding to the product;

at least a portion of the digital advertisements transmitted by the creation computer to the merchant computer over the network being authenticated by at least one digital signature.

**38**. A method of operating a merchant computer in a network-based sales system comprising a merchant database that comprises a plurality of digital advertisements and a plurality of respective product fulfillment items, at least one creation computer for creating the merchant database, and at least one merchant computer for causing the digital advertisements to be transmitted to a user and for causing advertised products to be transmitted to the user, the creation computer and the merchant computer being interconnected by a public packet switched computer network, the method comprising the steps of:

receiving, at the merchant computer, the digital advertisements and the product fulfillment items, the digital advertisements and the product fulfillment items having been transmitted over the network to the merchant computer by the creation computer, the merchant database comprising the digital advertisements and the product fulfillment items having been created by the creation computer;

receiving over the network a request for a digital advertisement from a user;

causing the digital advertisement to be sent to the user over the network;

receiving over the network from the user a product request message identifying an advertised product; and

causing the product to be sent to the user in accordance with a product fulfillment item corresponding to the product;

at least a portion of the digital advertisements transmitted by the creation computer to the merchant computer over the network being authenticated by at least one digital signature.

\* \* \* \* \*

## UNITED STATES PATENT AND TRADEMARK OFFICE
### Certificate

Patent No. 5,909,492                                                    Patented: June 1, 1999

On petition requesting issuance of a certificate for correction of inventorship pursuant to 35 U.S.C. 256, it has been found that the above identified patent, through error and without any deceptive intent, improperly sets forth the inventorship.

Accordingly, it is hereby certified that the correct inventorship of this patent is: Andrew C. Payne, Lincoln, MA (US); Lawrence C. Stewart, Wayland, MA (US); and G. Winfield Treese, Wayland, MA (US).

Signed and Sealed this Third Day of November 2009.

<div align="right">

Thomas H. Tarcza
*Supervisory Patent Examiner*
Art Unit 3662

</div>



US005909492C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (5845th)

# United States Patent
## Payne et al.

(10) **Number:**        **US 5,909,492 C1**

(45) **Certificate Issued:**    **\*Aug. 7, 2007**

---

(54) **NETWORK SALES SYSTEM**

(75) Inventors: **Andrew C. Payne**, Lincoln, MA (US); **Lawrence C. Stewart**, Burlington, MA (US); **David J. Mackle**, Brookdale, CA (US)

(73) Assignee: **Soverain Software LLC**, Chicago, IL (US)

**Reexamination Request:**
No. 90/007,286, Nov. 3, 2004

**Reexamination Certificate for:**
Patent No.:     **5,909,492**
Issued:        **Jun. 1, 1999**
Appl. No.:     **08/878,396**
Filed:         **Jun. 18, 1997**

(\*) Notice:    This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 08/328,133, filed on Oct. 24, 1994, now Pat. No. 5,715,314.

(51) **Int. Cl.**
    *G06Q 30/00*    (2006.01)
    *G06Q 10/00*    (2006.01)
    *G06Q 20/00*    (2006.01)
    *G07F 7/00*     (2006.01)

(52) **U.S. Cl.** ........................... **705/78**; 705/26; 705/27; 705/39; 705/40; 705/44

(58) **Field of Classification Search** ...................... None
    See application file for complete search history.

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,484,304 A | 11/1984 | Anderson et al. |
| 4,566,078 A | 1/1986 | Crabtree |
| 4,941,089 A | 7/1990 | Fischer |
| 5,035,515 A | 7/1991 | Crossman et al. |
| 5,204,947 A | 4/1993 | Bernstein et al. |

| | | | |
|---|---|---|---|
| 5,297,249 A | 3/1994 | Bernstein et al. |
| 5,309,437 A | 5/1994 | Perlman et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0456920 | 1/1991 |
| EP | 0645688 | 3/1995 |
| JP | 3278230 | 12/1991 |
| JP | 05-158963 | 6/1993 |
| JP | 5274275 | 10/1993 |
| JP | 6162059 | 6/1994 |
| JP | 6291776 | 10/1994 |
| WO | WO 93/10503 | 5/1993 |
| WO | WO 94/03859 | 2/1994 |
| WO | WO 95/16971 | 6/1995 |

OTHER PUBLICATIONS

*Soverain Software LLC* v. *Amazon.Com, Inc.* and *The Gap, Inc.,* Form of Stipulated Request for Final Dismissals of the Actions, filed Aug. 30, 2005.

(Continued)

*Primary Examiner*—Michael O'Neill

(57)                **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.



**US 5,909,492 C1**
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,325,362 | A | 6/1994 | Aziz |
| 5,347,632 | A | 9/1994 | Filepp et al. ............... 395/200 |
| 5,353,283 | A | 10/1994 | Tsuchiya |
| 5,388,257 | A | 2/1995 | Bauer |
| 5,457,738 | A | 10/1995 | Sylvan |
| 5,475,585 | A | 12/1995 | Bush |
| 5,483,652 | A | 1/1996 | Sudama et al. |
| 5,491,820 | A | 2/1996 | Belove et al. |
| 5,530,852 | A | 6/1996 | Meske, Jr. et al. |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,544,322 | A | 8/1996 | Cheng et al. |
| 5,550,984 | A | 8/1996 | Gelb |
| 5,560,008 | A | 9/1996 | Johnson et al. |
| 5,577,209 | A | 11/1996 | Boyle et al. |
| 5,583,996 | A | 12/1996 | Tsuchiya |
| 5,592,378 | A | 1/1997 | Cameron et al. ........... 395/227 |
| 5,619,648 | A | 4/1997 | Canale et al. |
| 5,623,656 | A | 4/1997 | Lyons |
| 5,664,110 | A | 9/1997 | Green et al. |
| 5,664,111 | A | 9/1997 | Nahan et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,708,780 | A | 1/1998 | Levergood et al. |
| 5,710,884 | A | 1/1998 | Dedrick |
| 5,715,314 | A | * 2/1998 | Payne et al. .................. 705/78 |
| 5,724,521 | A | 3/1998 | Dedrick |
| 5,727,164 | A | 3/1998 | Kaye et al. |
| 5,732,219 | A | 3/1998 | Blumer et al. |
| 5,734,719 | A | 3/1998 | Tsevdos et al. |
| 5,761,662 | A | 6/1998 | Dasan |
| 5,768,142 | A | 6/1998 | Jacobs |
| 5,768,521 | A | 6/1998 | Dedrick |
| 5,774,670 | A | 6/1998 | Montulli |
| 5,784,565 | A | 7/1998 | Lewine |
| 5,790,793 | A | 8/1998 | Higley |
| 5,806,077 | A | 9/1998 | Wecker |
| 5,812,776 | A | 9/1998 | Gifford |
| 5,826,241 | A | 10/1998 | Stein et al. |
| 5,826,242 | A | 10/1998 | Montulli |
| 5,848,399 | A | 12/1998 | Burke .......................... 705/27 |
| 5,848,413 | A | 12/1998 | Wolff |
| 5,870,552 | A | 2/1999 | Dozier et al. |
| 5,895,454 | A | 4/1999 | Harrington |
| 5,897,622 | A | 4/1999 | Blinn et al. |
| 5,920,847 | A | 7/1999 | Kolling et al. |
| 5,982,891 | A | 11/1999 | Ginter et al. |
| 6,006,199 | A | 12/1999 | Berlin et al. |
| 6,023,683 | A | 2/2000 | Johnson et al. |
| 6,041,316 | A | 3/2000 | Allen |
| 6,049,785 | A | 4/2000 | Gifford |
| 6,134,532 | A | 10/2000 | Montulli |
| 6,195,649 | B1 | 2/2001 | Gifford |
| 6,199,051 | B1 | 3/2001 | Gifford |
| 6,205,437 | B1 | 3/2001 | Gifford |
| 6,449,599 | B1 | 9/2002 | Payne et al. |
| 6,708,157 | B2 | 3/2004 | Stefik et al. |

OTHER PUBLICATIONS

*Soverain Software LLC* v. *Amazon.Com, Inc.* and *The Gap, Inc.,* Order of Dismissal with Prejudice filed Aug. 31, 2005.
Bina et al., "Secure Access to Data Over the Internet", Natl. Center for Supercomputing Appls., Univ. Of Illinois, Champaign, Illinois, pp. 99–102.
Farber, David, "Interesting–People Message—RSA/NCSA/ EIT Announcement on Secure Mosaic" Palo Alto, California, Apr. 12, 1994, 4 pages.
Kent, Stephen T., "Internet Privacy Enhanced Mail", 8070 Communications of the ACM 36, New York, Aug. 1993, pp. 48–60.

Kohn, Dan, "Prior Art on Open Market Patents", e–mail message dated Mar. 9, 1998, 1 page.
Lewis, Peter H., "Attention Shoppers: Internet is Open", 2 pages.
Medvinsky et al., NetCash: A Design for Practical Electronic Currency on the Internet, Information Sciences Institute. University of Southern California, 1993, pp. 102–106.
Schaefer et al., "Networked Information Discovery and Retrieval Tools: Security Capabilities and Needs", The MITRE Corporation, 1994, pp. 145–153.
European Search Report dated Jun. 19, 2006.
Ohmori et al., "An On–line Shopping System Protecting User's Privacy" Information Communication Laboratory of Matsushita Electric Industrial Co., Ltd. , pp. 25–32. Note: 12 Pages of Translation Attached.
Motoda, Toshihiro et al., *An Experimental Verification of Relational Database Access Over WWW,* NTT Software Laboratories, Nippon Telegraph and Telephone Corporation, 1995, pp. 47–54 (with English Translation—8 pages).
Gifford, Stewart, Payne, Treese, "Payment Switches for Open Networks," presented at 40th IEEE, IEEE, COMP-CON '95, Mar. 5–9, 1995, San Francisco, CA.
Defendant Amazon.com Inc.'s Unopposed Motion for Leave to Amend its Answer to Include Allegations Regarding Stuff.com.
Declaration of James E. Geringer in Support of Amazon.com, Inc's Motion for Leave to Amend its Answer and Counterclaims to Add Stuff.com.
Exhibit 1 of Geringer Declaration: Excerpts of Deposition of Michael Kuniavsky.
Exhibit 2 of Geringer Declaration: E–mail from Brooks Cutter to Mike Kuniavsky (Jun. 14, 1994).
Exhibit 3 of Geringer Declaration: Excerpts of Deposition of Richard Boake.
Exhibit 5 of Geringer Declaration: Excerpts of Deposition of Andrew Payne.
Exhibit 6 of Geringer Declaration: E–mail from Andrew Payne to Winfield Treese, et al. (Jun. 15, 1994).
Exhibit 7 of Geringer Declaration: Excerpts of Deposition of Winfield Treese.
Exhibit 8 of Geringer Declaration: Amazon.com, Inc.'s [Proposed] fourth Amended Answer, Affirmative Defenses, and Counterclaims to Soverain Software, LLC's Complaint (Redlined Version).
Amazon.com's Motion for Partial Summary Judgment that '314 claims 34–49, '492 claims 17–18 and 36–36, and '780 claims 1, 4, and 22–24 are invalid under 35 U.S.C. 102.
Amazon.com's Motion for Partial Summary Judgment that claims are indefinite under 35 U.S.C. 112.
Berners–Lee, T., et al., http://www.ietf.org/rfc/ rfc1738.txt?numbers=1738.
Changes to wwwStat at http://ftp.ics.uci.edu/pub/websoft/ wwwstat/Changes.
Berners–Lee, T., RFC 1630: Universal Resource Identifiers in WWW: A Unifying Syntax for the Expression of Names and Addresses of Objects on the Network as used in the World–Wide Web.
Berners–Lee, T., et al. RDC 1738: Uniform Resource Locators.
Fielding, R., RFC 1808: Relative Uniform Resource Locators.
Berners–Lee, T., et al. RFC 1945: Hypertext Transfer Protocol—HTTP/1.0.

**US 5,909,492 C1**

Page 3

Fielding, R., et al. RFC 2608: Hypertext Transfer Protocol—HTTP/1.1.

Fielding, R., et al. RFC 2616: Hypertext Transfer Protocol—HTTP1/1.

Berners–Lee, T. "draft–ietf–iiir–http–00.txt" (Nov. 5, 1993). wwwStat Readme file at http://ftp.ics.uci.edu/pub/websoft/wwwstate/README.

NCSA HTTPd release notes at http://hoohoo.ncsa.uiuc.edu/docs/Upgrade.html (last updated Aug. 1, 1995).

Crocker, Glenn, "web2mush: Serving Interactive Resources to the Web", Electronic Proc. of the 2nd World Wide Web Conf. '94: Mosaic and the Web!, Developers Day, (Oct. 20, 1994).

Dukach, Seymon; Prototype Implementation of the SNPP Protocol; allspic.lcs.mit.edu; 1992.

Batelaan; Butler; Chan; Evenchick; Hughes; Jen; Jeng; Millett; Riccio; Skoudis; Starace; Stoddard; "An Internet Billing Serving Prototype Design", Carnegie Mellon.

O'Mahony, Donal, Michael Peirce, & Hitesh Tewari, Electronic Payment Systems, Artech House, Inc., pp. 145–155, Jan. 1997.

Maren, Michael, "The Age of E–Mail," Home Office Computing, vol. 11, No. 12, p. 63(5).

Foster, David & Stuart Finn, "Insurers Can Benefit From E–Mail Networks", National Underwriter Property & Casualty–Risk & Benefits Management, No. 9, p. 46(2), Mar. 4.

Ferrarini, E., "Flight of Fancy: Goodbye Travel Agent", Business Computer Systems, vol. 2, No. 11, pp. 39–40, Nov. 1993.

Trip et al., "Cookies" (client–side persistent information) and their use, Netscape Technical Note 20019, Netscape Communications Corp., Oct. 1995.

Archive of WWWorder mailing list (Jun. 18, 1994–Jun.13, 1994).

Leggett, John et al., "Hyperform: Using Extensibility to Develop Dynamic, Open and Distributed Hypertext Systems" (1992).

Bieber, Michael, "Issues in Modeling a 'Dynamic' Hypertext Interface for Non–Hypertext Systems" (1991).

Nielson, Jacob, Hypertext & Hypermedia (1990).

"Announcing: Internet Shopkeeper" (Aug. 2, 1994) posting on comp.infosystems.www and misc.forsale.

Eaasy Sabre User's Guide and Eaasy Sabre Reference Guide.

Compuserve Manual (undated).

The Major BBS: Collection of information and Advertisements concerning The Major BBS (Fall 1993).

Fielding, Roy, et al., "Principled Design of the Modern Web Architecture" ACM Transactions on Internet Technology 2, 2 pp. 115–150 (May 2002).

Smithson, Brian, and Singer, Barbara, An Information Clearinghouse Server for Industry Consortia, 2nd Int'l Conf. On the World Wide Web, Chicago, Ill., Oct. 1994.

Soverain's ANSWER to Counterclaim (Amazon's Third Amended Counterclaim) by Soverain Software LLC.(Seraphine, Jennifer) (Entered: Mar. 17, 2005).

NOTICE by Amazon.com re: Answer to Amended Complaint, Counterclaim Of Rejection Of Claims 1–45 Of U.S. Patent No. 4,708,780 (Entered: Mar. 25, 2005).

MOTION to Stay [Renewed] by Amazon.com. (Entered: Apr. 5, 2005).

Soverain's Opposition to Amazon's Renewed Motion to Stay.

Amazon.Com, Inc.'s Reply in Support of Renewed Motion to Stay.

Deposition of Glenn Arthur Hauman with Exhibits (Oct. 28, 2004).

Deposition of Glenn Crocker with Exhibits (Mar. 10, 2005).

Deposition of Glenn M. Trewitt with Exhibits (Jan. 25, 2005).

Deposition of Guy Henry Timothy Haskin with Exhibits (Mar. 18, 2005).

Deposition of Joshua Smith with Exhibits (Mar. 2, 2005).

Deposition of Kevin Ming–Wei Kadaja Hughes with Exhibits (Mar. 21, 2005).

Deposition of Michael Kuniavsky with Exhibits (Feb. 22, 2005).

Deposition of Michael Lazzaro with Exhibits (Mar. 9, 2005).

Deposition of Phillip Hallam–Baker with Exhibits (Mar. 11, 2005).

Deposition of Robert Allen Olson with Exhibits (Mar. 3, 2005).

Deposition of Thomas Soulnaille with Exhibits (Mar. 14, 2005).

Expert Report of Alexander B. Travor (Apr. 10, 2005).

Reply to Response to Motion re: Motion to Stay [Renewed] (Surreply in Opposition to Amazon's Renewed Motion to Stay) filed by Soverain Software LLC.

Soverain's Reply to Amazon's Third Amended Counterclaims, dated Mar. 17, 2005.

Amazon.com's Renewed Motion to Stay Proceedings Until the Patent and Trademark Office Completes Re–Examination of the Three Patents in Suit, dated Apr. 5, 2005.

NCSA "What's New", http://archive.ncsa.uiuc.edu/SDG/Software/Mosaic/Docs/old–whats–new/

whats–new–0294.html, Feb. 28, 1994, 17 pages.

Business Wire, CommerceNet Urges Government to Ease Export Restrictions on Encryption Products: Consortium's New White Paper Articulates Position on the Export of Cryptography–Based Products, Jun. 26, 1995, 2 pages.

"Advanced Electronic Credit Authorization Through the Amherst Group SNET", New Releases, New Haven, CT, Dec. 7, 1987, 2 pages.

Anderson, Scot et al., "Sessioneer: Flexible Session Level Authentication With Off the Shelf Servers and Clients", http//www.igd.fhg.de/archive/1995__www95/papers/77/sessioneer2.html, pp. 1–7.

Buhle, E. Loren, Jr., "Wide Area Information Servers", Digital Systems Journal, Sep./Oct. 1994, pp. 13–18.

Comer, D., et al., "The Tilde File Naming Scheme", The 6th International Conference on Distributed Computer Systems, IEEE Computer Society, Cambridge, MA., May 1996, pp. 509–514.

Comer, D.E., et al. "A Model of Name Resolution in Distributed Systems", The 6th International Conference on Distributed Computer Systems, IEEE Computer Society, Cambridge, MA, May 1996, pp. 523–530.

Computer Fraud & Security Bulletin, "Underlying Security Mechansms", Mar. 1997, 2 pages.

Cookies and Privacy FAQ, http://search.netscape.com/assist/security/faqs/cookies.html Jan. 9, 1998 at 4:29 pm., pp. 1–3.

Net Market Company, "Numerous News Media Stories", New York Times, Front Page of Business Section, Aug. 12, 1994, 4 pages.

Phillips, K., "SuperHighway Access Eases Internet Entry", PC Week, Oct. 31, 1994, 3 pages.

US 5,909,492 C1

Page 4

Poler, Ariel, "Improving WWW Marketing Through User Information and Non–Instrusive Communications", Internet Profiles Corporation (I/PRO), 2*nd* WWW Conference, Chicago, Illinois, Oct. 1994, 4 pages.

Soverain's Disclosure of Asserted Claims and Preliminary Infringement Contentions dated Jun. 3, 2004.

Supplemental Disclosure of Preliminary Invalidity Contentions by Amazon and the Gap dated Jul. 26, 2004.

Deposition of G. Winfield Treese, dated Oct. 27, 2004.

Soverain's Reply to Amazon.Com's Amended Counterclaims, dated Jan. 14, 2005.

Third Supplement to Defendant Amazon's Initial Disclosures, dated Mar. 4, 2005.

VideoTaped Deposition of Mark Levergood dated Mar. 8, 2005 (2 parts).

VideoTaped Deposition of Andrew Payne dated Mar. 11, 2005.

VideoTaped Deposition of Stephen Morris dated Mar. 9, 2005.

VideoTaped Deposition of Glenn Trewitt dated Jan. 25, 2005 (2 parts).

Soverain's Fourth Supplemental Responses to Amazon's First Set of Interrogatores (Nos. 1–14) dated Mar. 21, 2005.

Soverain's Responses to Interrogatory Nos. 22, 23, 26 and 36 of Amazon's Third Set of Interrogatores (Nos. 17–28) dated Mar. 21, 2005.

Soverain's Responses to Amazon's First Set of Requests for Admission to Plaintiff Soverain Software (Nos. 1–100) dated Mar. 21, 2005.

Memorandum Opinion dated Apr. 7, 2005.

"It will happen", article excerpt from infoHighway, vol. 2–1, Jan. 1995.

Aronson, Dan, et al., Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Access and session control" dated Sep. 15, 1994.

Derier, Christian, "The World–Wide Web Gateway to Hyper–G: Using a Connectionless Protocol to Access Session–Oriented Services", Institut für Informationverarbeitung and Computergestützte neue Medien, Graz, Austria, dated Mar. 1995.

English, Joe, Electronic Mail to multiple recipients of the www–talk list (www–talk@info.cern.ch) on "Re: Identifying Mosaic session" dated Dec. 20, 1994.

Fielding, Roy, software distribution archive for the HTTP log file analysis program, wwwstat v101, dated Apr. 24, 1994, published at http://www.ics.uci.edu/WebSoft/www-stat/.

Hall, Devra, et al., "Build a Web Site: The Programmer's Guide to Creating, Building, and Maintaining a Web Presence", published Apr. 1996. ISBN 0–7615–0064–2.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 1, 64 pages.

Hughes, Kevin, source code file for the HTTP log file analysis program, getstats v1.0, dated Feb. 1, 1994, published at http://eit.com/software/getstats/getstats.html—Version 2, 64 pages.

McCartney, Todd, Message posted to Usenet public discussion group, rec.arts.disney, dated Nov. 21, 1994.

Pitkow, et al., "Results from the First World Wide Web Use Survey", presented at the First International Conference on the World Wide Web, Geneva, Switzerland, Ma 25–27, 1994, published at http://www94.web.cern.ch/WWW94/PrelimProcs.html on Jun. 2, 1994, and reprinted in the Journal of Computer Networks and ISDN Systems, vol. 27, No. 2, Nov. 1994, Elsevier Science B.V.

The NetMarket Company, NetMarket PGP Help file, from http://www.netmarket.com, dated Dec. 10, 1994.

"CompuServe Videotex Network Offers Marketing Research Service, ad Test", Marketing News, Nov. 25, 1983, p. 21.

"Electronic In–Home Shopping: 'Our Stores are Always Open'," Chain Store Age Executive, Mar. 1985, pp. 111, 116.

"Mail Offers a Holiday Treat for Hackers," Advertising Age, Nov. 13, 1985, p. 76.

"Redcoats Join Communications Fight", Industry Week, Feb. 22, 1982, pp. 108–109.

"Suddenly, VideoTex is Finding an Audience", Business Week, Oct. 19, 1987, pp. 92–94.

"Taking Advantage of the Past",Advertising Age, Apr. 11, 1983, pp. M36–37.

American National Standard: "Financial Institution Retail Message Authentication"; ANXI X9, 1986.

American National Standard: "Interchange Message Specification for Debit and Credit Card Message Exchange Among Financial Institutions"; ANXI–X9, Feb. 1988.

Anderson, Ross J.: UEPS—A Second Generation Electronic Wallet: Proc. of the Second European Symposium on Research in Computer Security (ESORICS); Touluse, France, pp. 411–418, undated.

Bellcore Internal e–mail, Nov. 24, 1993, 7 pages.

Bender, M., EFTC: Electronic Funds Transfer Systems:, Kennikat Press; Port Washington, New York, pp. 42–46, 1975.

Beutelspacher et al., "Payment Applications with Multifunctional Smart Cards", Smart Card 2000, 1989, pp. 95–101.

Booz, Allen & Hamilton, "How to Buy Information with a First Virtual Account", Apr. 11, 1994, 63 pages.

Bos et al., "SmartCast: A Practical Electronic Payment System" Centre for Mathematics and Computer Science, Aug. 1990, pp. 1–8.

Burk et al., "Digital Payment Systems Enabling Security and Unobservability", Computer & Security, 1989, pp. 399–415.

Burk et al., "Value Exchange Systems Enabling Security and Unobservability", Computer & Security, 1990, pp. 715–721.

Chaum et al., "Untraceable Electronic Cash"; Advances in Cryptology, 1988, pp. 319–327.

Chaum et al., "Implementing Capability–Based Protection Using Encryption", Electronics Research Laboratory, University of California, Berkeley, 1978, 12 pages.

Cohen, D., "Computerized Commerce", ISI Reprint Series IS/RS–89–243; Oct. 1989, Reprinted from Information Processing 89, Proceedings of the IFIP World Computer Congress, Held Aug. 28–Sep. 1, 1989, 8 pages.

Cohen, D., "Electronic Commerce", University of Southern California Information Sciences Institute, Research Report ISI/RR–89–244, Oct. 1989, 42 pages.

CompuServe International: CompuServe Information Service Users Guide, pp. 109–113; 1986.

Computer Shopper, "Internet for Profit", Nov. 1994, pp. 180–182; 190–192; 522–528, 532, 534.

US 5,909,492 C1

Page 5

"Consumers Plugging into New Electronic Mail", Advertising Age, Mar. 4, 1985, p. 74.

Damgard, "Payment Systems and Credential Mechanisms with Provable Security Against Abuse by Individuals", Advances in Cryptology–CRYPTO '88, 1988, pp. 328–335.

Davies et al., "Security for Computer Networks: An Introduction to Data Security in Teleprocessing and Electronic Funds Transfer", John Wiley & Sons, Dec. 5, 1985, pp. 304–336.

Dukach, S., "SNPP: A Simple Network Payment Protocol"; MIT Laboratory for Computer Science: Cambridge, MA, 7 pages.

Even et al., "Electronic Wallet"; Computer Science Department, Israel, pp. 383–386.

Ferranini, E., "Direct Connections for Software Selections", Business Computer Systems, Feb. 1985, pp. 35–38.

Fujioka, et al., "ESIGN: An Efficient Digital Signature Implementation for Smart Cards," Advances in Cryptology—Eurocrypt '91, Apr. 1991; pp. 446–457.

Gifford et al., "Case Study; The Cirrus Banking Network", Communications of the ACM, Aug. 1995, 2 pages.

Gifford, David K., "Notes on Community Information Systems", MIT/LCS/TM–419, Dec. 10, 1989, 7 pages.

Gifford, David K, "Cryptographic Sealing for Information Secrecy and Authenication", Stanford University and Xerox Palo Alto Research Center, Communications of the ACM, vol 25, No. 4, Apr. 1982, pp. 274–286.

Hakola., et al., A System for Automatic Value Exchange Exchange, Proceedings—Fall Joint Computer Conference, Nov. 1966, pp. 579–589.

Harty et al., "Case Study: The VISA Transaction Processing System", May 1988, pp. 1–23.

Hirschfeld, "Making Electronic Refunds Safer", Laboratory for Computer Science, MIT, 1992, 4 pages.

Information Networking Institute, Carnegie Mellon University, Prototype Scope Document, INI Technical Report 1993–1, Oct. 14, 1993, 29 pages.

International Organization for Standardization, International Standard—Bank Card Originated Messages—Interchange Message Specifications Content for Financial Transactions, ISO 8383 1987.

Intuit Corp. Quicken User's Guide, "Paying Bills Electronically", no date, pp. 171–191.

Jansson, L., "General Electronic Payment System", 7th Proceedings of the International Conference on Computer Communication, 1985, pp. 832–835.

Kenny, "EDI Security: Risks and Solutions", SD–Scion UK Limited, 1992, 12 pages.

Knapskog, "Privacy Protected Payments—Reliazation of a Protocol that Guarantees Payer Anonymity", EuroCrypt 1988, pp. 107–121.

Krajewski, M., "Concept for a Smart Card Kerberos", 15th National Computer Security Conference, Oct. 1992, 9 pages.

Krajewski, M., et al., "Applicability of Smart Cards to Network User Authentication", Computing Systems, vol. 7, No. 1, Winter 1994, pp. 75–89.

Krajewski, M., "Smart Card Augmentation of Kerberos", Privacy and Security Research Group Workshop on Network and Distributed System Security, Feb. 1993, 5 pages.

Lai et al., "Endorsements, Licensing, and Insurance for Distributed System Services", Information Sciences Institute, U. of Southern California, undated, 6 pages.

Low et al., "Anonymous Credit Cards", undated, pp. 1–16.

Medvinsky et al., "Electronic Currency for the Internet", Electronic Markets, Sep. 1993, pp. 30–31.

Messmer, "NIST Stumbles on Proposal for Public–Key Encryption", Network World, Jul. 27, 1992, pp. 1–6.

Mosaic Communications Corp. Press Release, "Mosaic Communications Unveils Network Navigator and Server Software for the Internet", Sep. 1994, 3 pages.

National Westminster Bank Group, "Clearing House Automated Payments System", undated, 31 pages.

Needham, Roger M., "Adding Capability Access to Conventional File Servers", Xerox Palo Alto Research Center, California, undated, pp. 3–4.

Okamoto et al., "University Electronic Cash", NTT Laboratories, pp. 324–337.

Payment Systems, "United States", undated, pp. 217–235.

Perry, "Electronic Banking Goes to Market", IEEE Spectrum, Feb. 1988, pp. 46–49.

Pfitzmann et al., "How to Break and Repair a Provably Secure Untraceable Payment System", pp. 338–350.

Ph, van Heurck, "TRASEC: Belgian Security Systems for Electronic Funds Transfers," Computers & Security, 1987, pp. 261–268.

Pongratz, et al., "IC Cards in Videotex Systems", Smart Card 2000, 1989, pp. 179–186, 1 page.

Recommendation X.509: The Directory—Authentication framework, Fascicle VIII.8 (Melbourne 1988) pp. 48–82.

Remery, P., et al., "Le palement electronique", L'Echo des Recherches, No. 134, 1988, pp. 15–23.

Rescorla E., et al., "The Secure HyperText Transfer Protocol", Enterprise Integration Technologies, Dec. 1994, 35 pages.

Rescorla, E., et al., "The Secure HyperText Transfer Protocol", Enterprise Integration Technologies, Jun. 1994, 22 pages.

Rivest et al., "A Method for Obtaining Digital Signatures and Public–Key Crypotosystems", Laboratory for Computer Science, MIT, undated, pp. 1–15.

Schaumuller–Bichl, "IC Cardfs in High–Security Applications", Selected Papers from the Smart Card Conference, Springer Verlag, 1991, pp. 177–199.

Shain, "Security inElectronic Funds Transfer: Message Integrity in Money Transfer and Bond–Settlements through GE Information Services' Global Network", Computers & Security, vol. 8, No. 3 1989, pp. 209–221.

Sirbu, Marvin A., "Internet Billing Service Design and Prototype Implementation", pp. 1–19.

Society for Worldwide Interbank Financial Telecommunications S.C.; "A S.W.I.F.T. Overview" no date, 34 pages.

Staskauskas, "The Formal Specification and Design of a Distributed Electronic Funds–Transfer System", EEE, 1988, pp. 1515–1528.

Stol, "Privacy Protected Payments—A Possible Structure for a Real Implementation and Some Resource Considerations", Reproduced by U.S. Department of Commerce, 83 pages.

Strazewski, "Computerized Service Sets Shoppers Hacking", Advertising Age, Feb. 22, 1988, p. 62.

Takei, Videotex Information System and Credit System Connecting with MARS 301–of JNR, Japanese Railway Engineering, No. 95, Sep. 1985, pp. 9–11.

Tanaka et al., "Untraceable Electronic Funds Transfer Systems", Electronics and Communications in Japan, Part 3, vol. 72, No. 9, 1989, pp. 47–54.

US 5,909,492 C1

Page 6

Tenenbaum et al., "Development of Network Infrastructure and Services for Rapid Acquisition", Adapted from a White Paper Submitted to DARPA by MCC in Collaboratio with EIT and ISI, Jan. 1992, pp. 1–19.

Tunstall, "Electronic Currency", Smart Card 2000: The Future of IC Cards, Oct. 1987, pp. 47–48.

Vittal, "Active Message Processing: Messages as Messengers", 1981, pp. 175–195.

Waidner, et al., "Loss–Tolerance for Electronics Wallets", Fault–Tolerant Computing: 20th International Symposium, Jun. 26–28, 1990, pp. 140–147.

Weber, "Controls in Electronic Funds Transfer Systems: A Survey and Synthesis", Computers & Security, 1989, pp. 123–137.

Williams, "Debt Program Cuts Fraud—CompuServe Plan a Success", Pensions & Investment Age, Feb. 4, 1985, pp. 31–33.

Joint Claim Construction Chart (Patient Local Rule 4–5D)), filed Dec. 27, 2004 with Appendix A.

Order Denying Amazon's Motion to Stay Proceedings Pending Completion of the Reexamination.

Transcript of the Markmam Hearing Before the Honorable Leonard David United States District Judge, Jan. 6, 2005.

Complaint for Patent Infringement filed Jan. 12, 2004.

Amazon.com's Answer, Affirmative Defenses, and Counterclaims to Soverain Software's Complaint filed Mar. 9, 2004.

Amazon.com's Response to Plaintiffs First Set of Interrogatories (Nos. 1–22) filed Jun. 11, 2004.

Soverain's Responses and Objections to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Jun. 11, 2004.

Diclosure of Preliminary Invalidity Contentions by Defendants Amazon.com and the Gap (with Exhibit A) filed Jul. 6, 2004.

Soverain's Supplemental Responses to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Aug. 13, 2004.

Soverain's Second—Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14) filed Sep. 21, 2004.

Soverain's Third Supplemental Response to Amazon.com's First Set of Interrogatories (Nos. 1–14).

Soverain's Preliminary Claim Construction (Patent Local Rule 4–2) filed Sep. 2, 2004.

Joint Disclosure of Preliminary Claim Construction and Extrinsic Evidence by Defendants Amazon.com and the Gap (with Exhibits A–B) filed Sep. 2, 2004.

Joint Claim Construction and Prehearing Statement (Patent Local Rule 4–3) (with Exhibits A–D) filed Oct. 4, 2004.

Amazon.com's First Amended Answer, Affirmative Defenses, and Counterclaims to Soverain's Complaint filed Oct. 6, 2004.

Declaration of Jack D. Grimes Ph.D., dated Nov. 15, 2004.

Soverain's Claim Construction Brief Pursuant to Patent Rule 4–5(a) dated Nov. 16, 2004.

Declaration of Dr. Richard N. Taylor in Support of Defendants' Markman Brief dated Nov. 29, 2004.

Joint Claim Construction Brief of Amazon.com and Gap dated Nov. 30, 2004.

Soverain's Claim Construction Reply Brief Pusuant to Patent Rule 4–5(c) dated Dec. 7, 2004.

"HTTP State Management Mechanism," http://www.internic.net/rfc/rfc2109.txt (Jan. 9, 1998)—http://www.cse.ohio–state.edu/cgl–bin/rfc/rfc2965.html.

"maX.500—a Macintosh X.500 Directory Client", contents of WWW website, http://www.umich.edu/~dirsvc/ldap/max500/index.htlm as of Jul. 7, 1997.

"Mosaic Communications Unveils Network Navigator and Server Software for the Internet", Mosaic Communications Press Release, Sep. 1994.

"Persistent Client State HTTP Cookies," http://search.netscape.com/newsref/std/cookie spec.html (Jan. 9, 1998).

57 USPQ2D, "Amazon.com, Inc. v. Barnesandnoble.com, Inc." pp. 1746–1763.

Abadi M., et al., "Authentication and Delegation with Smart–Cards," Oct. 1990, Chapter 67.

Aho, A.V., et al., "Reports and Databases," in the AWK Programming Language, M.A. Harrison, ed., (Addison–Wesley), pp. 100–101 (1988).

Anderson, R., "Why Cryptosystems Fail," 1st Conf.—Computer & Comm. Security, 1993–11/93–VA, USA, pp. 215–227.

Andrade, et al., "Open On–Line Transaction Processing with the TUXEDO System," pp. 366–371, Digest of Papers, IEEE Computer Society Press, COMPSON Spring 1992, San Francisco, Calif.

Berners–Lee, T., et al., "Target a Common Internet Syntax Where the User Password is Appended to a Specific URL," http://www.ietf.org/rfc1738.txt?number–1738.

Bjorn N. Freeman–Benson, "Using the Web to Provide Private Information," First International Conference on the World Wide Web, WWW94, May 1994, 5 pages.

Bob Novick, (9503) Internet Marketing: The Clickstream, Mar. 1995, [http://www.i–m.com/archives/9503/0375.htm] 3 pages.

Bowman, et al., "Univers: An Attribute–Based Name Server," Software Practice and Experience, vol. 20(4) 403–424 (Apr. 1990).

Brian W. Kernighan and Dennis M. Ritchie, "The C Programming Language" second edition, AT&T Bell Laboratories, (N.J., Prentice Hall) pp. 17–21 (1998).

Catledge L.D., "Characterizing Browsing Strategies in the World–Wide Web," http.www.igd.thg.de/archive/1995_.../UserPatterns.Paper4.formatted.htm.

Chaum, D., "Achieving Electronic Privacy," Scientific American, Aug. 1992, pp. 96–101.

Cheriton D.R., et al., "Uniform Access to Distributed Name Interpretation in the V–System," pp. 290–297, 4th International Conference on Distributed Computing System, IEEE Computer Society, San Francisco, Calif., May, 1984.

Choudhury, Abhijit K., et al., "Copyright Protection for Electronic Publishing Over Computer Networks," IEEE Network, The Magazine of Computer Communications, vol. 9, No. 3, pp. 12–20, May 1995.

Clickstream, Oct. 1996, The word Spy, [http:www.wordspy–com/words/clickstream.asp], 2 pages.

Computer and Business Equipment Manufacturers Association, "American National Standard for Information Systems—Database Language SQL" (N.Y., American National Standards Institute) pp. 27–28 (1988).

Curtis, R., et al., "Naming in Distributed Language Systems," pp. 298–302, 4th International Conference on Distributed Computing Systems, IEEE Computer Society, San Francisco, CA May 1984.

Droms, R.E. "Access to Heterogenous Directory Services," Proceedings IEEE INFOCOM '90, pp. 1054–1061, San Francisco, Calif. Jun. 3–7, 1990.

US 5,909,492 C1

Page 7

Gary Weiz, "The Media Business on the WWW", Proceedings of the Second World Wide Web Conference 1994: Mosaic and the Web, Oct. 1994, 6 pages.

Gligor, V.D., "Object Migration and Authenication," IEEE Transactions of Software Engineering, vol. SE–5, No. 6, Nov. 1979, pp. 607–611.

Good, B., "Experience with Bank of America's Distributive Computing System," pp. 2–8, IEEE 1983.

Hitchens, M., et al., "Bindings Between Names and Objects in a Persistent System," Proceedings of the 2nd International Workshop on Object Orientation in Operating Systems, IEEE Computer Society, pp. 26–37, Dourdan, FR, Sep. 1992.

Housel, B.C., et al., "SNA Distribution Services," IBM Systems Journal, pp. 319–343, vol. 22, No. 4, 1983.

Inselberg, A., "An Approach to Successful Online Transaction Processing Applications," AFIPS Conference Proceedings, 1985 National Computer Conference, pp. 419–427, Chicago, Ill., Jul. 15–18, 1985.

Kahan, Jose, "A capability–based authorization model for the World–Wide Web," http://www.igd.fng.de/archive/1995_www95/proceedings/papers/86/CaMWWW.htlm pp. 1–14.

Kahan, Jose, "A Distributed Authorization Model for WWW," http://www.isoc.org/HMP/PAPER/107/html/paper.html. pp. 1–16.

Kahan, Jose, "A New Authorization Model for Distributed Multimedia Information Consultation Systems" English Translation, pp. 1–21.

Kahan, Jose, "Un nouveau modele d–autorisation pour les systemes de consulation d–information multimedia repartee," pp. 45–57.

Kelley, A., and Pohl, I., "Arrays, Strings, and Pointers," in a Book on C, A, Apt, ed., (the Benjamin/Cummings Publishing Company, Inc.) pp. 33–37 (1984).

Kluchi, T., et al., "C–HTTP—The Development of a Secure, Closed HTTP–Based Network on the Internet," 1996 IEEE, pp. 64–75.

Lampson, B.W., "Designing a Global Name Service," pp. 1–10, Proceedings of the 5th Annual ACM Symposium on Principles of Distributed Computing, ACM, Calgary, Alberta, Canada, Aug. 1986.

Lim, Jong–Gyun, "Using Coolists to Index HTML Documents in the Web," http://www.ncsa.uiuc.edu/SDG/TT94/Proceedings/Searching/lim/coolist. htm, pp. 1–8.

Lou Montulli, Electronic Mail to Multiple Recipients of the www–talk list (www–talk.1995a2/0134.html on "Session Tracking" (omi.mail.www–talk, Apr. 18, 1995).

Menefee, C., "New host for Internet Commercial Site Index," Newsbytes Nov. 9, 1994, p. 15.

Metcalf, R.M. "Commercialization of the Internet Opens Gateways to Interpreneurs," InfoWorld, Aug. 8, 1994, p. 44.

Michalski, J., "Content in context: the Future of SGML and HTML," Release 1.0, Sep. 27, 1994, pp. 1–10.

NCSA HTTPd 1.5 Beta How to Redirect, "The New Redirect Directives."

Neuman, B.C., "Proxy–Based Authorization and Accounting for Distributed Systems," Proceedings on the 13th International Conference on Distributed Computing Systems, Pittsburg, May 1993, pp. 283–291.

Notkin, D., "Proxies: A Software Structure for Accomodating Hetergeneity," Software–Practice and Experience, vol. 20(4), 357–364, Apr. 1990.

Ordille, J.J., et al., "Nomenclater Descriptive Query Optimization for Large X.500 Environments," pp. 185–196, SIGCOM '91 Conference, Communication Architectures & Protocols, vol. 21, No. 4, Zurich, Switzerland, Sep. 1991.

Peterson, Larry L., "A Yellow–Pages Service for a Local–Area Network," ACM Proceedings of the ACM SIG–COMM 87 Workshop, ACM Press, 1988, pp. 235–242.

Pitkow, J.E., "Webviz: A Tool for World–Wide Web Access Log Analysis," First International World Wide Web Conf., May 1994, 7 pgs.

Pitkow, J.E., and Recker, M.M., Using the Web as a Survey Tool: Results from Second WWW User Survey,: http://www.igd.fhg.de/archive/1995_www95/papers/79/survey/survey_2_paper.html.

Ramanathan, Sirvivas, et al., "Architectures for Personalized Multimedia," IEEE Multimedia, vol. 1, No. 1, Computer Society, pp. 37–46, 1994.

Rescorla, E., et al., "The Secure HyperTest Transfer Protocol," Aug. 1999.

Rivest, R., "The MD5 Message–Digest Algorithm," MIT Laboratory for Computer Science and RSA Data Security, Inc., Apr. 1992.

Schwartz, et al., "A Name Service for Evolving, Heterogeneous Systems," Proceedings of the 11th ACM Symposium on Operating Systems Principles, vol. 21, No. 5, pp. 52–62, Austin, TX, Nov. 1987.

Schwartz, M.F., et al., Experience with a Semantically Cognizant Internet White Pages Directory Tool, Journal of Internetworking: Research and Experience, pp. 1–22 (1990).

Sedayao, J., "Mosaic Will Kill My Network!—Studying Network Traffic Patterns of Mosaic Use", http://www.nc-sa.uiuc.edu/SDG/TT94/P...qs/DDay/sedayao/mos_traf_paper.htm.

Sheltzer, et al., "Name Service Locality and Cache Design in a Distributed Operating System," University of California, Los Angeles, 8 pgs.

Squillante, M.C., et al., Integrating Heterogeneous Local Mail Systems, pp. 59–67, IEEE Software, Nov. 1989.

Terry, D.B., "Structure–free Name Management for Evolving Distributed Envrionments," pp. 502–508, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1986.

Voydock V., et al., "Security Mechanisms in High Level Network Protocols," Computing Surveys, vol. 15, No. 2, Jun. 1983, pp. 135–171.

Welch, B., et al., "Prefix Tables: A Simple Mechanism for Locating Films in a Distributed System," pp. 184–189, 6th International Conference on Distributed Computing Systems, IEEE Computer Society, Cambridge, MA, May 1996.

WordPerfect for Macintosh, pp. 153–162 (1990).

Zatti, et al., "Naming and Registration for IBM Distributed Systems," IBM Systems Journal, pp. 353–380, vol. 31, No. 2, 1992.

"Here it is, World" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Oct. 13, 1994–Oct. 17, 1994) available at: http://groups.google.com/group/comp.infosystems. www.users/browse_thread/thread/3666fe4e21b3a9e2/9a210e5f72278328?lnk=st&rnum=5&hl=en#9a210e5f72278328.

## US 5,909,492 C1
Page 8

"Netscape 0.93 Setup Questions" internet postings to comp.infosystems.www.misc discussion list re: Mosaic Netscape (Nov. 21, 1994–Nov. 25, 1994) available at: http://groups.google/com/group/comp.infosystems.www.misc/browse_thread/thread/da4c82efc6512f67/8dabc347291409d5?lnk=st&rnum=1&hl=en#8dabc347291409d5.

"Netscape and Cookies" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 11, 1994–Dec. 13, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/5347cb89bbae572b/3583cab5e6c13e94?lnk=st&rnum=3&hl=en#3583cab5e6c13e94.

"Cookies.txt" internet postings to comp.infosystems.www.users discussion list re: Mosaic Netscape (Dec. 23, 1994–Dec. 27, 1994) available at: http://groups.google.com/group/comp.infosystems.www.users/browse_thread/thread/613e81948e9cf6e4/134ade72dfc1c58d?lnk=st&rnum=2&hl=en#134ade72dfc1c58d.

"How to get stateful HTML documents" internet postings to comp.infosystems.www.misc discussion list (Jun. 24, 1994–Jun. 25, 1994) available at: http://groups.google.com/group/comp.infosystems.www.misc/browse_thread/thread/fd304fedb645529a/b8f6dab2aa73ae71?lnk=st&rnum=7&hl=en#b8f6dab2aa73ae71.

"How to add state infor to a form" internet postings to comp.infosystems.www.providers discussion list (Jun. 30, 1994–Jul. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www.providers/browse_thread/thread/2acad6cdc8ebb8a/bf368e630add2c94?lnk=st&rnum=8&hl=en#bf368e630add2c94.

"Transactional Services on WWW" internet postings to comp.infosystems.www discussion list (May 21, 1994–Jun. 1, 1994) available at: http://groups.google.com/group/comp.infosystems.www/browse_thread/thread/bf430e6df8e6e7d/8ed77a97f5d0b96?lnk=st&hl=en#8ed77a97f5d0b9d6.

Dan Aronson, "access and session control" posting to www–talk discussion list (Sep. 14, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0901.html.

Rick Troth, "access and session control" (Sep. 15, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q3/0923.html.

alain@hyperman.co.il, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at http://1997.webhistory.org/www.lists./www–talk.1994q4/1098.html.

Joe English, "Re: Identifying Mosaic session", posting to www–talk discussion list (Dec. 20, 1994 available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1109.html.

Steven Majewski, "Identifying Mosaic session" posting to www–talk discussion list (Dec. 20, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q4/1111.html.

Nick Arnett, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0562.html.

Jared Rhine, "Statelessness" posting to www–talk discussion list (May 16, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0563.html.

Simon Spero, "Statelessness" posting to www–talk discussion list (May 17, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0579.html.

Jim McBeath, "Statelessness" posting to www–talk discussion list (May 27, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0683.html.

Philip Hallam–Baker, "Statelessness" posting to www–talk discussion list (May 30, 1994) available at: http://1997.webhistory.org/www.lists/www–talk.1994q2/0705.html.

Trewitt, Glenn, *Using Tcl to Process HTML Forms*, Digital Equipment Corporation Network Systems Laboratory TN–14, dated Mar. 1994.

Viescas, John L., The Official Guide to the Prodigy Service, Microsoft Press, 1991, ISBN 1–55615–374–0.

BizNet Technologies, Versatile Virtual Vending, published at http://www.bnt.com, Sep. 12, 1994.

* cited by examiner

US 5,909,492 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims 1–38 is confirmed.

New claims 39–108 are added and determined to be patentable.

*39. A hypertext statement system in accordance with claim 15, wherein the network is an Internet.*

*40. A hypertext statement system in accordance with claim 15, wherein the client computer is a buyer computer, and at least one of the server computers is a payment computer.*

*41. A hypertext statement system in accordance with claim 15, wherein the statement document is sent by at least one of the server computers to the client computer in response to a statement URL sent by the client computer to at least one of the server computers.*

*42. A hypertext statement system in accordance with claim 41, wherein the statement URL includes a URL authenticator that is a digital signature based on a cryptographic key;*

*wherein the URL authenticator is a hash of information contained in the statement URL;*

*wherein at least one of the server computers verifies whether the statement URL authenticator was created based upon the information contained in the statement URL using the cryptographic key.*

*43. A hypertext statement system in accordance with claim 42, wherein if verification by at least one of the server computers fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.*

*44. A hypertext statement system in accordance with claim 42, wherein the statement URL comprises a client network address;*

*wherein the client computer network address is verified by matching it with the network address specified in the statement URL.*

*45. A hypertext statement system in accordance with claim 44, wherein if verification fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.*

*46. A hypertext statement system in accordance with claim 42, wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt.*

*47. A hypertext statement system in accordance with claim 46, wherein at least one of the server computers verifies that the account name and password provided by the user match a previously provided account name and password.*

*48. A hypertext statement system of claim 47, wherein if the account name and password verification fails, then at least one of the server computers sends a document to the client computer indicating that access to at least a portion of a network sales system is denied.*

**2**

*49. A hypertext statement system of claim 44, wherein if a payment amount exceeds a threshold, then the user is prompted for security-related information;*

*wherein at least one of the server computers verifies that the security-related information matches previously provided security-related information.*

*50. A hypertext statement system in accordance with claim 49, wherein if the security-related verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.*

*51. A hypertext statement system in accordance with claim 49, wherein at least one of the server computers transmits the statement document to the client computer, and the client computer displays the statement document to the user.*

*52. A hypertext statement system in accordance with claim 51, wherein the client computer is a buyer computer;*

*wherein at least one of the server computers retrieves settlement data from a settlement database for use in generating the statement document.*

*53. A hypertext statement system in accordance with claim 15, wherein the transaction detail hypertext link includes a transaction detail URL;*

*wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;*

*wherein the URL authenticator is a hash of information contained in the transaction detail URL;*

*wherein at least one of the server computers verifies whether the transaction detail authenticator was created from information contained in the transaction detail URL based upon the cryptographic key;*

*wherein the transaction detail URL comprises a client network address;*

*wherein the client computer network address is verified by matching it with the network address specified in the transaction detail URL;*

*wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt;*

*wherein at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;*

*wherein if a payment amount exceeds a threshold, then the user is prompted for security-related information;*

*wherein at least one of the server computers verifies that the security-related information matches previously provided security-related information.*

*54. A hypertext statement system in accordance with claim 53, wherein the client computer is a buyer computer, and at least one of the server computers is a payment computer.*

*55. A hypertext statement system in accordance with claim 15, wherein the user requests customer service;*

*wherein in response to the user request, the client computer sends a customer service URL to at least one of the server computers, and at least one of the server computers creates a customer service form and sends the form to the client computer;*

*wherein the form contains an area for the user to provide comments.*

*56. A hypertext statement system in accordance with claim 55, wherein the client computer sends the user's comments to at least one of the server computers;*

*wherein at least one of the server computers processes the user comments.*

**JA0159**

**3**

57. A hypertext statement system in accordance with claim 15, wherein the user requests display of a product listed on the statement document.

58. A hypertext statement system in accordance with claim 57, wherein the client computer sends an access URL to a second server computer.

59. A hypertext statement system in accordance with claim 58, wherein the access URL comprises an authenticator based on a cryptographic key;

wherein the access URL authenticator is a hash of other information in the access URL;

wherein the second server computer verifies whether the access URL authenticator was created from information contained in the access URL using a cryptographic key;

wherein the access URL comprises a duration of time for access indicator, and the second server computer verifies whether the duration time for access has expired;

wherein the access URL comprises a buyer network address indicator, and the second server computer verifies that a buyer computer network address is the same as the buyer network address indicated in the access URL;

wherein the second server transmits a fulfillment document to the client computer.

60. A hypertext statement system in accordance with claim 15, wherein the statement document includes information on transactions by the user that took place in a given month.

61. A hypertext statement system in accordance with claim 60, wherein the information on transactions by the user includes at least one of the following types of information: a date of transaction, an identification of the product, a payment amount, and a merchant identifier.

62. A hypertext statement system in accordance with claim 60, wherein the statement document also includes one or more links to information regarding previous transactions by the user.

63. A hypertext statement system in accordance with claim 60, wherein for a transaction there is a transaction detail URL that includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator.

64. A hypertext statement system in accordance with claim 63, wherein at least one of the server computers receives the transaction detail URL;

wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the transaction detail URL;

wherein at least one of the server computers verifies whether the transaction detail URL authenticator was created from information contained in the transaction detail URL using the cryptographic key;

wherein the transaction detail URL comprises a client computer network address, and the client computer network address is verified by matching it with the network address specified in the transaction detail URL;

wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt, and at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;

wherein if a verification by at least one of the server computers fails, then at least one of the server com-

**4**

puters sends a document to the client computer indicating that access is denied.

65. A hypertext statement system of claim 15, wherein if a payment amount provided by the user exceeds a threshold, then the user is prompted for security-related information, and at least one of the server computers verifies that the security information matches previously provided security-related information.

66. A hypertext statement system in accordance with claim 15, wherein the transaction detail document includes transaction information and merchant information.

67. A hypertext statement system in accordance with claim 66, wherein the transaction information includes at least one of the following types of information: a URL where a product is located, a transaction log identifier, a currency type used, a transaction date, an expiration time, an initiator number, a product description, a transaction amount, a beneficiary number, an IP address, a transaction type indicator, and a domain corresponding to the product.

68. A hypertext statement system in accordance with claim 66, wherein the merchant information includes at least one of the following types of information: a merchant telephone number, a merchant address, a merchant FAX number, a merchant e-mail address, a merchant principal name, a merchant home URL, and a merchant country.

69. A hypertext statement system in accordance with claim 66, wherein the transaction detail document comprises a customer feedback form, including the following fields for data entry by the user: account name, e-mail address, subject, and comments.

70. A hypertext statement system in accordance with claim 69, wherein the customer feedback form includes a hyperlink that a user activates to send the form to at least one of the server computers.

71. A hypertext statement system in accordance with claim 66, wherein the transaction detail document comprises a message to the user inviting comments by e-mail and giving an e-mail address.

72. A hypertext statement system in accordance with claim 66, wherein the transaction detail document further comprises a message to the user inviting comments by FAX and giving a FAX number.

73. A hypertext statement system in accordance with claim 15, wherein a digital advertising document is provided to the client computer.

74. The method of claim 16, wherein the network is an Internet.

75. The method of claim 16, wherein the client computer is a buyer computer, and at least one of the server computers is a payment computer.

76. The method of claim 16, wherein the statement document is sent by at least one of the server computers to the client computer in response to a statement URL sent by the client computer to at least one of the server computers.

77. The method of claim 76, wherein the statement URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the statement URL;

wherein at least one of the server computers verifies whether the statement URL authenticator was created based upon the information contained in the statement URL using the cryptographic key.

78. The method of claim 77, wherein if verification by at least one of the server computers fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.

US 5,909,492 C1

**5**

79. The method of claim 77, wherein the statement URL comprises a client computer network address;

wherein the client computer network address is verified by matching it with the network address specified in the statement URL.

80. The method of claim 79, wherein if verification fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.

81. The method of claim 77, wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt.

82. The method of claim 81, wherein at least one of the server computers verifies that the account name and password provided by the user match a previously provided account name and password.

83. The method of claim 82, wherein if the account name and password verification fails, then at least one of the server computers sends a document to the client computer indicating that access to at least a portion of a network sales system is denied.

84. The method of claim 79, wherein if a payment amount exceeds a threshold, then the user is prompted for security-related information;

wherein at least one of the server computers verifies that the security-related information matches previously provided security-related information.

85. The method of claim 84, wherein if the security-related verification fails, then the payment computer sends a document to the buyer computer indicating that access is not allowed.

86. The method of claim 84, wherein at least one of the server computers transmits the statement document to the client computer and the client computer displays the statement document to the user.

87. The method of claim 86, wherein the client computer is a buyer computer;

wherein at least one of the server computers retrieves settlement data from a settlement database for use in generating the statement document.

88. The method of claim 16, wherein the transaction detail hypertext link includes a transaction detail URL;

wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the transaction detail URL;

wherein at least one of the server computers verifies whether the transaction detail URL authenticator was created from information contained in the transaction detail URL based upon the cryptographic key;

wherein the transaction detail URL comprises a client network address;

wherein the client computer network address is verified by matching it with the network address specified in the transaction detail URL;

wherein the client computer prompts the use for an account name and password by creating an account name prompt and a password prompt;

wherein at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;

wherein if a payment amount exceeds a threshold, then the user is prompted for security-related information;

wherein at least one of the server computers verifies that the security-related information matches previously provided security-related information.

**6**

89. The method of claim 88, wherein the client computer is a buyer computer, and at least one of the server computers is a payment computer.

90. The method of claim 16, wherein the user requests customer service;

wherein in response to the user request, the client computer sends a customer service URL to at least one of the server computers, and at least one of the server computers creates a customer service form and sends the form to the client computer;

wherein the form contains an area for the user to provide comments.

91. The method of claim 90, wherein the client computer sends the user's comments to at least one of the server computers;

wherein at least one of the server computers processes the user comments.

92. The method of claim 16, wherein the user requests display of a product listed on the statement document.

93. The method of claim 92, wherein the client computer sends an access URL to a second server computer.

94. The method of claim 93, wherein the access URL comprises an authenticator based on a cryptographic key;

wherein the access URL authenticator is a hash of other information in the access URL;

wherein the second server computer verifies whether the access URL authenticator was created from information contained in the access URL using a cryptographic key;

wherein the access URL comprises a duration of time for access indicator, and the second server computer verifies whether the duration time for access has expired;

wherein the access URL comprises a buyer network address indicator, and the second server computer verifies that a buyer computer network address is the same as the buyer network address indicated in the access URL;

wherein the second server transmits a fulfillment document to the client computer.

95. The method of claim 16, wherein the statement document includes information on transactions by the user that took place in a given month.

96. The method of claim 95, wherein the information on transactions by the user includes at least one of the following types of information: a date of transaction, an identification of the product, a payment amount, and a merchant identifier.

97. The method of claim 95, wherein the statement document also includes one or more links to information regarding previous transactions by the user.

98. The method of claim 95, wherein for a transaction there is a transaction detail URL that includes a transaction identifier, a buyer network address, and a transaction detail URL authenticator.

99. The method of claim 98, wherein at least one of the server computers receives the transaction detail URL;

wherein the transaction detail URL includes a URL authenticator that is a digital signature based on a cryptographic key;

wherein the URL authenticator is a hash of information contained in the transaction detail URL;

wherein at least one of the server computers verifies whether the transaction detail URL authenticator was created from information contained in the transaction detail URL using the cryptographic key;

**JA0161**

US 5,909,492 C1

**7**

wherein the transaction detail URL comprises a client computer network address, and the client computer network address is verified by matching it with the network address specified in the transaction detail URL;

wherein the client computer prompts the user for an account name and password by creating an account name prompt and a password prompt, and at least one of the server computers verifies that the account name and password entered by the user match a previously provided account name and password;

wherein if a verification by at least one of the server computers fails, then at least one of the server computers sends a document to the client computer indicating that access is denied.

100. The method of claim 16, wherein if a payment amount provided by the user exceeds a threshold, then the user is prompted for security-related information, and at least one of the server computers verifies that the security information matches previously provided security-related information.

101. The method of claim 16, wherein the transaction detail document includes transaction information and merchant information.

102. The method of claim 101, wherein the transaction information includes at least one of the following types of information: a URL where a product is located, a transaction log identifier, a currency type used, a transaction date,

**8**

an expiration time, an initiator number, a product description, a transaction amount, a beneficiary number, an IP address, a transaction type indicator, and a domain corresponding to the product.

103. The method of claim 101, wherein the merchant information includes at least one of the following types of information: a merchant telephone number, a merchant address, a merchant FAX number, a merchant e-mail address, a merchant principal name, a merchant home URL, and a merchant country.

104. The method of claim 101, wherein the transaction detail document comprises a customer feedback form, including the following fields for data entry by the user: account name, e-mail address, subject, and comments.

105. The method of claim 104, wherein the customer feedback form includes a hyperlink that a user activates to send the form to at least one of the server computers.

106. The method of claim 101, wherein the transaction detail document comprises a message to the user inviting comments by e-mail and giving an e-mail address.

107. The method of claim 101, wherein the transaction detail document further comprises a message to the user inviting comments by FAX and giving a FAX number.

108. The method of claim 16, wherein a digital advertising document is provided to the client computer.

\*   \*   \*   \*   \*



US005909492C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9427th)

# United States Patent
Payne et al.

(10) **Number:** US 5,909,492 C2
(45) **Certificate Issued:** *Nov. 28, 2012

(54) **NETWORK SALES SYSTEM**

(75) Inventors: **Andrew C. Payne**, Lincoln, CA (US); **Lawrence C. Stewart**, Wayland, MA (US); **G. Winfield Treese**, Wayland, MA (US)

(73) Assignee: **Soverain Software LLC**

**Reexamination Request:**
No. 90/011,442, Jan. 18, 2011

**Reexamination Certificate for:**
Patent No.: **5,909,492**
Issued: **Jun. 1, 1999**
Appl. No.: **08/878,396**
Filed: **Jun. 18, 1997**

Reexamination Certificate C1 5,909,492 issued Aug. 7, 2007

Certificate of Correction issued Nov. 3, 1999.

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 08/328,133, filed on Oct. 24, 1994, now Pat. No. 5,715,314.

(51) **Int. Cl.**
*H04L 9/00* (2006.01)

(52) **U.S. Cl.** .............. **705/78**; 705/25.1; 705/39; 705/40; 705/44

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,442, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Deandra M. Hughes

(57) **ABSTRACT**

A network-based sales system includes at least one buyer computer for operation by a user desiring to buy a product, at least one merchant computer, and at least one payment computer. The buyer computer, the merchant computer, and the payment computer are interconnected by a computer network. The buyer computer is programmed to receive a user request for purchasing a product, and to cause a payment message to be sent to the payment computer that comprises a product identifier identifying the product. The payment computer is programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer. The merchant computer is programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.



US 5,909,492 C2

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **15-18**, **35**, **36**, **39-41**, **60**, **61**, **66**, **68**, **73**, **74**, **92**, **95**, **96** and **101** is confirmed.

Claims **1-14**, **19-34**, **37**, **38**, **42-59**, **62-65**, **67**, **69-72**, **75-91**, **93**, **94**, **97-100** and **102-108** were not reexamined.

\* \* \* \* \*

157

1  element-by-element analysis.

2              THE COURT:  Motion is denied.

3              MR. NELSON:  Okay.  Thank you, Your

4  Honor.

5              THE COURT:  Anything further?

6              Damages?

7              MR. NELSON:  No.  I got the -- there was

8  a 112 -- there were 112 arguments that are offered in

9  the jury instructions, but there's been no testimony

10 concerning any 112 invalidity issues, Your Honor.

11             THE COURT:  Response?

12             MR. NELSON:  And I mean Section 112, of

13 course.

14             MR. GLENN:  Are you referring to the --

15 pardon me just a second.

16             I just wanted to make sure I understood

17 which argument we were talking about.  I believe that's

18 an argument we're withdrawing, Your Honor.

19             THE COURT:  All right.  Motion's granted.

20             MR. NELSON:  So as to all the 112

21 arguments, Your Honor?

22             THE COURT:  Yes.

23             MR. NELSON:  Thank you.

24             They've also raised a 101 Bilski defense,

25 Your Honor, but I don't believe there's been any

**JA3365**

158

1  testimony, and the claims that are asserted are systems

2  claims anyway.  So that should not go to the jury.

3            THE COURT:  Response?

4            MR. LEVY:  Your Honor, I believe that's a

5  question of law as well, and we also have our JMOL

6  motion on that.  And the issue there is only teed up

7  that if, in fact, these claims can be read so broadly as

8  to encompass parts of computers distributed all over the

9  country or the world as long as they're interconnected,

10  then it reduces the invention here to nothing but an

11  idea of receiving messages, passing on messages, taking

12  a payment, making a change to an inventory database; and

13  that's just a concept that can't be patented.

14            And so that's -- that's the 101 issue.

15            THE COURT:  Do you agree that there's not

16  a fact issue; that's just a question of law?

17            MR. LEVY:  That is correct, Your Honor.

18            THE COURT:  All right.  The motion's

19  granted.

20            MR. NELSON:  The last on their

21  corroboration issues with respect to the JCP OOE system.

22            Much of the testimony was from the

23  witness's memory without any citation or corresponding

24  argument to support the underlying documents.

25            And also the same with the respect to the

**JA3366**

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing Opening Brief of

Defendant-Appellant Avon Products, Inc. via ECF, which will deliver to each

party's counsel as follows:

| | |
|---|---|
| Robert B. Wilson<br>Anastasia M. Fernands<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000<br>(212) 849-7100<br>robertwilson@quinnemanuel.com<br>anastasiafernands@quinnemanuel.com | David A. Nelson<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>500 West Madison Street, Suite 2450<br>Chicago, IL 60661<br>(312) 705-7465<br>(312) 705-7401<br>davenelson@quinnemanuel.com |
| *Counsel for Plaintiff-Appellee Soverain Software LLC* | |
| Robert Rhoad<br>Dechert LLP<br>902 Carnegie Center, Suite 500<br>Princeton, NJ 08540<br>(609) 955-3200<br>(609) 955-3259<br>robert.rhoad@dechert.com<br>*Counsel for Defendant-Appellant Victoria Secret Direct Brand Management, LLC* | |

This 22d day of January, 2013.

  /s/ Daryl L. Joseffer
Daryl L. Joseffer